# EXHIBIT A

# OPERATING AGREEMENT

## OF

## CARTER'S GROVE, LLC
### a Virginia limited liability company

This Operating Agreement ("Agreement") of CARTER'S GROVE, LLC, a Virginia limited liability company (the "Company"), is made as of December 12, 2007, by the undersigned, as the sole member of the Company.

### RECITALS:

A. The undersigned has caused the Company to be organized as a limited liability company under the laws of the Commonwealth of Virginia effective as of the date hereof.

B. The undersigned desires to set forth the terms and conditions on which the management, business and financial affairs of the Company shall be conducted as set forth below.

## ARTICLE I
## FORMATION AND PURPOSE

1.1 **Formation.** The undersigned, together with all persons who may be admitted as a member of the Company as provided in Article VIII hereof (each, a "Member" and collectively, the "Members"):

(a) acknowledge the formation of the Company as a limited liability company pursuant to the Virginia Limited Liability Company Act, as amended, (the "Act") by virtue of Articles of Organization filed December 11, 2007, with the Virginia State Corporation Commission;

(b) confirm and agree to their status as Members of the Company upon the terms and conditions set forth in this Agreement; and

(c) execute and adopt this Agreement as an Operating Agreement of the Company pursuant to §13.1-1023 of the Act, which is intended to be the entire agreement of the Members with respect to the matters set forth herein and supersedes any prior understanding or agreement, oral or written.

1.2 **Name.** The name of the Company shall be Carter's Grove, LLC.

1.3 **Choice of Law.** This Agreement, including all questions with respect to the rights and obligations of the parties, the construction, enforcement, and interpretation hereof and

the formation, administration, and termination of the Company, shall be governed by the Act and other applicable laws of the Commonwealth of Virginia.

1.4  **Defined Terms.**  Except when the context may otherwise require, each capitalized term used in this Agreement shall have the meaning specified in the Section where such capitalized term is defined.

1.5  **Purposes.**  The sole purpose of the Company shall be to acquire, finance, develop, improve, conserve, own and hold title to, and to lease, manage, operate, market and sell those certain parcels of real property with improvements thereon located in James City County, Virginia (collectively, the "**Properties**"), and commonly known as Carter's Grove Plantation, together with such other activities (including the sale or disposition of the Properties or any portion thereof) as may be necessary, advisable or convenient to the promotion or conduct of the business of the Company including, without limitation, the incurring of indebtedness and the granting of liens and security interests on the real and personal property of the Company to secure the payment of such indebtedness in accordance with the terms of this Agreement.

## ARTICLE II
## MEMBERS

2.1  **Members.**  The initial Member shall be the HALSEY MCLEAN MINOR REVOCABLE TRUST 11304, Halsey M. Minor, Trustee.

2.2  **Membership Interests.**  Each Member's ownership interest in the Company is hereinafter referred to generally as a "**Membership Interest**".

2.3  **Duties and Limitations.**

(a)  Except as otherwise provided herein, any Member may engage in or possess any interest in another business or venture of any nature and description, independently or with others. These ventures may compete directly with the business of the Company, and neither the Company nor any Member hereof shall have any rights in, or to, any such independent ventures or the income or profits derived therefrom.

(b)  Except as otherwise provided herein or required by law, voting power shall be vested jointly in the Members, each of whom shall be entitled to a vote equal to his or her Membership Interest. No Member, other than the Managers, shall take part in the management of the business or transact any business for the Company in their capacity as Member. Furthermore, no such Member shall have the power to sign for, or to bind, the Company; provided, however, that all Members shall have the right as provided herein to approve or consent to certain matters.

2.4  **Voting.**  The consent of the Members owning more than 50% of the Membership Interests (a "**Majority**") shall be required for the following actions:

2

(i) any action in contravention of this Agreement;

(ii) amendment of the Articles of Organization of the Company (the "**Articles**");

(iii) merger or reorganization of the Company;

(iv) request Members to make any contribution to the capital of the Company not provided for in this Agreement;

(v) lend Company funds to any person or entity;

(vi) guarantee the loan of any person or entity or offer Company assets as collateral for any such loan;

(vii) dissolution, or the taking or omission of any action which would cause the termination of the Company;

(viii) sale or transfer of all or substantially all of the Company assets outside of the ordinary course of business; and

(ix) remove the special manager named in Section 9.1(b) hereof and designate a new special manager.

## ARTICLE III
## MANAGEMENT

3.1 **Management of Operations.** Except as otherwise expressly provided in the Act, the Articles or this Agreement, the responsibility for managing the business and affairs of the Company shall be vested in a manager or managers (individually or collectively referred to herein as the "**Manager**"). Managers need not also be a Member. The Members hereby unanimously elect Halsey M. Minor and Venable Minor, Jr., as the initial Managers, who shall serve until removed by the Members or until their earlier resignation. Upon the removal or resignation of a Manager, a Majority may appoint another Manager, or allow the remaining Manager to act as sole Manager. The Managers shall, except as specifically limited in this Agreement, have the complete power and authority designated to the Managers herein to make decisions affecting the routine business and affairs of the Company for the purposes set forth in Section 1.5 hereof. The Managers agree to manage and control the affairs of the Company in good faith to the best of their ability and in accordance with this Agreement, the Act and good industry practice. Except as otherwise provided by the Act, no person dealing with the Company shall be required to inquire into the authority of any Manager to take any action or to make any decision; the Managers may expressly delegate authority to an attorney-in-fact as they see fit.

3

3.2 **Fees.** The Company may enter into agreements with the Members (including the Manager) requiring payments to such Members for services, but only with the consent of a Majority. Any such fee shall be deemed a guaranteed payment under § 707(c) of the Internal Revenue Code of 1986, as amended (the "Code").

3.3 **Limitation on Liability.** No Member shall be liable, responsible or accountable to the Company or any other Member in damages or otherwise for any acts, or for any failure to act, performed or omitted in good faith; provided, however, that a Member shall not be relieved of (1) its fiduciary obligations to any other Member and the Company imposed by law, or (2) liability for fraud, bad faith, or gross negligence.

3.4 **Reimbursement and Indemnification.** The Company shall bear all expenses incurred with respect to the organization, operation and management of the Company. A Member or Manager shall be entitled to reimbursement from the Company for direct expenses incurred by him and allocable to the organization, operation or management of the Company. The Members intend that only the assets of the Company be exposed for the liabilities of the Company pursuant to the Act. However, if a Member incurs a personal liability that did not arise from its fraud, bad faith or gross negligence, the Company and each Member in proportion to its Membership Interest shall indemnify and hold harmless such Member from, and with respect to, any such liability. The indemnification provided by this Section 3.4 shall in no event cause the Members to incur any liability to the Company beyond their total capital contributions plus their share of any undistributed profits of the Company, nor shall it result in any liability of the Members to any third party.

3.5 **Duties.** Subject to any limitations expressly set forth in this Agreement, the Manager shall perform or cause to be performed, at the Company's expense, all acts reasonably required to facilitate the acquisition, development, redevelopment, ownership, management and operation of the Properties, including (without limitation) making arrangement for loans for the business of the Company; marketing, leasing and managing the Properties; and coordinating all other management and operational functions relating to the Properties. Subject to the foregoing limitation, and without limiting the generality of the Manager's duties and responsibilities, the Manager is expressly authorized on behalf of the Company to:

   (a) conduct any activities which are normal or customary for the development of real estate similar to the Properties;

   (b) perform any and all acts necessary or appropriate for the ownership, development, operation, lease and/or sale of the Properties, including, but not limited to, marketing and selling the Properties; securing acquisition and development financing (secured by one or more deeds of trust on the Properties) to the extent that the Company's equity is insufficient for the Company's plan of development; instituting, defending and/or settling any litigation involving the Company; and establishing bank accounts in which shall be deposited all Company funds and from which payments shall be made;

4

(c) procure and maintain with responsible companies such insurance as may be available in such amounts and covering such risks as the Manager deems appropriate;

(d) execute and deliver on behalf of and in the name of the Company such deeds, deeds of trust, notes, leases, property management agreements and any and all other instruments necessary or incidental to the conduct of the Company's business;

(e) contract for and coordinate all accounting, engineering, consulting, legal and other professional or clerical functions of the Company; and

(f) file, or cause to be filed, prior to delinquency, all tax returns required to be filed by the Company pursuant to the Code, and all tax returns required in each jurisdiction in which the Company transacts business.

3.6 Removal as Manager. The Manager may be relieved of its duties and powers as Manager by written notice executed by a Majority, for cause, for gross negligence, fraud, willful intentional misconduct or material breach of this Agreement. In such event, a substitute Manager shall be elected by a Majority or else the assets of the Company shall be sold and the Company dissolved as provided in Article VII hereof.

3.7 Reliance by Other Persons. Any person dealing with the Company, other than a Member, may rely on the authority of the Manager in taking any action in the name of the Company if the Manager provides to such person a copy of the applicable provision of this Operating Agreement and, if required, the resolution or written consent of the Members granting such authority, certified in writing by such Manager to be genuine and correct and not to have been revoked, superseded or otherwise amended.

3.8 Loans to Members and Affiliates. Upon the approval of a Majority, the Manager shall have the right to make loans from the Company to Members or their affiliates on commercially-reasonable terms at prevailing rates.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS AND
## FINANCIAL OBLIGATIONS OF MEMBERS

4.1 Capital Contributions. The initial capital contributions of each of the Members shall be as set forth on Exhibit 4.1.

4.2 Capital Account Deficits. No Member shall be required to restore any deficit in its Capital Account (as such term is defined in Section 6.1 of this Agreement), although it will comply with the provisions of Section 3.4. This Agreement hereby contains a qualified income offset in accordance with regulations ("**Treasury Regulations**") under § 704(b) of the Code.

5

Case: 11-30554    Doc# 23-1    Filed: 03/03/11    Entered: 03/03/11 18:32:14    Page 6 of 8

4.3    **No Interest Upon Contributions.** No Member shall be entitled to receive interest on its capital contribution.

4.4    **Return of Capital Contributions.** No Member shall be entitled to withdraw any part of its capital contribution or its Capital Account or to receive any distribution from the Company except as specifically provided in this Agreement. Except as otherwise provided herein, no obligation exists for the Company to return to any Member or withdrawn Member any part of such Member's capital contributions so long as the Company continues in existence.

4.5    **Additional Contributions.** Except as provided in this Agreement, no Member shall be required under any circumstances to contribute any money or property to the Company. The Members acknowledge that the Manager will use its best efforts to arrange for institutional financing to cover expenses of acquiring, developing, redeveloping, owning, leasing, managing, operating and marketing the Properties not funded by the initial capital contributions of the Members. If the Company requires additional funds, the Manager may, upon receiving the Members' unanimous approval, call for the Members to make additional capital contributions in proportion to their relative interests in the Company to fund the Company's operating deficits or other expenses for which Company revenues are inadequate.

## ARTICLE V
## DISTRIBUTIONS OF CASH AND PROPERTY; INVESTMENTS

5.1    **Distribution of Net Cash Flow.**

(a)    The term **"Net Cash Flow"** for a fiscal year or other period of the Company shall mean:

(i)    All cash receipts as shown on the books of the Company (excluding, however, capital contributions from Members, net proceeds to the Company from financing or refinancing secured by the assets of the Company, and proceeds from the sale or the disposition of substantially all of the Company assets or from the winding up of the Company), reduced by (A) cash disbursements for Company purposes, including interest and principal upon loans (including loans from Members), and (B) all cash reserves reasonably set aside by the Managers to accomplish the Company purposes; plus

(ii)    Any other funds, including amounts previously set aside as for reserves now deemed available by the Manager as Net Cash Flow.

(b)    Priority of Distribution. The Net Cash Flow of the Company for a fiscal year or other period shall be paid out to the Members in accordance with their respective Membership Interests on a monthly basis or at such other intervals as a Majority shall determine.

6

Case: 11-30554   Doc# 23-1   Filed: 03/03/11   Entered: 03/03/11 18:32:14   Page 7 of 8

5.2 **Distribution of the Proceeds of Sale or Refinancing.**

(a) Sale. Upon a sale of any of the Properties or other material asset of the Company, the net proceeds of sale (in excess of any reserves the Managers determine necessary) shall be distributed to the Members in accordance with their respective Membership Interests.

(b) Refinancing. If the Managers determine that all or any part of the proceeds of financing or refinancing secured by the assets of the Company are in excess of the needs of the Company, such excess proceeds shall be distributed to the Members in accordance with, and to the extent of, their respective Membership Interests.

5.3 **Distribution of the Proceeds of Dissolution.** If the Company dissolves (and is not continued in accordance with this Agreement), then, except as otherwise provided in this Agreement, the net proceeds of dissolution, including proceeds from any accompanying sale of Company assets, shall be distributed in the following order of priority:

(a) First, towards the satisfaction of all outstanding debts and other obligations of the Company in the priority required by law (including those owing to Members); and

(b) The balance, among those Members with positive Capital Account balances, after adjustments for all distributions and allocations for all prior periods, in proportion to their respective Capital Account balances.

5.4 **Distribution of Debt Instruments.**

(a) If the Company sells any of its assets and all or a portion of the sales price is paid by a promissory note or installment contractual obligation (a "**Debt Instrument**"), all interest and principal received by the Company shall be treated as net proceeds of a sale or refinancing, or if such sale occurs in conjunction with the dissolution (without continuation) of the Company, as net proceeds of dissolution, and shall be distributed in accordance with Sections 5.2 or 5.3, as the case may be.

(b) If the Company holds a Debt Instrument as described in Section 5.4(a) and the Company either is terminated in conjunction with the sale which gave rise to such Debt Instrument or is terminated before payment in full of such Debt Instrument, the Members shall assign such Debt Instrument to a trustee or other custodian who, for a reasonable fee, shall collect all sums which may become due and payable under the Debt Instrument, who shall have the power and authority to act to enforce all rights of the holder of such Debt Instrument, and who shall distribute such sums pursuant to the procedures in Section 5.2 or 5.3, as applicable.

5.5 **Tax Distributions.** The Company shall distribute to the Members the amount necessary (as reasonably determined by the Manager) to cover the income taxes payable by the Members on income earned by the Company that is allocated and taxable to the Members assuming each Member is in the highest combined individual federal, state and local tax bracket

7

Case: 11-30554    Doc# 23-1    Filed: 03/03/11    Entered: 03/03/11 18:32:14    Page 8 of 8