Richard M. Pachulski (CA Bar No. 90073)
Debra I. Grassgreen (CA Bar No. 169978)
John W. Lucas (CA Bar No. 271038)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010
E-mail: rpachulski@pszjlaw.com
dgrassgreen@pszjlaw.com
jlucas@pszjlaw.com

Attorneys for Carter's Grove, LLC
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>**CARTER'S GROVE, LLC,**<br><br>Debtor. | Case No.: 11-30554 (TEC)<br><br>Chapter 11<br><br>**DECLARATION OF HALSEY M. MINOR IN SUPPORT OF DEBTOR'S OBJECTION TO MOTION OF COLONIAL WILLIAMSBURG FOUNDATION TO TRANSFER VENUE TO THE EASTERN DISTRICT OF VIRGINIA**<br><br>Date: April 1, 2011<br>Time: 10:00 a.m.<br>Place: U.S. Bankruptcy Court<br>      234 Pine Street, 19th Floor<br>      San Francisco, California<br>Judge: Honorable Thomas E. Carlson |

HALSEY M. MINOR, declares under penalty of perjury as follows:

I submit this declaration (the "Declaration") in support of the *Debtor's Objection to Motion of Colonial Williamsburg Foundation to Transfer Venue to the Eastern District of Virginia* (the "Objection") filed contemporaneously herewith.[1]

Except as otherwise stated, all facts contained within this Declaration are based upon personal knowledge (albeit my own or knowledge that is gathered from my review of relevant

---
[1] Capitalized terms not defined herein shall have the meanings use in the Objection.

documents, or my opinion based upon my experience concerning my business and financial affairs). If called upon to testify, I would testify to the facts set forth in this Declaration.

I have been a technology entrepreneur for approximately 20 years. During this time, I have been the head of many successful businesses and other ventures and built many relationships that are not only important to me professionally but also personally. I founded CNET in 1993 and ran CNET for 8 years during which time it became one of the internet's first companies to achieve profitability. I also developed 2 other spin-off companies which independent of CNET became public entities: Vignette Software and Snap/NBCi. I am currently investing in new companies in a broad range of fields through Minor Ventures. For instance the service Google Voice was developed by Minor Ventures and sold to Google. In addition, I co-founded and was the largest financial investor and second largest shareholder in Salesforce.com, one of the most successful technology companies of the decade and a pioneer in "cloud computing."

Carter's Grove Plantation ("Carter's Grove") is a historic plantation located on the north shore of the James River in the Grove Community of southeastern James City County in the Virginia Peninsula area of the Hampton Roads region of Virginia. As a passionate historic preservationist, I acquired the Georgian style mansion and 476 acres for $15.3 million in December 2007 with the intent of restoring it consistent with its original design.

I initially purchased Carter's Grove through the Halsey McLean Minor Revocable Trust 11304 (the "Trust"). I am the trustee and sole beneficiary of the Trust. A true and correct copy of the Trust is annexed to this Declaration as **Exhibit A**. The Trust was initially formed on or around November 3, 2004 in San Francisco, California pursuant to the laws of the state of California. In connection with the purchase of Carter's Grove by the Trust, in my sole capacity as trustee of the Trust, I caused the Trust to assign its interest in Carter's Grove to Carter's Grove, LLC (the "Debtor").

I formed the Debtor entity on December 10, 2007 to hold title to Carter's Grove. The Debtor is not a commercial enterprise. It operates no business. The Debtor's ability to pay its obligations is entirely dependent on my personal financial situation and all the decisions regarding the property have always been made by me, from my offices in San Francisco.

Case: 11-30554 Doc# 33-1 Filed: 03/23/11 Entered: 03/23/11 16:17:48 Page 2 of 9
55801-002\DOCS_SF:76264.9

I have been a resident of San Francisco since 1994 (with the exception of 18 months during 2002 and 2003). Since 2005, I have conducted all of my various business ventures out of my Minor Venture's office located on 50 Fremont Street, San Francisco, California. These offices were moved to 199 Fremont, San Francisco California in June 2007. In April 2010 I relocated my office to my home in San Francisco, California (which is also an historically significant property that is on the National Historical Registry as is Carter's Grove).

At all times during the negotiation of the purchase of Carter's Grove and to date, I have controlled, directed, and coordinated the preservation, anticipated renovation and maintenance of Carter's Grove from my offices in San Francisco, California. The financial records regarding Carter's Grove are located in San Francisco. All decisions regarding capital expenditures and equity infusions from my home office in San Francisco, California and implemented by employees in San Francisco.

CWF was well aware that it was doing business with me in California. Among other things, the various transaction documents relating to the purchase, sale, lease, and use of Carter's Grove between the Debtor and CWF reflect that I conducted my management duties and operation of Carter's Grove from San Francisco, California.

The Debtor's Articles of Organization, dated December 10, 2007 (the "Articles") reflect that the "address of the principal office where the records will be maintained pursuant to Va. Code § 13.1-1028 is c/o Minor Ventures, 199 Fremont Street, 12th Floor, San Francisco, California 94105. A true and correct copy of the Articles is annexed to this Declaration as **Exhibit B**.

The deed (the "Carter's Grove Deed") pursuant to which CWF transferred its interest in Carter's Grove to the Trust demonstrates that the management of the Debtor would take place in San Francisco, California. A true and correct copy of the Carter's Grove Deed is annexed to this Declaration as **Exhibit C**. The very first paragraph of the Carter's Grove Deed states that

> **THIS DEED**, made this 17th day of December, 2007, by and between **THE COLONIAL WILLIAMSBURG FOUNDATION**, a Virginia non-stock, non-profit corporation (successor in interest to **COLONIAL WILLIAMSBURG, INCORPORATED**), ("Grantor"), and **CARTER'S GROVE, LLC**, a Virginia limited liability company ("Grantee") whose address is c/o Minor Ventures, 199 Fremont Street, 12th Floor, San Francisco, California 94105.

Carter's Grove Deed, pg. 1 (emphasis in original).

Similarly, the notice address under the following documents all used my San Francisco, California office location: (i) CWF Deed of Trust (annexed hereto as **Exhibit D**), (ii) the Note relating to the Debtor's payment obligations to CWF (annexed hereto as **Exhibit E**), (iii) the Deed of Lease, dated December 17, 2007, between the Debtor and CWF with respect to the Museum (annexed hereto as **Exhibit F**), (iv) the Deed of Lease, dated December 17, 2007, between the Debtor and CWF with respect to the Pasture (annexed hereto as **Exhibit G**), (v) the Archaeological Agreement, dated December 17, 2007, between the Debtor and CWF (annexed hereto as **Exhibit H**), and (vi) the Maintenance Agreement, dated December 17, 2007, between the Debtor and CWF (annexed hereto as **Exhibit I**).

While the operating agreement of the Debtor, dated December 12, 2007 (the "Operating Agreement"), designates 1340 Stony Point Road, Charlottesville, Virginia as the Debtor's principal place of business, it should be noted that this was the address used by a person that administered the payment of bills and other ministerial services for Carter's Grove and my other business ventures in Virginia. This individual ceased working for me well over a year prior to the commencement of the Debtor's case. My actual accountants that I used for Carter's Grove and my other business ventures are located in California.

In any event, the principal place of business provision in the Operating Agreement does not restrict the Debtor from changing the principal place of business. In fact, section 9.1(a) of the operating agreement provides that the Debtor "may relocate the principle place of business and principal office and have such additional offices as the Manager (myself) may deem advisable. A true and correct copy of the Operating Agreement is annexed to this Declaration as **Exhibit J**.

CWF's Press Release regarding the sale of Carter's Grove also reflects that I would oversee the preservation and management of Carter's Grove. A true and correct copy of the Press Release is annexed to this Declaration as **Exhibit K**. In the Press Release, I am described as the purchaser, not the Debtor. In addition, in the Press Release, CWF acknowledges that I will oversee and make the day to day decisions regarding Carter's Grove since it is I that "will protect the property for the long term . . . [and] will be a fine steward of the Carter's Grove."

*Assets*

In October 2009, and after the onset of the recession that began in August 2008, I obtained an appraisal (the "Appraisal") of Carter's Grove to determine whether any equity financing would be available to me. The relevant pages of the Appraisal are annexed to this Declaration as **Exhibit L**. A the time of the Appraisal, it shows that Carter's Grove is worth no less than $21,000,000. It should be noted that the appraisal does not include approximately 76 acres of developable land that owned by the Debtor. Accordingly, I believe that the value of Carter's Grove is greater than $21,000,000 and still exceeds by a substantial amount the $12.5 million in claims asserted against the Debtor.

*First Deed of Trust*

The Debtor purchased Carter's Grove for $[15.3] million and paid CWF all but $3.4 million (the last two payments). In December 2007, the Debtor (through myself) executed the Note for the benefit of CWF promising to pay $10,300,000 in exchange for the purchase of Carter's Grove. A true and correct copy of the Note is annexed to this Declaration as **Exhibit E**. The Note requires the Debtor to make six (6) installment payments beginning July 15, 2008 each in the approximate amount of $1.7 million. Each subsequent installment payment was due every six months thereafter until the Note was paid in full. The Debtor's repayment obligations under the Note are secured by a first priority deed of trust, dated December 17, 2007 (the "CWF Deed of Trust") and my personal guaranty. The Note also contains a provision providing for the confession of judgment upon default. The Note confession of judgment could have been enforced in Williamsburg, Virginia, but CWF did not take any action to enforce the confession of judgment prior to the commencement of the Debtor's case.

As of the Petition Date, the Debtor had not made the last two installment payments due (July 15, 2010 and January 15, 2011) under the Note. These payments were not made because I have been experiencing severe liquidity problems that have prevented me from making these last two payments. The missed payments were the result of Sotheby's Inc. ("Sotheby's") execution on a judgment obtained in litigation in the Southern District of New York. Currently, I estimate that the claims asserted by CWF under the Note are approximately $4,000,000. I believe the Debtor

may have defenses to these claims or affirmative claims against CWF relating to failure to disclose or potential active concealment of conditions on the property of Carter's Grove. I am investigating these claims and defenses.

*Second Deed of Trust/AVN Air, LLC Guaranty*

In my sole capacity as trustee for the Trust, I caused the Trust to enter into a lease, dated May 22, 2005 (the "AVN Lease"), with AVN Air, LLC ("AVN") for a certain aircraft. In or around February 2010, after executing the AVN Lease, AVN and myself restructured the obligations under the AVN Lease by entering into various forbearance and guaranty agreements. AVN was represented in the February 2010 restructuring and continues to be represented by Davis, Wright and Tremaine in San Francisco. To secure the payment obligations under these agreements, I caused the Debtor to guarantee the obligations of AVN in the amount of $5,000,000 and agreed to execute a second priority deed of trust, dated February 1, 2010 (the "AVN Deed of Trust"), having a limitation of liability of $5,000,000.

*Third Deed of Trust/Sotheby's Guaranty*

Prior to the Petition Date, Sotheby's obtained a judgment against me arising from my purchase of art from Sotheby's. I satisfied the initial judgment through a payment of over $6 million to Sotheby's and appealed that judgment. Thereafter, in November 2010, Sotheby's obtained a judgment for attorneys' fees (the "Fee Judgment"). Sotheby's subsequently executed on the Fee Judgment and obtained a liens and retraining notices against my various art, furniture, and design property (the "Property"). Sotheby's also levied upon my cash and a receivable due to me (approximately $1.3 million) from the sale of other art. From early November 2010, through the Petition Date, my assets were completely frozen.

On or around February 14, 2011, Sotheby's and I entered into a settlement agreement (the "Sotheby's Settlement Agreement") regarding the Fee Judgment and the appeal of the prior judgment. In connection therewith, I agreed to (i) withdraw the appeal, (ii) permit Sotheby's to sell the Property and use the sale proceeds to pay secured tax claims and to satisfy the $3.4 million Fee Judgment, and (iii) cause the Debtor execute a third priority deed of trust against Carter's Grove (the "Sotheby's Deed of Trust"), to secure my payment of the Fee Judgment. The Property is

scheduled for auction by Sotheby's in the Fall. In exchange, I was released and the release of the $1.3 million created short term liquidity which will enable me to pay my ordinary course personal and business expenses and to restructure my other debts.

*Tax Claims*

James City County has a lien against Carter's Grove arising from the Debtor's obligation to pay certain property taxes. The property taxes were assessed on June 5, 2010 and December 6, 2010. As of the Petition Date, the Debtor estimates that the James City County is owed approximately $22,000. The tax claims represent less than 0.25% of the total claims asserted against the Debtor.

*Trade Debt*

Of the ten (10) general unsecured creditors listed in the Debtor's schedules of assets and liabilities (the "Schedules"),[2] seven (7) are utilities, two (2) are insurance related, and one (1) relates to services provided to Carter's Grove. In the aggregate, the trade creditors assert general unsecured claims directly against the Debtor in the approximate amount of $53,400. The general unsecured claims asserted against the Debtor are *de minimis*. These claims represent approximately less than 0.5% of the total claims asserted against the Debtor. Given the value Carter's Grove, I believe that all creditors, including the *de minimis* trade debt, will be satisfied in full because the Debtor's equity in the property exceeds the value of the secured claims by a substantial amount.

*Summary and Geographic Distribution of Debt*

As noted above, there are approximately $12.4 million in secured claims and $53,400 in general unsecured claims asserted against the Debtor's estate. The amount outstanding under the CWF Deed of Trust is approximately $4 million and held by CWF located in Williamsburg, Virginia. The amount of the AVN Deed of Trust is approximately $5 million and held by AVN who is located in Irvine, California and has counsel located in San Francisco, California. The amount outstanding under the Sotheby's Deed of Trust is approximately $3.4 million and held by

---

[2] Based on further review of the Debtor's records and discussions with the Office of the United States Trustee, including at the March 22, 2011 section 341 meeting, I intend to cause the Debtor to amend the Schedules. The amendments do not change the creditor composition.

Sotheby's, Inc. who is located in New York, New York. Both Sotheby's and AVN have San Francisco based counsel.

The geographic distribution of the asserted secured debt reflects that 40% of such amount is held by creditors in California, 27% in New York (with counsel located in California), and 32% in Virginia. Accordingly, approximately 67% of the claims asserted against the Debtor is held by creditors located in or represented by counsel in California. As noted above, nearly all of the trade or unsecured debt is held by various utility providers and are located in the region near Carter's Grove. However, such unsecured debt represents less than 0.5% of the total debt asserted against the Debtor.

*Restructuring Efforts*

The commencement of the Debtor's chapter 11 case was precipitated by my individual liquidity problems. The Debtor does not operate or generate any revenue. As a result, all of the expenses of maintaining and preserving Carter's Grove are funded by me. When my assets were frozen, I could not fund the payments to CWF and CWF initiated foreclosure proceedings. The foreclosure sale was noticed on a very short timetable –approximately two weeks- and this case was filed just prior to the scheduled sale to preserve the substantial equity in Carter's Grove.

I have substantial other assets which, while currently illiquid, will be available to satisfy the claims of creditors. I believe this case should move rapidly and given the substantial equity cushion, the restructuring of any remaining secured debt should be consensual. However, absent a consensual restructuring, I intend to very quickly propose a plan that will pay all allowed claims in full.

*Minor Family Hotels, LLC Bankruptcy Case*

In September 2010, Minor Family Hotels, LLC ("MFH") commenced a chapter 11 case in the Bankruptcy Court for the Western District of Virginia. Prior to the commencement of MFH's chapter 11 case, MFH commenced actions against the developer of MFH's property and the developer's principal, the bank that committed to certain financing within the Western District of Virginia. Subsequently, the general contractor filed an action against MFH and me, and we filed

counterclaims. While all of these lawsuits were pending in Virginia, MFH's lender commenced an action in Georgia against MFH.

With the advice of counsel, I determined that, due to these numerous and protracted litigations, it was appropriate to commence MFH's chapter 11 case in the Western District of Virginia. Unlike the Debtor's case, MFH's case was strongly tied to the development of the assets held by MFH and the financing that was crucial to the development of such assets. After commencing MFH's chapter 11 case, MFH removed these various litigations to the bankruptcy court and attempted to consolidate them. However, the bankruptcy court refused to consolidate the litigations and instead transferred the actions to the Georgia court that was presiding over the case commenced by MFH's lender. The bankruptcy court transferred the removed cases to Georgia even though MFH's assets were located within the Western District of Virginia. Here, by contrast, the Debtor's chapter 11 case was caused by my liquidity problems, and not by problems associated with the assets of the Debtor.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 23, 2011
Los Angeles, California

_____
Halsey M. Minor