PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# **EXHIBIT G**

(Deed of Lease - Pasture)

DEED OF LEASE
(PASTURE)

BETWEEN

CARTER'S GROVE, LLC,
a Virginia limited liability company

AS LANDLORD

And

THE COLONIAL WILLIAMSBURG FOUNDATION,
a Virginia non-stock corporation

AS TENANT

# DEED OF LEASE

## TABLE OF CONTENTS

**DESCRIPTION**                                                                                                    **PAGE**

Section 1.  Premises ............................................................................................................................1

Section 2.  Term.................................................................................................................................1

Section 3.  Rent .................................................................................................................................2

Section 4.  Place of Payment .............................................................................................................2

Section 5.  Use of Premises ...............................................................................................................2

Section 6.  Utility Expenses; Real Estate Taxes ................................................................................2

Section 7.  Utilities and Services .......................................................................................................3

Section 8.  Improvements, Repairs, Additions, Replacements...........................................................3

Section 9.  Covenant Against Liens ...................................................................................................3

Section 10.  Access to Premises .........................................................................................................3

Section 11.  Assignment and Subletting..............................................................................................3

Section 12.  Indemnity ........................................................................................................................3

Section 13.  Insurance .........................................................................................................................4

Section 14.  Damage or Destruction ...................................................................................................5

Section 15.  Eminent Domain..............................................................................................................5

Section 16.  Utilities ...........................................................................................................................5

Section 17.  Mortgage .........................................................................................................................5

Section 18.  Quiet Enjoyment; Status of Landlord's Title ...................................................................5

Section 19.  Defaults ...........................................................................................................................6

Section 20.  Waivers ...........................................................................................................................6

Section 21.  Attorney's Fees ...............................................................................................................6

Section 22.  No Broker........................................................................................................................7

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 3 of 51

Section 23.  Force Majeure ...................................................................................................7

Section 24.  Notices ...........................................................................................................7

Section 25.  Estoppel Certificates .........................................................................................7

Section 26.  Governing Law ..................................................................................................8

Section 27.  Partial Invalidity ...............................................................................................8

Section 28.  Interpretation ....................................................................................................8

Section 29.  Entire Agreement ..............................................................................................8

Section 30.  Parties .............................................................................................................8

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 4 of 51

## DEED OF LEASE (PASTURE)

THIS DEED OF LEASE ("Lease") dated as of the 17th day of December, 2007, by and between **CARTER'S GROVE, LLC**, a Virginia limited liability company, ("Landlord"), and **THE COLONIAL WILLIAMSBURG FOUNDATION**, a Virginia non-stock corporation ("Tenant").

## W I T N E S S E T H:

In consideration of Ten Dollars ($10.00) cash in hand paid, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Landlord and Tenant hereby agree as follows:

Section 1.  Premises:  Landlord hereby leases to Tenant, and Tenant hereby takes from Landlord, upon and subject to the terms, conditions, covenants and provisions herein, a parcel of land containing approximately forty-seven (47) acres of pastureland (the "Land"), which Land is located on U.S. Route 60, six (6) miles east of Williamsburg, Virginia, in the County of James City, Virginia, and is more particularly designated as "Leased Pastureland" on Exhibit A attached hereto and incorporated herein by reference; TOGETHER WITH: (i) any and all buildings, improvements, structures, driveways, and trails located on the Land including, but not limited to, the stables and hay shed located on the Land (the "Improvements"); (ii) any and all utility systems necessary for use and maintenance of the Land, including but not limited to the septic systems, electrical systems, and water systems currently serving the Land; and (iii) any and all appurtenances, rights, privileges and easements benefiting, belonging or pertaining to the Land or necessary for use and maintenance of the Land (the "Easements") (all the foregoing Land, Improvements and Easements are hereinafter collectively referred to as the "Premises").  Tenant owns the harness racks, security control panels, repeater and antennae in the modern stable located on the Land, and the head gates and round pen located on the Land, all of which items shall be removed by Tenant not later than upon expiration or earlier termination of this Lease.

Section 2.  Term:

(a)  The term ("Term") of this Lease shall commence on the date (the "Commencement Date") on which a fully executed original of this Lease has been delivered to Tenant.  Landlord shall deliver to Tenant full and exclusive possession of the Land and Improvements, AS-IS, on or as of the Commencement Date. As provided in Section 3 below, rent shall commence to accrue on the Commencement Date.

(b) The term (the "Initial Term") of this Lease shall be for the period beginning on the Commencement Date and terminating on the last day of the twelfth (12th) full month thereafter unless sooner terminated or extended as herein provided.  The term "Lease Year" means each successive twelve (12)-month period during the term of the Lease, except that the first Lease Year shall commence on the Commencement Date and end on the last day of the twelfth full month thereafter unless the Commencement Date is the first day of a month, in which case the first Lease Year shall end on the day preceding the first anniversary of the Commencement Date.

(c)  If mutually agreed upon by Landlord and Tenant prior to the expiration of the Initial Term, this Lease may be renewed on a month-to-month basis (each month term shall be a "Renewal Term") (the Initial Term and any Renewal Term shall be collectively referred to as the "Term").  Each Renewal Term

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 5 of 51

shall be subject to the same terms (except the base rent shall be Ten Dollars ($10.00) for each Renewal Term) and conditions set forth in this Lease.

(d) References in this Lease to the "expiration" of the Lease term shall include "termination" and vice-versa, unless the context otherwise clearly requires.

(e) Notwithstanding any provision to the contrary contained herein, Tenant may upon thirty (30) days prior written notice to Landlord terminate this Lease at any time and for any reason without penalty or further liability.

Section 3. Rent:

(a) Tenant covenants and agrees to pay Landlord for the Premises, without offset or deduction, and without previous demand therefor, base rent at the rate of $120 for the Initial Term, payable on the Commencement Date.

(b) As used herein, the term "rent" shall be deemed to include the base rent payable by Tenant to Landlord hereunder, and all payments required to be made by Tenant to Landlord hereunder.

Section 4. Place of Payment: All amounts payable under Section 3 of this Lease, as well as all other amounts payable by Tenant to Landlord under the terms of this Lease, shall be paid to Landlord c/o Minor Ventures, 199 Fremont Street, 12th Floor, San Francisco, CA 94105 or at such other place as Landlord may from time to time designate by written notice to Tenant, in lawful money of the United States which shall be legal tender for the payment of all debts and dues, public and private, at the time of payment.

Section 5. Use of Premises:

(a) The Premises may only be used to carry on operations associated with Tenant's Rare Breeds and coach and livestock programs, including, but not limited to, coach-and-livestock training, animal husbandry, transporting livestock by trailer, mowing, fence maintenance, grazing and any and all ancillary operations necessary for the care and maintenance of livestock (the "Specified Uses").

(b) It is expressly understood and agreed that nothing in this Lease shall require that (1) except as may be expressly provided in this Lease, any improvements located on the Premises as of the Commencement Date be demolished, removed or altered by Tenant; (2) any building or improvements be constructed upon the Premises; or (3) all or any part of the Premises or any building or improvements thereon to be occupied or otherwise utilized at any time during the term hereof.

Section 6. Utility Expenses; Real Estate Taxes:

(a) During the term of this Lease, Tenant shall also pay and discharge punctually, as and when the same shall become due and payable, all charges for water and electricity and other utility services furnished to the Land and/or Improvements or the occupants thereof during the term of this Lease.

(b) Landlord shall be responsible for payment of all real estate taxes and assessments assessed or levied against the Premises through the term of this Lease.

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 6 of 51

Section 7.  Utilities and Services:  Landlord agrees to fully cooperate with Tenant (at no cost or expense to Landlord) to ensure that the Premises remains connected and continues to receive all necessary utility services, and Landlord agrees not to take any action to interrupt or interfere with utility service to the Premises.  Landlord further covenants and agrees that Tenant may take such steps as may be reasonably necessary to ensure the Premises shall be connected, at all times during the term of this Lease, with all necessary public or private utility lines and the municipal water system so long as the same is at no cost or expense to Landlord and does not diminish the value of the Premises.

Section 8.  Improvements, Repairs, Additions, Replacements:  Tenant shall at its own cost and expense maintain the Land and shall maintain and repair all Improvements construed or existing on the Land in good condition and repair.  Tenant shall maintain all landscaping in accordance with the use of the Premises, and shall keep the Land free of trash and other debris.

Section 9.  Covenant Against Liens:  If, because of any work performed upon the Premises by or on behalf of Tenant, any mechanic's lien or other lien shall be filed against Landlord or any portion of the Premises, Tenant shall, at its own cost and expense, cause the same to be discharged of record or (in the case of mechanic's liens) bonded within sixty (60) days after written notice from Landlord to Tenant of the filing thereof.

Section 10.  Access to Premises:  During the term of this Lease, Landlord or Landlord's authorized agents shall have the right, after giving Tenant reasonable advance notice, to enter upon the Premises at reasonable times to examine the same provided such entry shall not unreasonably interfere with the activities then being conducted on the Premises.  Such entry shall be during regular business hours except in the event of an emergency, in which event entry may be at any time.

Section 11.  Assignment and Subletting:  Tenant may not assign this Lease or sublet all or portions of the Premises, without Landlord's prior written consent.

Section 12.  Indemnity:

(a)  Tenant shall, unless released under the provisions of subsection 12(d) below hereof, defend, save harmless, protect and indemnify Landlord from and against any and all losses, liabilities, direct damages, claims, suits, demands, actions, judgments, costs and expenses (including reasonable attorney's fees), relating to any injury to, or death of, any person or persons, or any damage to any property (collectively all of the foregoing are referred to as "Damages"), occurring on or about the Land during the term of this Lease (except to the extent that such injury, death or damage shall be caused by the negligent or willful acts or omissions of Landlord or its agents, servants, employees, guests or contractors), and arising from, growing out of, or being attributable to, any willful or negligent, act or default of Tenant or its subtenants, agents, servants, employees, guests or contractors.  Tenant shall, at its own cost and expense, defend any and all suits or actions which may be brought against Landlord or in which Landlord may be impleaded with others upon any such above-mentioned matter.  Landlord shall be entitled to retain, at its own cost and expense, separate counsel to defend Landlord in any such suits or actions.  Regardless of whether Landlord retains separate counsel or not, Landlord shall not settle, stipulate or otherwise agree to be liable for any claim, by agreement or otherwise, without the prior written approval of Tenant.  Any such unapproved settlement of a claim shall operate to release Tenant fully, unconditionally and absolutely from the indemnity set forth in this Section 12(a) with respect to that claim.

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 7 of 51

(b)  Landlord shall, unless released under the provisions of subsection 12(d) below hereof, defend, save harmless, protect and indemnify Tenant from and against any and all Damages which may arise from, grow out of or be attributable to, any willful act or negligence of Landlord or its agents, servants, employees, guests or contractors. Landlord shall, at its own cost and expense, defend any and all suits or actions which may be brought against Tenant or in which Tenant may be impleaded with others upon any such above-mentioned matter.  Tenant shall not settle, stipulate or otherwise agree to be liable for any claim, by agreement or otherwise, without the prior written approval of Landlord.  Any such unapproved settlement of a claim shall operate to release Landlord fully, unconditionally and absolutely from the indemnity set forth in this Section 12(b) with respect to that claim.

(c)  The indemnification obligations of Landlord and Tenant under this Section 12 relating to claims or liabilities which occur, arise and/or accrue during the Lease term shall survive the expiration or earlier termination of this Lease.

(d)  Landlord and Tenant mutually release and discharge each other (as well as the officers, directors, members, partners, agents and employees of each other) from responsibility and liability (by way of subrogation or otherwise) for loss or damage to any building, structure or other property (real or personal) of the other party, or any resulting loss of income, that is an insured loss under the terms of the insurance policy(ies) of the releasing party or that involves a fire, casualty or other risk or loss required to be insured (or self-insured) against under this Lease or could be covered by a "special form" insurance policy.  This release and discharge shall be applicable even though such loss or damage may have been caused by the negligence of the party hereby released, but shall not be applicable to the extent of any deductible under the insured's applicable policy.  Landlord and Tenant agree to include a waiver of subrogation endorsement or provision in each of their respective casualty insurance policies or a provision permitting the insured to prospectively waive claims.

Section 13.  Insurance:

(a)  Commencing as of the Commencement Date, Tenant shall maintain with respect to the Premises Commercial General Liability insurance in combination with Umbrella/Excess Liability Coverage with limits of not less than Two Million Dollars ($2,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate, insuring Landlord as an additional insured, Tenant and any designee of Tenant having an interest in the Premises, against the matters indemnified against by Tenant pursuant to the preceding Section; provided, however, that Tenant's obligation to maintain the insurance required hereunder shall always be subject to the availability of such insurance in the required amounts.

(b)  During the term of this Lease from and after the Commencement Date, Tenant shall keep all buildings and improvements located on or erected on the Premises at any time  insured for the benefit of Tenant against loss or damage by fire, and those casualties covered by so-called Special Causes of Loss policies, in a minimum amount no less than the replacement value; provided, however, that (1) Tenant's obligations to maintain any of the insurance required hereunder shall always be subject to the availability of the required insurance in the required amounts; and (2) Tenant may maintain its usual deductibles on such insurance.  All proceeds payable at any time and from time to time by any insurance company under such policies shall be payable to and shall be the absolute property of Tenant, and Landlord shall not be entitled to, and shall have no interest in, the proceeds of such insurance or any part thereof, except to the extent that such insurance proceeds relate to Tenant's obligations with respect to demolition of improvements as set forth in this Lease, and then only in the event that Tenant fails to comply with such obligations.

Case: 11-30554     Doc# 33-3     Filed: 03/23/11     Entered: 03/23/11 16:17:48     Page 8 of 51

Landlord shall, at Tenant's cost and expense, cooperate fully with Tenant in order to obtain the largest possible recovery and shall execute any and all consents and other instruments and take all other actions necessary or desirable in order to effectuate the same and to cause such proceeds to be paid as hereinbefore provided and Landlord shall not carry any insurance concurrent in coverage and contributing in the event of loss with any insurance required to be furnished by Tenant hereunder if the effect of such separate insurance would be to reduce the protection or the payment to be made under Tenant's insurance.

(c)  All policies of insurance to be maintained under this Lease shall be issued by responsible companies licensed to do business in the Commonwealth of Virginia and rated at least A or higher by A.M. Best (or future comparable rating).

Section 14.  Damage or Destruction:  In the event that, at any time during the term of this Lease, any one or more of the buildings on the Premises shall be destroyed or damaged in whole or in part by fire or other cause, Tenant shall within a reasonable time, at its own cost and expense, either repair said damaged buildings to complete architectural units, or demolish and remove said damaged buildings from the Premises, fill any excavations with suitable, compact clean fill, remove all rubble and grade and seed the site.  Tenant shall not be entitled to any suspension or abatement of rent by reason of any such destruction or damage to the buildings and improvements upon the Premises.  Tenant's obligations under this Section 14 shall survive the expiration or earlier termination of this Lease.

Section 15.  Eminent Domain:  If at any time during the Term there shall be a taking (or conveyance pursuant to threat of taking) of any part of the Premises by eminent domain, then the Premises shall be reduced in proportion to the amount so taken or conveyed, unless the amount taken or conveyed shall be so great that it would be impractical, in Tenant's reasonable opinion, for Tenant to continue operation, in which event this Lease shall be canceled and terminated as of the date the governmental authority commences its use of such taking.   All compensation awarded for any taking of the Land and Improvements shall belong solely to and be the property of Landlord; provided, however, that Tenant shall have the right to make its own claim for any separate condemnation award that may be made for loss Tenant may sustain in the removal of its trade fixtures, equipment and furnishings.  Unless this Lease is terminated as aforesaid, any such taking (or any conveyance pursuant to the threat thereof) shall have no effect on any rent payable under the Lease or other charges payable as rent, security charges and taxes, nor shall any rent or related charges be reduced thereby.

Section 16.  Utilities :  Landlord shall ensure that gas, electricity, telephone, water and sewer serve the buildings and improvements on the Land, provided that Tenant shall pay the bills for the utility services used by Tenant.

Section 17.  Mortgage:  Landlord hereby covenants and agrees that during the term of this Lease, if there are any mortgages or deeds of trust encumbering the Premises which are not subject and subordinate to this Lease and the rights of Tenant hereunder in all respects, then Landlord shall cause such holders of said mortgage(s) or deed(s) of trust to enter into a non-disturbance agreement with Tenant in form and substance reasonably acceptable to Tenant.

Section 18.  Quiet Enjoyment; Status of Landlord's Title:  Tenant, upon paying the rent and additional rent and all other sums and charges to be paid by it as herein provided, and observing and keeping all covenants, warranties, agreements and conditions of this Lease on its part to be kept, shall quietly have

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 9 of 51

and enjoy the Premises during the term of this Lease, without hindrance or molestation by anyone claiming by, through, or under Landlord.

Section 19.  Defaults:

(a)  The following events shall constitute events of default under this Lease:

(i)  Tenant's failure to pay any installment of rent when the same shall be due and payable and the continuance of such failure for a period of thirty (30) days after receipt by Tenant of notice in writing from Landlord specifying the nature of such failure; or

(ii)  Tenant's failure to perform any of the other covenants, conditions and agreements herein contained on Tenant's part to be kept or performed and the continuance of such failure without the curing of same for a period of sixty (60) days after receipt by Tenant of notice in writing from Landlord specifying the nature of such failure, provided, however, said default is of such a nature that it cannot be cured within such sixty (60)-day period then such default shall not be deemed to continue so long as Tenant, after receiving such notice, promptly proceeds to cure the default and continues to take all steps necessary to complete the same promptly.  No default shall be deemed to continue if and so long as Tenant shall be delayed in or prevented from curing the same by any cause specified in the Section of this Lease entitled "Force Majeure".

(b)  Upon the occurrence of an event of default and the failure of Tenant to cure the same within the cure period specified, Landlord may give to Tenant a notice of election to end the term of this Lease upon a date specified in such notice, which date shall be not less than sixty (60) days (Saturdays, Sundays and legal holidays excluded) after the date of receipt by Tenant of such notice from Landlord, and upon the date specified in said notice, and provided such event of default has not been cured, the term and estate hereby vested in Tenant shall cease and any and all other right, title and interest of Tenant hereunder shall likewise cease without further notice or lapse of time, as fully and with like effect as if the entire term of this Lease had elapsed; provided however, nothing herein shall limit the remedies available to Landlord under the laws of the Commonwealth of Virginia.

(c)  Upon any termination of the term of this Lease pursuant to Section 19(b), or at any time thereafter, Landlord may, in addition to and without prejudice to any other rights and remedies Landlord shall have at law or in equity, re-enter the Premises and recover possession thereof and dispossess any or all occupants of the Premises in the manner prescribed by the statute relating to summary proceedings, or similar statutes.

Section 20.  Waivers:  Failure of Landlord or Tenant to complain of any act or omission on the part of the other party no matter how long the same may continue, shall not be deemed to be a waiver by said party of any of its rights hereunder.  No waiver by Landlord or Tenant at any time, express or implied, of any breach of any provision of this Lease shall be deemed a waiver of a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision.

Section 21.  Attorney's Fees:  Should either party institute any legal proceedings against the other party for breach of any provision herein contained, and should one of the parties prevail in such action, the non-prevailing party shall in addition be liable for the costs and expenses of the prevailing party, including its reasonable attorneys' fees (at all tribunal levels).

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 10 of 51

<u>Section 22.</u>  <u>No Broker</u>:   Landlord and Tenant agree that no brokers have been involved in this lease transaction.  Landlord and Tenant each agrees to hold and indemnify the other harmless from and against any losses, damages, costs or expenses (including reasonable attorneys' fee) that either party may suffer as a result of claims made or suits brought by any broker in connection with this transaction, the obligated party hereunder to be the party whose conduct gives rise to such claim.  The provisions of this Section shall survive any termination of this Lease.

<u>Section 23.</u>  <u>Force Majeure</u>:   In the event that Landlord or Tenant shall be delayed, hindered in or prevented from the performance of any act required hereunder by reason of or resulting from an act of God, strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war or any reason beyond their control, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.  Lack of funds shall not be a basis for avoidance or delay of any obligation under this Lease.

<u>Section 24.</u>  <u>Notices</u>:   Every notice, approval, consent, or other communication authorized or required by this Lease shall not be effective unless same shall be in writing and delivered in person, by courier, by reputable overnight courier guaranteeing next day delivery, or sent postage prepaid by United States registered or certified mail, return receipt requested, directed to the other party at its address shown below, or such other address as either party may designate by notice given from time to time in accordance with this Section.  Such notices or other communications shall be effective when received or refused by the party to whom such notice is addressed.  Any such notice or other communication which requires or anticipates a response by the receiving party within a certain period or prior to a certain date shall be deemed to have been given to the receiving party when received or refused by the party to whom such notice or other communication is addressed.  The rent payable by Tenant hereunder shall be paid to Landlord at the same place where a notice to Landlord is herein required to be directed or as may be otherwise directed by Landlord.  The address for notices for each party is as follows:

Landlord:

     c/o Minor Ventures
     199 Fremont Street, 12th Floor
     San Francisco, CA 94105

Tenant:

     The Colonial Williamsburg Foundation
     P. O. Box 1776
     Williamsburg, VA 23187-1776
     Attention: General Counsel

<u>Section 25.</u>  <u>Estoppel Certificates</u>:   Either party shall, without charge, at any time and from time to time hereafter, within fourteen (14) days after written request of the other, certify by written instrument duly executed and acknowledged to the requesting party or any other person, firm or corporation specified in such request:  (i) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (ii) as to the validity and force and effect of this Lease, in accordance with its tenor as then constituted; (iii) as to the existence of any default under this Lease; (iv) as

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 11 of 51

to the existence of any offsets, counterclaims or defenses thereto on the part of such other party; (v) as to the commencement and expiration dates of the term of this Lease; and (vi) as to any other matters as may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any other person, firm or corporation to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

Section 26. Governing Law: This Lease and the performance thereof shall be governed, interpreted, construed and regulated by the laws of the Commonwealth of Virginia.

Section 27. Partial Invalidity: If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, at any time or to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

Section 28. Interpretation: Wherever herein the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require. The section headings used herein are for reference and convenience only, and shall not enter into the interpretation hereof. This Lease may be executed in several counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument. The term "Landlord" whenever used herein shall mean only the owner at the time of Landlord's interest herein, and upon any sale or assignment of the interest of Landlord, its successors in interest and/or assigns shall, during the term of its ownership of its estate herein, be deemed to be Landlord.

Section 29. Entire Agreement: No oral statement or prior written matter shall have any force or effect. Landlord and Tenant agree that they are not relying on any representations or agreements other than those contained in this Lease. This Lease shall not be modified except by writing executed by Landlord and Tenant.

Section 30. Parties: Except as herein otherwise expressly provided, the covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, successors, successors in title, administrators and assigns.


IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first above written.


[Signatures on following pages]

Case: 11-30554     Doc# 33-3     Filed: 03/23/11     Entered: 03/23/11 16:17:48     Page 12 of 51

**LANDLORD:**

**CARTER'S GROVE, LLC**

a Virginia limited liability company

By: _____

Name: Halsey M. Minor

Its: Manager

Date of Execution By Landlord:

_12_/_17_____, 20_07_

*[Tenant Signature Page to Follow]*

Case: 11-30554   Doc# 33-3   Filed: 03/23/11   Entered: 03/23/11 16:17:48   Page 13 of 51

**TENANT:**

**THE COLONIAL WILLIAMSBURG FOUNDATION,**

a Virginia non-stock corporation

By: *Robert B. Taylor*

Name: Robert B. Taylor

Its: Senior Vice President for Finance and Administration

Date of Execution By Tenant:

December 18, 2007

6147123\10

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 14 of 51

**EXHIBIT H**

(Archaeological Agreement)

3

Tax ID Nos: 591-01-00-030
582-01-00-002

*070* **034971**

## ARCHAEOLOGICAL AGREEMENT

THIS ARCHAEOLOGICAL AGREEMENT, dated as of the 17th day of December, 2007, by and among **CARTER'S GROVE, LLC**, a Virginia limited liability company (the "Grantor"), and **THE COLONIAL WILLIAMSBURG FOUNDATION**, a Virginia non-stock, corporation (the "Grantee"), recites and provides as follows:

RECITALS

    1.    Grantor is the fee simple owner of a certain parcel of land containing approximately 400.928 acres situated in the County of James City, Commonwealth of Virginia, and more particularly described on <u>Exhibit A</u> attached hereto ("Grantor's Property").

    2.    Grantor's Property is the location of sites (individually each a "Site" and collectively, the "Sites") of significant archaeological importance identified as "Archaeological Site J", "Archaeological Site – CG-2" and "Archaeological Sites F & G" on the plat attached as "<u>EXHIBIT C1</u>" to that Deed of Gift of Easement (the "Conservation Easement"), dated December 14, 2007, among Grantee, Virginia Outdoors Foundation and Virginia Board of Historic Resources, and recorded in the Clerk's Office of the Circuit Court of the City of Williamsburg and County of James City, Virginia prior hereto.

    3.    Grantor desires to grant a "profit à prendre" to Grantee to recover, remove, own and possess any and all artifacts or items that may be located or found in, over, under, through and across the Sites on the terms and conditions hereinafter set forth.

    4.    Grantor also desires to grant certain easements to Grantee in, over, through and across Grantor's Property to provide an exclusive easement and right for the purpose of conducting archaeological excavation, testing, research and all other procedures appropriate for archaeological study on the terms and conditions hereinafter set forth, together with a reasonable non-exclusive right of ingress and egress over and across Grantor's Property to and from Sites subject to Grantee's activities hereunder.

PROFIT AND EASEMENT AGREEMENT

    NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor and the Grantee hereby agree as follows:

    1.    <u>Sites; Artifacts.</u>  The Grantor does hereby grant and convey unto Grantee, its successors and assigns, for a continuous period (the "Easement Period") commencing on the date

Prepared By/return to:
Kaufman & Canoles, P.C.
4801 Courthouse Street, Suite 300
Williamsburg, VA 23188

13
Page 1 of 12

of recordation of this Agreement and ending on January 1, 2033, an exclusive right and profit (profit à prendre) (the "Profit") for the purpose of recovering, removing, owning and possessing any and all artifacts or items whatsoever located or found in, over, under, through and across the Sites (collectively, the "Site Artifacts"). The Profit shall burden the Grantor's Property and run with the land.

2.    Site Easements. The Grantor does hereby grant and convey unto Grantee, its successors and assigns, for the Easement Period, exclusive (i.e. exclusive to Grantee as against all others, including, without limitation, Grantor) rights, privileges and easements for the purpose of conducting archaeological studies (the "Site Easements"), including, but not limited to, excavation, testing, research and any and all other uses that the Grantee in its reasonable discretion may deem ancillary to such archaeological study over, upon and across the Sites, subject to the following:

(a)    The Site Easements may be used by the Grantee and its agents, customers, employees, tenants, licensees, successors and assigns for the purposes, both direct and ancillary, or archaeological studies as set forth herein, including, but not limited to, the construction and maintenance of temporary shelters or structures for storage or work areas; provided, however, that any structures which are to be erected and remain in place for a period greater than ninety (90) days are subject to the approval of Grantor, which approval shall not be unreasonably withheld, conditioned or delayed. All archaeological research and excavation shall be conducted at the direction of an archaeologist meeting the U.S. Secretary of the Interior's Professional Qualifications Standards.

(b)    Grantee shall have the right and ability to build or install a temporary fence, wall or other barrier between the boundary of the Sites and the remainder of the Grantor's Property, subject to the terms, limitations and provisions of the Conservation Easement; provided, however, that any such fences, walls or other barriers which are to be erected and remain in place for a period greater than ninety (90) days are subject to the approval of Grantor, which approval shall not be unreasonably withheld, conditioned or delayed.

(c)    Within a reasonable time after completion of performance of archaeological research, the portion of the Grantor's Property affected by the archaeological research shall be restored as follows: (i) any temporary barrier and all equipment related to the performance of the archaeological research shall be removed, and (ii) the surface area of the Grantor's Property that was affected by the archaeological research must be restored to substantially the same condition that it was in immediately prior to the execution of the archaeological research; provided, however, trees required to be removed in execution of the research shall not be required to be replaced.

(d)    Grantor agrees that, prior to completion of archaeological research, it shall have no right to disturb the Sites and that it shall take all steps necessary to ensure that the use and development of that portion of the Property adjacent to the Sites shall not interfere with or damage the Sites or the use thereof permitted hereunder, including, but not limited to, erecting a temporary fence as set forth below, unless and until an investigation, assessment and, if appropriate, excavation is conducted by Grantee or its

Case: 11-30554 · Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 17 of 51

assignee(s). Grantor agrees that in the event that any disturbance of Grantor's Property affects any land within fifty (50) feet of the Sites, Grantor shall take measures to ensure that such activities do not interfere with the exercise of Grantee's rights hereunder or damage the archaeological resources at the Sites. In the event Grantor desires to disturb any of the Sites prior to completion of Grantee's archaeological research, then Grantor shall engage Grantee, at Grantor's sole cost and expense, at ordinary and reasonable rates, to complete such research of the Site proposed to be impacted, including, without limitation, installation of access to the Site.

3.  _Access Easements_. The Grantor does hereby grant and convey unto Grantee, its successors and assigns, for the Easement Period, nonexclusive rights, privileges and easements of right of way for the purpose of reasonable vehicular and pedestrian ingress and egress (the "Access Easements"), to and from the Sites, over, upon and across the roads and driveways existing from time to time on Grantor's Property and at such other locations as mutually determined from time to time by Grantor and Grantee, subject to the following:

(a)     The Access Easements shall be used by the Grantee and its respective agents, customers, employees, tenants, licensees, successors and assigns (i) for the purpose of ingress to and egress from the Sites on Grantor's Property and (ii) for the maintenance of the Access Easements.

(b)     The Grantor hereby reserves the right to make any other use of the Access Easements that is not inconsistent with the rights herein conveyed or does not unreasonably interfere with the use of the Access Easements by Grantee for the purposes aforesaid.

4.  _Additional Archaeological Work_.

(a)     On or before June 30, 2008, Grantee, at its sole cost and expense, shall conduct an archaeological survey (i.e., a Phase I archaeological survey) of the "Building Sites", "Special Use Areas" and "Recreation Areas" (as such terms are defined in the Conservation Easement) to determine the presence or absence of prehistoric or historic archaeological sites within such areas (the "Phase I Survey"); provided, however, if preliminary investigation reveals, and the Virginia Department of Historic Resources concurs, that a Phase I Survey is not needed as to an area of all or portions of any Site due to prior Site disturbance, then a Phase I Survey shall not be required to be conducted for such area. Any and all archaeological artifacts recovered in such areas or on other areas of Grantor's Property during the Easement Period shall be considered to be "Site Artifacts" for purposes of ownership and ownership thereof shall be vested in Grantee. Any sites identified during the Phase I Survey will be recorded in the Department for Historic Resources site files (Data Share Survey) and artifacts shall be curated according to the Department of Historic Resources' State Curation Standards (2006, and as amended). The results shall be addressed as prescribed by the Conservation Easement. If, (i) as a result of such Phase I Survey, potentially significant archaeological sites that

Case: 11-30554     Doc# 33-3     Filed: 03/23/11     Entered: 03/23/11 16:17:48     Page 18 of 51

warrant further study under a Phase II archaeological study (the "Phase II Study") are identified, and (ii) Grantor, on or before the date which is the later to occur of December 30, 2008 or one hundred eighty (180) days following Grantee's delivery to Grantor of the Phase I Survey, notifies Grantee in writing of Grantor's desire to have the Phase II Study undertaken, then Grantee shall undertake such Phase II Study and the cost thereof shall be divided equally between Grantor and Grantee. In the event such timely notification to conduct the Phase II Study is not provided by Grantor to Grantee, Grantee's obligation to pay a portion of the costs of a Phase II study shall cease.

(b)     Following expiration of the Easement Period, Grantor agrees that, in the event during any construction, land disturbance or other activities on the Grantor's Property archaeological artifacts are discovered at the Grantor's Property, Grantor shall use reasonable efforts to notify the Grantee or its successor in interest in writing and suspend operation in the area of such artifacts for a period of at least forty-eight (48) hours from the time of such notification to permit site recordation and, if reasonably feasible, object retrieval. Except as provided in Section 1 above and in the preceding portion of Section 4(a) above whereby the ownership of Site Artifacts and certain other artifacts are transferred to Grantee, ownership of the artifacts located on the Grantor's Property, other than the Site Artifacts and such certain other artifacts mentioned above, is not by the terms hereof transferred to Grantee.

5.     <u>Additional Terms and Conditions of Easements.</u>

(a)     The Site Easements and the Access Easements shall be hereinafter referred to collectively as the "Archaeological Easements".

(b)     The Archaeological Easements (i) shall burden the Grantor's Property (ii) shall run with the land, and (iii) shall exist, be subject to, and used only in accordance with the terms and conditions set forth herein.

(c)     The Archaeological Easements are granted subject to all recorded easements, agreements, covenants, restrictions and conditions affecting the Grantor's Property or any part thereof, including without limitation, the Conservation Easement.

(d)     The provisions hereof are not intended to and do not constitute a dedication for public use, and the rights and Archaeological Easements herein created are private and for the benefit of the parties designated herein.

(e)     This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns and shall run with the land.

(f)     The rights and obligations created herein shall not give rise to any third-party beneficiary rights in any persons, but shall be for the exclusive benefit of, and enforceable by, the parties hereto, their successors and assigns.

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 19
of 51

(g)    Any notice to be served upon any other party must be in writing and sent by registered or certified mail, return receipt requested, postage prepaid, unless another address is designated, as follows:

If to Grantor:

c/o Minor Ventures

199 Fremont Street

12th Floor

San Francisco, CA 94105

If to Grantee:

THE COLONIAL WILLIAMSBURG FOUNDATION

Attn:  Office of General Counsel

Mail Address:

P.O. Box 1776

Williamsburg, VA 23187

Hand Delivery/Overnight Courier Address:

134 N. Henry Street, Goodwin Building

Williamsburg, VA 23185

(h)    The Grantor and the Grantee hereby agree that this Agreement constitutes the entire agreement between the parties hereto and no representation or statements, verbal or written, have been made that modify, add to, or change the terms of this Agreement.

[SIGNATURES ON FOLLOWING PAGES]

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 20 of 51

*{Signature page to Archaeological Agreement}*

IN WITNESS WHEREOF, the Grantor and the Grantee have caused this Archaeological Agreement to be executed by their duly authorized representatives.

CARTER'S GROVE, LLC, a Virginia
limited liability company

By: _____
Halsey M. Minor, Manager

STATE OF _____ )
                               )   to Wit:
CITY/COUNTY OF _____ )

The foregoing Archaeological Agreement was acknowledged before me in the _____, _____, this the ____ day of _____, 20__ by Halsey M. Minor, who is either: ____ personally known to me or ___ who produced _____ as identification, as Manager of Carter's Grove, LLC, a Virginia limited liability company, on its behalf.

_____
Notary Public

My commission expires: _____
My registration number is: _____

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of __Los Angeles__ } ss.

On __12|17|07__, before me, __Sharron Callendor Craig__
    Date                Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared __Halsey M. Minor__
                           Name(s) of Signer(s)

☐ personally known to me
☐ proved to me on the basis of satisfactory evidence

SHARRON CALLENDER CRAIG
Commission # 1571530
Notary Public - California
Los Angeles County
My Comm. Expires May 19, 2009

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Place Notary Seal Above             Signature of Notary Public

—————————— **OPTIONAL** ——————————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: __Archaeological Agreement__

Document Date: __12|17|07__      Number of Pages: __13__

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer**
Signer's Name: __Halsey M. Minor__
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: __Manager__

Signer Is Representing: __Carter's Grove, LLC__

| RIGHT THUMBPRINT OF SIGNER |
|---|
| Top of thumb here |

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.nationalnotary.org    Prod. No. 5907    Reorder: Call Toll-Free 1-800-876-6827

Page 7 of 13

*{Signature page to Archaeological Agreement}*

**THE COLONIAL WILLIAMSBURG FOUNDATION,**
a Virginia non-stock, non-profit corporation

By: _Robert D. Taylor_____ (SEAL)
    Robert B. Taylor
    Senior Vice President for Finance and Administration

COMMONWEALTH OF VIRGINIA
AT LARGE, to-wit:

    The foregoing Archaeological Agreement was acknowledged before me in _Richmond_____, Virginia, this 18th day of _December_____, 2007 by Robert B. Taylor, who is personally known to me, as Senior Vice President for Finance and Administration of The Colonial Williamsburg Foundation, a Virginia non-stock, non-profit corporation, on its behalf.

_Lisa C. Keller_____
Notary Public

My commission expires: _Dec. 31, 2007___
Registration number: _334038_____


LISA A. KELLER
NOTARY
My Comm. Expires
Dec. 31, 2007
PUBLIC
COMMONWEALTH OF VIRGINIA

Page 8 of 13

# **EXHIBIT I**

(Maintenance Agreement)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

MINOR DECLARATION

# CARTER'S GROVE
## MAINTENANCE AGREEMENT

THIS MAINTENANCE AGREEMENT dated as of the 17th day of December, 2007, by and between CARTER'S GROVE, LLC, a Virginia limited liability company ("Owner"), and THE COLONIAL WILLIAMSBURG FOUNDATION, a Virginia non-stock, non-profit corporation ("CWF"), recites and provides:

## RECITALS

R1.     Owner is the owner of those parcels of land (the "Property") situated in the County of James City, Virginia, commonly known as Carter's Grove, and being more particularly described in Exhibit A attached hereto and by this reference made a part hereof.

R2.     The Carter's Grove Plantation mansion house (the "Mansion") is located on the Property.

R3.     Owner desires that CWF perform certain limited inspections and maintenance on the Mansion House on the terms and conditions hereinafter set forth.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the sum of Ten Dollars ($10.00), receipt and sufficiency of which is hereby acknowledged by CWF, and mutual promises contained herein, the parties to this Agreement agree and stipulate as follows:

1.     <u>Scope of Duties and Responsibilities</u>:  CWF shall perform certain inspections, repairs and maintenance on the Mansion, the scope of which is set forth on <u>Exhibit B</u> attached hereto and made a part hereof (collectively, the "Maintenance Services").

2.     <u>Term</u>:  The term of this Agreement shall be one (1) year from the date hereof; provided, however, upon thirty (30) days prior written notice to the other party, either party may terminate this Agreement prior to the expiration of the term thereof.  This Agreement may be extended for additional one (1) years terms upon mutual agreement of the parties hereto.

3.     <u>Fees/Costs</u>:  As compensation for the Maintenance Services provided by CWF pursuant to this Agreement, Owner shall pay to CWF, on a time and materials basis, all fees and costs for actual work performed and materials provided by CWF in connection with the performance of its obligations under this Agreement.  Such fees and costs shall be invoiced by CWF to Owner at Owner's notice address provided in Section 10.  All fees shall be based upon CWF's current schedule of hourly billing rates as set forth in <u>Exhibit B</u> attached and all costs shall be based on actual costs to CWF.   Owner shall pay all invoices in full, without offset, demand, or deduction, within fifteen (15) days of the receipt thereof in cash or lawful money of the United States. Payments shall be delivered to CWF at its notice address provided in Section 10, or at such other place as CWF may hereafter from time to time designate in writing.  Any

1

unpaid balance not received within five (5) days of its due date shall accrue interest at a per annum rate of SunTrust Bank's Prime Rate, plus four percent (SunTrust Prime + 4%).

4.     <u>Independent Contractor; Indemnity</u>:   All services provided by CWF under this Agreement shall be done by CWF as an independent contractor to Owner. Owner shall defend and indemnify and hold harmless CWF, its principals, officers, and employees from and against all claims, actions, damages, costs, including, without limitation, reasonable attorneys' fees, incurred by CWF arising from the performance of the Maintenance Services, including, but not limited to claims, suits, judgment, actions, damages, costs and reasonable attorneys fees for personal injury, bodily damage or property damage. This indemnity shall not be limited in any way by any limitations on the amount or type of proceeds, damages, compensation, or benefits payable under insurance policies, workers compensation acts, disability benefit, or other employee benefit acts. This section shall survive the termination of this Agreement.

5.     <u>Access</u>:   To the extent reasonably necessary to perform the Maintenance Services, Owner shall grant CWF access to the Property and the Mansion during reasonable hours to perform its obligations hereunder. During the term of this Agreement, CWF shall keep and maintain the security box located in the Mansion. Upon expiration or earlier termination of the Agreement, CWF shall remove said security box.

6.     <u>Insurance</u>:

(a)     Owner covenants that it will keep in force at all times during the original and all renewal terms of this Maintenance Agreement in companies licensed to conduct business in Virginia and rated with an AM Best rating of A or higher and in form reasonably acceptable to CWF with respect to the Property, without claim or reimbursement, commercial liability insurance covering Owner as named insureds with a minimum combined single limit of Two Million Dollars ($2,000,000.00) per occurrence and Three Million Dollars ($3,000,000.00) aggregate. Owner shall deliver to CWF a certificate of insurance showing the same to be in force and effect on or before the date hereof and shall deliver to CWF evidence of renewal or replacement of the policy prior to the expiration of such policy. Such coverage shall name CWF as an additional insured and include requirement to provide CWF with a minimum of thirty (30) days written notice if said insurance is canceled (other than nonpayment of premium which shall be ten (10) days), nonrenewed or coverage is materially changed.

(b)     During the term of this Agreement, Owner shall keep the Mansion and the buildings and improvements related thereto for which the Maintenance Services are to be provided insured for the benefit of Owner against loss or damage by fire, and those casualties covered by so-called Special Causes of Loss policies, in a minimum amount no less than the replacement value.

(c)     Owner and CWF mutually release and discharge each other (as well as the officers, directors, members, partners, agents and employees of each other) from responsibility and liability (by way of subrogation or otherwise) for loss or damage to any building, structure or other property (real or personal) of the other party, or any resulting loss of income, that is an insured loss under the terms of the insurance policy(ies) of the releasing party or that involves a

2

fire, casualty or other risk or loss required to be insured against under this Agreement. This release and discharge shall be applicable even though such loss or damage may have been caused by the negligence of the party hereby released, but shall not be applicable to the extent of any deductible under the insured's applicable policy. Owner agrees to include a waiver of subrogation endorsement or provision in its casualty insurance policies or a provision permitting the insured to prospectively waive claims.

7.   <u>No Warranty</u>: CWF does not, expressly or impliedly, warrant any goods or services provided in connection with this Agreement and Owner waives its rights to all warranties, either express or implied.

8.   <u>Owner's Remedy Upon Default</u>: In the event CWF fails to keep or observe any covenant, agreement or obligation to be kept or observed by CWF under this Agreement, and CWF does not cure such failure within thirty (30) days after written notice from Owner, Owner, as Owner's sole and exclusive remedy, may terminate this Agreement by giving written notice to that effect to CWF, in which event CWF shall return to Owner a prorated portion of the Contract Fee (based on the days elapsed of the term of this Agreement) as adequate liquidated damages for CWF's default and Owner shall have no other right or remedy, at law or in equity, against CWF, including, without limitation, any right to seek damages or specific performance.

9.   <u>CWF's Remedies Upon Default</u>: In the event Owner fails to keep or perform any covenant, agreement or obligation to be kept or performed by Owner under this Agreement, CWF may terminate this Agreement in addition to any other remedy available to CWF at law or in equity.

10.   <u>Notice</u>: Any notice hereunder shall be delivered or sent registered or certified mail, return receipt requested, postage prepaid as follows:

As to Owner:

      c/o Minor Ventures
      199 Fremont Street, 12th Floor
      San Francisco, CA 94105

Owner shall provide in writing to CWF the name, together with contact information, of the Owner's primary representative for administration of this Agreement and coordination of performance of CWF's duties hereunder.

As to CWF:

      The Colonial Williamsburg Foundation
      Attn: Sr. Vice President for Finance and Administration
   Mail Address:
      Post Office Box 1776
      Williamsburg, VA 23187
   Hand Delivery/Overnight Courier Address:
      134 North Henry Street, Goodwin Building
      Williamsburg VA 23185

3

with a copy (which shall not constitute notice) to:

> The Colonial Williamsburg Foundation
> Attn: Office of General Counsel
> Mail Address:
> Post Office Box 1776
> Williamsburg, VA 23187
> Hand Delivery/Overnight Courier Address:
> 134 North Henry Street, Goodwin Building
> Williamsburg VA 23185

11.   <u>Miscellaneous Provisions</u>:

(a)   <u>Enforcement</u>:  In the event it becomes necessary for either party hereto to file suit to enforce this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages, as provided herein, reasonable attorney's fees incurred in such suit.

(b)   <u>Applicable Law and Venue</u>:  This Agreement shall be governed by the laws of the Commonwealth of Virginia, without application of conflicts of law provisions, and venue and jurisdiction for any dispute hereunder shall be in the Court system for James City County, Virginia, or, if applicable, the U.S. Federal District Court, Eastern District, Norfolk Division.

(c)   <u>Entire Agreement</u>:  This Agreement constitutes the entire agreement between the parties and it is expressly understood and agreed that the Agreement may not be altered, amended, modified or otherwise changed in any respect or particular except by way of a writing duly executed by all of the parties hereto.

(d)   <u>Binding Nature of Agreement</u>:  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, administrators, executors, legal representatives, successors and assigns.  Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

(e)   <u>Force Majeure</u>:  In the event that Owner or CWF shall be delayed, hindered in or prevented from the performance of any act required hereunder by reason of or resulting from an act of God, strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war or any reason beyond their control, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.  Lack of funds shall not be a basis for avoidance or delay of any obligation under this Agreement.

4

(f)    Personnel:  CWF shall have full authority in the selection, recruiting, hiring, firing, supervising and scheduling of all its personnel and in the selection of all goods necessary to perform CWF's obligations under this Agreement.

(g)    Relationship of the Parties: The relationship of Owner and CWF will be that of principal and agent, and nothing contained in this Agreement, nor any acts of the parties shall create the relationship of a partnership or a joint venture, or cause the CWF to be responsible in any way for the debts or obligations of Owner or any other party.

(h)    Counterparts: This Agreement may be executed in a number of counterparts, each of which will be deemed an original and all of which will constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals to this Agreement as of the date first above written.

**OWNER**
CARTER'S GROVE, LLC, a Virginia limited liability company


By: _____(SEAL)
            Halsey M. Minor,  Manager


**CWF**
THE COLONIAL WILLIAMSBURG FOUNDATION,
a Virginia non-stock, non-profit corporation

By: _____(SEAL)
            Robert B. Taylor
            Senior Vice President for Finance and Administration

5

# **EXHIBIT J**

(Operating Agreement)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

OPERATING AGREEMENT

OF

CARTER'S GROVE, LLC
a Virginia limited liability company

This Operating Agreement ("**Agreement**") of **CARTER'S GROVE, LLC**, a Virginia limited liability company (the "**Company**"), is made as of December 12, 2007, by the undersigned, as the sole member of the Company.

<u>RECITALS:</u>

A.     The undersigned has caused the Company to be organized as a limited liability company under the laws of the Commonwealth of Virginia effective as of the date hereof.

B.     The undersigned desires to set forth the terms and conditions on which the management, business and financial affairs of the Company shall be conducted as set forth below.

ARTICLE I
<u>FORMATION AND PURPOSE</u>

1.1     **Formation.**  The undersigned, together with all persons who may be admitted as a member of the Company as provided in Article VIII hereof (each, a "Member" and collectively, the "Members"):

(a)     acknowledge the formation of the Company as a limited liability company pursuant to the Virginia Limited Liability Company Act, as amended, (the "**Act**") by virtue of Articles of Organization filed December 11, 2007, with the Virginia State Corporation Commission;

(b)     confirm and agree to their status as Members of the Company upon the terms and conditions set forth in this Agreement; and

(c)     execute and adopt this Agreement as an Operating Agreement of the Company pursuant to §13.1-1023 of the Act, which is intended to be the entire agreement of the Members with respect to the matters set forth herein and supersedes any prior understanding or agreement, oral or written.

1.2     **Name.**  The name of the Company shall be Carter's Grove, LLC.

1.3     **Choice of Law.**  This Agreement, including all questions with respect to the rights and obligations of the parties, the construction, enforcement, and interpretation hereof and

the formation, administration, and termination of the Company, shall be governed by the Act and other applicable laws of the Commonwealth of Virginia.

**1.4    Defined Terms.**    Except when the context may otherwise require, each capitalized term used in this Agreement shall have the meaning specified in the Section where such capitalized term is defined.

**1.5    Purposes.**    The sole purpose of the Company shall be to acquire, finance, develop, improve, conserve, own and hold title to, and to lease, manage, operate, market and sell those certain parcels of real property with improvements thereon located in James City County, Virginia (collectively, the **"Properties"**), and commonly known as Carter's Grove Plantation, together with such other activities (including the sale or disposition of the Properties or any portion thereof) as may be necessary, advisable or convenient to the promotion or conduct of the business of the Company including, without limitation, the incurring of indebtedness and the granting of liens and security interests on the real and personal property of the Company to secure the payment of such indebtedness in accordance with the terms of this Agreement.

**ARTICLE II**
**MEMBERS**

**2.1    Members.**    The initial Member shall be the HALSEY MCLEAN MINOR REVOCABLE TRUST 11304, Halsey M. Minor, Trustee.

**2.2    Membership Interests.**    Each Member's ownership interest in the Company is hereinafter referred to generally as a **"Membership Interest"**.

**2.3    Duties and Limitations.**

(a)    Except as otherwise provided herein, any Member may engage in or possess any interest in another business or venture of any nature and description, independently or with others. These ventures may compete directly with the business of the Company, and neither the Company nor any Member hereof shall have any rights in, or to, any such independent ventures or the income or profits derived therefrom.

(b)    Except as otherwise provided herein or required by law, voting power shall be vested jointly in the Members, each of whom shall be entitled to a vote equal to his or her Membership Interest. No Member, other than the Managers, shall take part in the management of the business or transact any business for the Company in their capacity as Member. Furthermore, no such Member shall have the power to sign for, or to bind, the Company; provided, however, that all Members shall have the right as provided herein to approve or consent to certain matters.

**2.4    Voting.**    The consent of the Members owning more than 50% of the Membership Interests (a **"Majority"**) shall be required for the following actions:

2

(i) any action in contravention of this Agreement;

(ii) amendment of the Articles of Organization of the Company (the "Articles");

(iii) merger or reorganization of the Company;

(iv) request Members to make any contribution to the capital of the Company not provided for in this Agreement;

(v) lend Company funds to any person or entity;

(vi) guarantee the loan of any person or entity or offer Company assets as collateral for any such loan;

(vii) dissolution, or the taking or omission of any action which would cause the termination of the Company;

(viii) sale or transfer of all or substantially all of the Company assets outside of the ordinary course of business; and

(ix) remove the special manager named in Section 9.1(b) hereof and designate a new special manager.

## ARTICLE III
## MANAGEMENT

3.1    **Management of Operations.** Except as otherwise expressly provided in the Act, the Articles or this Agreement, the responsibility for managing the business and affairs of the Company shall be vested in a manager or managers (individually or collectively referred to herein as the "Manager"). Managers need not also be a Member. The Members hereby unanimously elect Halsey M. Minor and Venable Minor, Jr., as the initial Managers, who shall serve until removed by the Members or until their earlier resignation. Upon the removal or resignation of a Manager, a Majority may appoint another Manager, or allow the remaining Manager to act as sole Manager. The Managers shall, except as specifically limited in this Agreement, have the complete power and authority designated to the Managers herein to make decisions affecting the routine business and affairs of the Company for the purposes set forth in Section 1.5 hereof. The Managers agree to manage and control the affairs of the Company in good faith to the best of their ability and in accordance with this Agreement, the Act and good industry practice. Except as otherwise provided by the Act, no person dealing with the Company shall be required to inquire into the authority of any Manager to take any action or to make any decision; the Managers may expressly delegate authority to an attorney-in-fact as they see fit.

3

3.2    **Fees.** The Company may enter into agreements with the Members (including the Manager) requiring payments to such Members for services, but only with the consent of a Majority. Any such fee shall be deemed a guaranteed payment under § 707(c) of the Internal Revenue Code of 1986, as amended (the **"Code"**).

3.3    **Limitation on Liability.** No Member shall be liable, responsible or accountable to the Company or any other Member in damages or otherwise for any acts, or for any failure to act, performed or omitted in good faith; provided, however, that a Member shall not be relieved of (1) its fiduciary obligations to any other Member and the Company imposed by law, or (2) liability for fraud, bad faith, or gross negligence.

3.4    **Reimbursement and Indemnification.** The Company shall bear all expenses incurred with respect to the organization, operation and management of the Company. A Member or Manager shall be entitled to reimbursement from the Company for direct expenses incurred by him and allocable to the organization, operation or management of the Company. The Members intend that only the assets of the Company be exposed for the liabilities of the Company pursuant to the Act. However, if a Member incurs a personal liability that did not arise from its fraud, bad faith or gross negligence, the Company and each Member in proportion to its Membership Interest shall indemnify and hold harmless such Member from, and with respect to, any such liability. The indemnification provided by this Section 3.4 shall in no event cause the Members to incur any liability to the Company beyond their total capital contributions plus their share of any undistributed profits of the Company, nor shall it result in any liability of the Members to any third party.

3.5    **Duties.** Subject to any limitations expressly set forth in this Agreement, the Manager shall perform or cause to be performed, at the Company's expense, all acts reasonably required to facilitate the acquisition, development, redevelopment, ownership, management and operation of the Properties, including (without limitation) making arrangement for loans for the business of the Company; marketing, leasing and managing the Properties; and coordinating all other management and operational functions relating to the Properties. Subject to the foregoing limitation, and without limiting the generality of the Manager's duties and responsibilities, the Manager is expressly authorized on behalf of the Company to:

(a)    conduct any activities which are normal or customary for the development of real estate similar to the Properties;

(b)    perform any and all acts necessary or appropriate for the ownership, development, operation, lease and/or sale of the Properties, including, but not limited to, marketing and selling the Properties; securing acquisition and development financing (secured by one or more deeds of trust on the Properties) to the extent that the Company's equity is insufficient for the Company's plan of development; instituting, defending and/or settling any litigation involving the Company; and establishing bank accounts in which shall be deposited all Company funds and from which payments shall be made;

4

(c)    procure and maintain with responsible companies such insurance as may be available in such amounts and covering such risks as the Manager deems appropriate;

(d)    execute and deliver on behalf of and in the name of the Company such deeds, deeds of trust, notes, leases, property management agreements and any and all other instruments necessary or incidental to the conduct of the Company's business;

(e)    contract for and coordinate all accounting, engineering, consulting, legal and other professional or clerical functions of the Company; and

(f)    file, or cause to be filed, prior to delinquency, all tax returns required to be filed by the Company pursuant to the Code, and all tax returns required in each jurisdiction in which the Company transacts business.

3.6    Removal as Manager. The Manager may be relieved of its duties and powers as Manager by written notice executed by a Majority, for cause, for gross negligence, fraud, willful intentional misconduct or material breach of this Agreement. In such event, a substitute Manager shall be elected by a Majority or else the assets of the Company shall be sold and the Company dissolved as provided in Article VII hereof.

3.7    Reliance by Other Persons. Any person dealing with the Company, other than a Member, may rely on the authority of the Manager in taking any action in the name of the Company if the Manager provides to such person a copy of the applicable provision of this Operating Agreement and, if required, the resolution or written consent of the Members granting such authority, certified in writing by such Manager to be genuine and correct and not to have been revoked, superseded or otherwise amended.

**3.8**    **Loans to Members and Affiliates.** Upon the approval of a Majority, the Manager shall have the right to make loans from the Company to Members or their affiliates on commercially-reasonable terms at prevailing rates.

# ARTICLE IV
## CAPITAL CONTRIBUTIONS AND
## FINANCIAL OBLIGATIONS OF MEMBERS

4.1    **Capital Contributions.** The initial capital contributions of each of the Members shall be as set forth on Exhibit 4.1.

4.2    **Capital Account Deficits.** No Member shall be required to restore any deficit in its Capital Account (as such term is defined in Section 6.1 of this Agreement), although it will comply with the provisions of Section 3.4. This Agreement hereby contains a qualified income offset in accordance with regulations ("**Treasury Regulations**") under § 704(b) of the Code.

5

**4.3    No Interest Upon Contributions.** No Member shall be entitled to receive interest on its capital contribution.

**4.4    Return of Capital Contributions.** No Member shall be entitled to withdraw any part of its capital contribution or its Capital Account or to receive any distribution from the Company except as specifically provided in this Agreement. Except as otherwise provided herein, no obligation exists for the Company to return to any Member or withdrawn Member any part of such Member's capital contributions so long as the Company continues in existence.

**4.5    Additional Contributions.** Except as provided in this Agreement, no Member shall be required under any circumstances to contribute any money or property to the Company. The Members acknowledge that the Manager will use its best efforts to arrange for institutional financing to cover expenses of acquiring, developing, redeveloping, owning, leasing, managing, operating and marketing the Properties not funded by the initial capital contributions of the Members. If the Company requires additional funds, the Manager may, upon receiving the Members' unanimous approval, call for the Members to make additional capital contributions in proportion to their relative interests in the Company to fund the Company's operating deficits or other expenses for which Company revenues are inadequate.

## ARTICLE V
## DISTRIBUTIONS OF CASH AND PROPERTY: INVESTMENTS

**5.1    Distribution of Net Cash Flow.**

(a)  The term **"Net Cash Flow"** for a fiscal year or other period of the Company shall mean:

(i)    All cash receipts as shown on the books of the Company (excluding, however, capital contributions from Members, net proceeds to the Company from financing or refinancing secured by the assets of the Company, and proceeds from the sale or the disposition of substantially all of the Company assets or from the winding up of the Company), reduced by (A) cash disbursements for Company purposes, including interest and principal upon loans (including loans from Members), and (B) all cash reserves reasonably set aside by the Managers to accomplish the Company purposes; plus

(ii)    Any other funds, including amounts previously set aside as for reserves now deemed available by the Manager as Net Cash Flow.

(b)    Priority of Distribution.  The Net Cash Flow of the Company for a fiscal year or other period shall be paid out to the Members in accordance with their respective Membership Interests on a monthly basis or at such other intervals as a Majority shall determine.

6

5.2    **Distribution of the Proceeds of Sale or Refinancing.**

(a)    Sale.  Upon a sale of any of the Properties or other material asset of the Company, the net proceeds of sale (in excess of any reserves the Managers determine necessary) shall be distributed to the Members in accordance with their respective Membership Interests.

(b)    Refinancing.  If the Managers determine that all or any part of the proceeds of financing or refinancing secured by the assets of the Company are in excess of the needs of the Company, such excess proceeds shall be distributed to the Members in accordance with, and to the extent of, their respective Membership Interests.

5.3    **Distribution of the Proceeds of Dissolution.**  If the Company dissolves (and is not continued in accordance with this Agreement), then, except as otherwise provided in this Agreement, the net proceeds of dissolution, including proceeds from any accompanying sale of Company assets, shall be distributed in the following order of priority:

(a)    First, towards the satisfaction of all outstanding debts and other obligations of the Company in the priority required by law (including those owing to Members); and

(b)    The balance, among those Members with positive Capital Account balances, after adjustments for all distributions and allocations for all prior periods, in proportion to their respective Capital Account balances.

5.4    **Distribution of Debt Instruments.**

(a)    If the Company sells any of its assets and all or a portion of the sales price is paid by a promissory note or installment contractual obligation (a **"Debt Instrument"**), all interest and principal received by the Company shall be treated as net proceeds of a sale or refinancing, or if such sale occurs in conjunction with the dissolution (without continuation) of the Company, as net proceeds of dissolution, and shall be distributed in accordance with Sections 5.2 or 5.3, as the case may be.

(b)    If the Company holds a Debt Instrument as described in Section 5.4(a) and the Company either is terminated in conjunction with the sale which gave rise to such Debt Instrument or is terminated before payment in full of such Debt Instrument, the Members shall assign such Debt Instrument to a trustee or other custodian who, for a reasonable fee, shall collect all sums which may become due and payable under the Debt Instrument, who shall have the power and authority to act to enforce all rights of the holder of such Debt Instrument, and who shall distribute such sums pursuant to the procedures in Section 5.2 or 5.3, as applicable.

5.5    Tax Distributions.  The Company shall distribute to the Members the amount necessary (as reasonably determined by the Manager) to cover the income taxes payable by the Members on income earned by the Company that is allocated and taxable to the Members assuming each Member is in the highest combined individual federal, state and local tax bracket

7

applicable to any Member. Distributions under this Section 5.5 shall be made when such taxes are due, including the payment of estimated taxes, and shall be netted against other distributions made under this Article V. Amounts otherwise distributable to a Member pursuant to this Section 5.5 shall be reduced by all prior distributions made to a Member under this Article V.

   5.6    Withholding.   All other provisions hereof notwithstanding, the Company's obligation, and the Manager's authority, to make any distribution is subject to the restrictions governing distributions under the Act and such other pertinent governmental restrictions as are now and may hereafter become effective. All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Member or Members pursuant to this Article V.

**ARTICLE VI**
**PROFITS AND LOSSES; TAX MATTERS**

   6.1    **Maintenance of Members' Capital Accounts.**  A separate capital account (the "**Capital Account**") for each Member shall be established and maintained throughout the full term of the Company. Each Capital Account shall be established and maintained in accordance with the Treasury Regulations which must be complied with for the allocations of profits and losses in this Agreement to have "economic effect" under applicable Treasury Regulations.

   6.2    **Allocations of Profits, Losses, and Credits of the Company.**  Except as expressly otherwise provided in this Agreement, the Company's net profits, net losses and tax credits, if any, for a fiscal year or other periods shall be allocated among the Members as follows:

       (a)    Net Profits.  The net profits for a fiscal year or other period of the Company shall be allocated to the Members in accordance with their respective Membership Interests.

       (b)    Net Losses.  The net losses, if any, for a fiscal year or other period of the Company shall be allocated to the Members in accordance with their respective Membership Interests.

       (c)    Credits.  Any tax credits (and credit recapture, if any) shall be allocated in the manner specified by the Code and the Treasury Regulations issued thereunder.

   6.3    **Tax Allocations.**  Except as otherwise expressly provided in this Agreement or the Code or Treasury Regulations, the Company shall allocate its tax items in the same manner and percentages as its book items are allocated.

8

Case: 11-30554   Doc# 33-3   Filed: 03/23/11   Entered: 03/23/11 16:17:48   Page 38 of 51

**6.4     Tax Year and Accounting Matters.**  The tax year of the Company shall be the calendar year.  The Company shall adopt methods of accounting as the Manager determines upon the advice of the certified public accounting firm engaged by the Company.

**6.5     Tax Elections.**  The Managers may cause the Company to make, refrain from making, or revoke all tax elections provided for under the Code and the Treasury Regulations.

**ARTICLE VII**
**TERM AND TERMINATION OF THE COMPANY**

**7.1     Term of the Company.**  The term of the Company shall commence upon the date of this Agreement and shall continue until terminated as provided in this Agreement.

**7.2     Events of Dissolution.**  The Company shall be dissolved upon the occurrence of any of the following events:

(a)     the determination in writing of a Majority to dissolve the Company;

(b)     the entry of a decree of judicial dissolution under § 13.1-1047 of the Act; or

(c)     except upon the determination of the Manager, which decision has not been objected to by a Majority, to continue the business of the Company within six months of the following events, in which case the Company shall not be dissolved and the Company and the business of the Company shall be continued:

(i)     the sale, transfer or other disposition of substantially all of the non-cash assets of the Company (other than Debt Instruments) with the intent to liquidate the Company;

(ii)     when otherwise so required by this Agreement; or

(iii)     as otherwise required by the Act.

**7.3     Conclusion of Affairs.**  Subject to the operation of Section 7.5, upon the dissolution of the Company for any reason, if the Company is not continued as permitted by this Agreement, the Manager shall promptly wind up the Company' affairs.  Except as otherwise provided in this Agreement, the Members and their successors in interest shall continue to share distributions and allocations during the winding up period in the same manner as before dissolution.  The Manager shall have reasonable discretion to determine the time, manner and terms of any sale or sales of Company property pursuant to such winding up, having due regard to the activity and the condition of the Company and relevant market, financial and economic conditions, and consistent with its obligations to the Members.

9

7.4    **Liquidating Distributions.**  After paying or providing for the payment of all debts and liabilities of the Company and all expenses of winding up, and subject to the right of the Manager to set up such reserves as he may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation, and any other remaining assets of the Company, shall be promptly distributed to, or for the benefit of, the Members (and their successors in interest) in accordance with this Agreement.  No Member shall have any right to demand or receive property other than cash upon dissolution and winding up of the Company.  However, the Manager may determine whether and to whom property should be distributed in kind rather than liquidated.  The Value of property distributed in kind shall be determined as set forth in this Section 7.4.  Any property distributed in kind shall be treated as though such asset was sold for its Value at the time of the distribution, and the cash proceeds were distributed.  The difference between the Value of property distributed in kind and its previous Value for purposes of maintenance of the Capital Accounts shall be treated as profits or losses and shall be credited or charged to Members' Capital Accounts in accordance with their interest in such profits or losses pursuant to Section 6.2.  The "**Value**" of an asset of the Company shall be, in the case of other than securities, real estate and improvements, book value as determined by the certified public accountant for the Company in accordance with the Company's accounting method applied on a consistent basis and, in the case of securities, real estate and improvements, their fair market value as determined pursuant to the following provisions.  The fair market value of securities shall be determined in accordance with the then current Treasury Regulations for federal estate tax purposes concerning valuation.  The Manager shall select a qualified, independent appraiser to appraise any real estate and improvements at the Company's expense, and such appraised value shall be its fair market value.

7.5    **Termination.**  Within a reasonable time following the completion of the winding up of the Company, the Manager shall supply to each Member a statement setting forth the assets and the liabilities of the Company as of the date of completion of the winding up and each Member's portion of the distributions pursuant to this Agreement.  Upon completion of the winding up of the Company and the distribution of all Company assets, the Company shall terminate, and the Manager shall execute and file Articles of Cancellation of the Company and all other documents required to effectuate the dissolution and termination of the Company.

## ARTICLE VIII
## TRANSFERS AND THE ADDITION, SUBSTITUTION, AND
## WITHDRAWAL OF MEMBERS

8.1    **Transfer, Substitution, & Withdrawal.**  Except as otherwise provided herein, a Membership Interest may be assigned in whole or in part only as follows:

(a)    A Member may transfer all or a portion of his or her Interest to a spouse, ancestor, lineal descendant, charitable organization described in § 501(c)(3) or § 170(c) of the Code, or a trust or an entity solely for the benefit of one or more of the foregoing persons.  A transfer pursuant to this Section 8.1(a) shall not be subject to Sections 8.1(b) through (f), but shall be subject to all other provisions of this Agreement, including Section 8.1(g).

10

(b)     Except as provided in Section 8.1(a), if any Member desires to sell, exchange, or otherwise convey for consideration, give, assign or pledge his Membership Interest (the "Offered Interest"), such Member or his duly authorized representative (hereinafter called "Seller") shall give written notice thereof to the Company and the remaining Members, which notice (hereinafter referred to as "Seller's Notice") shall set forth the following:

(i)     the identity of the person, firm, or corporation (hereinafter called "Purchaser") to whom the Offered Interest is proposed to be sold, exchanged, conveyed, given, assigned or pledged;

(ii)     the purchase price for the Offered Interest; and

(iii)     any other terms and conditions associated with the sale of the Offered Interest, including but not limited to the schedule for payment of the purchase price.

Such Seller's Notice shall constitute an offer by Seller to sell the Offered Interest to the Company, and if such offer is not accepted by the Company, it shall constitute an offer to sell all, but not less than all, of the Offered Interest to the remaining Members, at a price equal to the price specified in Seller's Notice and upon the same terms and conditions specified in Seller's Notice.

(c)     Upon receipt of Seller's Notice, the Company shall have a period of 30 days next following the date of mailing of Seller's Notice within which to accept Seller's offer to sell the Offered Interest. If the Company elects to purchase the Offered Interest, written notice thereof shall be given to Seller on or before the last day of said 30-day period. Upon mailing of said notice, Seller shall be obligated to deliver to the Company the certificates or other instruments evidencing the Offered Interest properly endorsed for transfer, and the Company shall be obligated to accept the Offered Interest and pay the purchase price therefor. If the Company fails to exercise its right to purchase the Offered Interest, the Company shall be deemed to have waived its right to purchase the Offered Interest, and all rights of the Company to purchase such Offered Interest under Seller's Notice shall terminate. If the right of the Company to purchase the Offered Interest terminates, the Company shall provide prompt written notice of such termination (the "Termination Notice") to the remaining Members.

(d)     Upon receipt of the Termination Notice, each remaining Member shall have a period of 30 days next following the date of mailing of the Termination Notice within which to accept Seller's offer to sell the Offered Interest. The remaining Members shall be entitled to purchase such portion of the Offered Interest as they may among themselves agree, or, if they shall not agree, each of the remaining Members shall have the right to purchase that portion of the Offered Interest equal to the fraction, the numerator of which shall be the Membership Interest of such remaining Member expressed as a percentage and the denominator of which shall be the total of the Membership Interests of all remaining Members exercising the right of purchase expressed as a percentage; provided, however, that all of the Members exercising the right of purchase shall be required to purchase all of the Offered Interest. If a

11

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 41 of 51

remaining Member elects to purchase the Offered Interest, written notice thereof shall be given to Seller on or before the last day of said 30-day period. Upon mailing of such notice, Seller shall be obligated to deliver to the remaining Member or Members the certificates or other instruments evidencing the Offered Interest properly endorsed for transfer, and the remaining Members who have exercised the above purchase rights shall be obligated to purchase the applicable portion of the Offered Interest and pay the purchase price therefor. The remaining Members failing to exercise their right to purchase the Offered Interest shall be deemed to have waived their right to purchase the Offered Interest, and all rights of those remaining Members to purchase such securities under such Seller's Notice shall terminate.

(e)     If the Offered Interest is not purchased by the Company or the remaining Members do not Purchase the Offered Interest in its entirety, Seller may make a bona fide transfer or encumbrance to the Purchaser named in Seller's Notice on the terms and conditions set forth therein. If Seller fails to make such transfer or encumbrance within 30 days following the expiration of the remaining Members' purchase rights, such Membership Interest shall become again subject to all the restrictions of this Agreement.

(f)     The closing of any purchase by the Company or a Member pursuant to this Section shall take place at the principal office of the Company. All acts or decisions of the Company with respect to the provisions of Sections 8.1(b) through (f) as they relate to a particular Offered Interest shall be based upon the vote or consent of a Majority of the Members other than Seller.

(g)     Any transfer of a Membership Interest, other than to an existing Member, shall be effective only to give the transferee ("Transferee") the right to receive the share of allocations and distributions to which the transferor would otherwise be entitled. Any Transferee who is not a Member before the transfer shall not have the right to become a substituted Member without the written consent of two-thirds (2/3) of the Members, which approval may be granted or denied in the exercise of the sole and absolute discretion of the Members, and only if the Transferee agrees to be bound by all of the terms and conditions of this Agreement as then in effect. Unless and until a Transferee is admitted as a substituted Member, the Transferee shall have no right to exercise any of the powers, rights and privileges of a Member hereunder. A Member who has assigned his Membership Interest shall cease to be a Member upon assignment of the Member's entire Membership Interest and thereafter shall have no further powers, rights and privileges as a Member hereunder, but shall, unless otherwise relieved of such obligations by agreement of all of the other Members or by operation of law, remain liable for all obligations and duties incurred as a Member. A Transferee who becomes a substitute Member is liable for any obligations of his transferor to make or retain capital contributions as provided in this Agreement and by the Act; provided, however, such Transferee shall not be obligated for liabilities of his transferor unknown to him at the time he became a Member.

(h)     The Manager may, in his reasonable discretion, charge a fee to cover the additional administrative expenses (including attorney's fees) incurred in connection with, or as a consequence of the transfer of, all or part of a Membership Interest.

Case: 11-30554     Doc# 33-3     Filed: 03/23/11     Entered: 03/23/11 16:17:48     Page 42 of 51

(i)     The Company, each Member and any other person having business with the Company need deal only with Members who are admitted as Members or as substituted Members of the Company, and they shall not be required to deal with any other person or entity by reason of assignment by a Member or by reason of the death of a Member, except as otherwise provided in this Agreement. In the absence of the substitution (as provided herein) of a Member for an assigning or deceased Member, any payment to a Member or to a Member's executors or administrators shall release the Company and the Manager from all liability to any other persons who may be interested in such payment by reason of an assignment by, or the death of, such Member.

(j)     No lien or security interest shall be created or perfected in any Membership Interest except in accordance with the provisions of this Agreement and upon prior notice to the Company of such security interest together with a copy of all documentation with respect thereto, including financing statements.

(k)     Any transfer not in accord with this Agreement shall be void, except to give rise to a cause of action against the purported transferor for breach of this Agreement.

**8.2     Additional Members.**  Any additional Membership Interest offered must be expressly approved in writing by a majority of the Members, who may withhold such approval in their sole and absolute discretion. A new Member's admittance to the Company will cause a pro rata reduction in each Member's Membership Interest. No new Members shall be entitled to any retroactive allocation of income, losses or expense deductions the Company incurs. The Manager may, at its option, at the time a new Member is admitted, close the Company's books (as though the Company's tax year had ended) or make pro rata allocations of income, loss and expense deductions to a new Member for that portion of the Company's tax year in which the new Member was admitted in accordance with the provisions of Code Section 706(d) and the regulations thereunder.

## ARTICLE IX
## ADMINISTRATIVE PROVISIONS

**9.1     Office and Registered Agent.**

(a)     The initial principal place of business and principal office of the Company shall be 1340 Stony Point Road, Charlottesville, Virginia 22911. The Company may relocate the principal place of business and principal office and have such additional offices as the Manager may deem advisable.

(b)     The Member hereby appoints Alexander M. Toomy, a resident of the Commonwealth of Virginia, as special manager of the Company solely to act as the Company's initial registered agent for purposes of the Act. The address of the initial registered office of the Company is 1340 Stony Point Road, Charlottesville, Virginia 22911. The registered agent's sole

13

duty is to forward to the Company at its principal office and place of business any notice that is served on him as registered agent.

9.2 **Bank Accounts.** The Manager may, from time to time, open bank accounts in the name of the Company, and the Manager shall be the only signatories thereon, unless the Manager determines otherwise. Funds of the Company shall be deposited in such account or accounts as the Manager shall determine. Funds may be withdrawn from such accounts only for bona fide and legitimate Company purposes and may from time to time be invested in such securities, money market funds, certificates of deposit, or other liquid assets as the Manager deems prudent. The Manager shall not be accountable or liable for any loss of Company funds resulting from failure or insolvency of the depository institution, so long as the deposit of such funds was in compliance with this Agreement.

9.3 **Books and Records.** At all times during the term of the Company, the Manager shall keep, or cause to be kept, full and accurate books of account, records and supporting documents, which shall reflect completely, accurately and in reasonable detail each transaction of the Company (including, without limitation, transactions with the Members or affiliates). The books of account shall be maintained and tax returns prepared and filed based on the method of accounting the Manager determines. The books of account, records and all documents and other writings of the Company shall be kept and maintained at the principal office of the Company. Each Member or its designated representative shall, upon reasonable notice to the Manager, have access to such financial books, records and documents during reasonable business hours and may inspect and make copies of any of them at its own expense. The Manager shall cause the Company to keep at its principal office all books and records required to be maintained by the Act and the other laws of the Commonwealth of Virginia.

9.4 **Notices.** Unless otherwise provided herein, any offer, acceptance, election, approval, consent, certification, request, waiver, notice or other communication required or permitted to be given hereunder (hereinafter collectively referred to as a **"Notice"**), shall be given by addressing the same to the Member to whom the Notice is to be given at the appropriate address set forth on the attached Exhibit 4.1 or at such other address as any Member hereafter may designate in accordance with the provisions of this Section 9.4 and delivering such Notice in person, by facsimile or by U.S. Mail, postage prepaid. In addition, the Company and any other Members shall be sent a copy of all Notices by delivery in person, by facsimile or by U.S. Mail, postage prepaid.

14

## ARTICLE X
## MISCELLANEOUS

10.1    **Amendment.**  Except as provided by law or as otherwise set forth herein, this Agreement may be modified or amended only by a written instrument evidencing the unanimous approval of the Members.  Notwithstanding anything to the contrary in this Agreement, Exhibit 4.1 may be amended from time to time by the Manager only to the extent necessary to reflect accurately the then current status of the information contained thereon.

10.2    **Interpretation.**  Whenever the context may require, any noun or pronoun used herein shall include the corresponding masculine, feminine or neuter forms.  The singular form of nouns, pronouns and verbs shall include the plural, and vice versa.

10.3    **Severability.**  Each provision of this Agreement shall be considered severable, so that if any provision hereof is determined to be invalid, such invalidity shall not impair or affect the valid portions of this Agreement, and this Agreement shall remain in full force and effect and shall be construed and enforced in all respects as if such invalid or unenforceable provision had been omitted.

10.4    **Burden and Benefit Upon Successors.**  Except as expressly otherwise provided herein, this Agreement is binding upon and inures to the benefit of the Members and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns.

10.5    **Third Parties.**  The agreements, covenants and representations in this Agreement are made solely for the benefit of the Members and not for the benefit of any third parties, including, without limitation, any creditors of the Company or of a Member.

10.6    **Further Assurances.**  Each Member shall execute and deliver such further instruments, provide all information and take or forbear such further acts and things as may be reasonably required to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

10.7    **Counterparts.**  This Agreement may be executed in any number of counterparts, all of which together shall constitute one fully-executed instrument.

10.8    **Section Headings.**  Section titles or captions contained in this Agreement are inserted as a matter of convenience and for reference only and shall not be construed in any way to define, limit or extend or describe the scope of this Agreement.

10.9    **Applicable Law.**  This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Virginia without regard to conflicts of law rules.

15

**10.10 Legal Counsel.** This Agreement has been prepared by LeClair Ryan, A Professional Corporation ("**LeClair Ryan**"), as counsel to the Company, with the consent of each Member. Each Member acknowledges that it was advised by counsel to the Company that a conflict exists among their individual interests with respect to this Agreement, that each Member should seek the advice of independent counsel, and that each Member has had the opportunity to seek the advice of independent counsel. Each Member further acknowledges that counsel for the Company has provided no advice or representations to them regarding the tax consequences of this Agreement to any individual Member, and that each Member has been advised to seek the advice and consultation of its own personal tax advisers with respect to such tax consequences.

IN WITNESS WHEREOF, the Member has executed this Agreement by its duly-authorized signature below.

SOLE MEMBER:

HALSEY MCLEAN REVOCABLE TRUST 11304

By: Halsey M. Minor, Trustee

16

# **EXHIBIT K**

(Press Release)



[About Us](#) : News Releases

## December 19, 2007
# CW achieves protected sale of Carter's Grove

The Colonial Williamsburg Foundation has transferred ownership of Carter's Grove Plantation, including the Georgian style mansion and 400 acres that are subject to a conservation easement, as well as an additional 76 acres adjoining the property. Halsey Minor, a Virginia native and successful entrepreneur, has purchased the property for $15.3 million. He intends to use the site as a residence and as a center for a thoroughbred horse breeding program.

The conservation easement is co-held by the Virginia Outdoors Foundation and the Virginia Department of Historic Resources.

"The easement reflects the Foundation's fundamental commitment to protect and preserve the mansion, maintain the integrity of the mansion's view shed and protect the archaeological sites on the property," said Colin Campbell, chairman and president of The Colonial Williamsburg Foundation.

In 2006, the Foundation announced it would assure the preservation of Carter's Grove by offering it for sale subject to restrictions that would protect the site's historic, architectural, visual, archaeological and environmental resources. The restrictions prohibit residential and commercial development of the property.

The decision to pursue sale of the property with restrictions was based on a thorough evaluation of Carter's Grove's relevance to Colonial Williamsburg's interpretive focus on the story of citizenship and becoming Americans in the 18th century. The Historic Area is the principal setting for this story, led by the presentation and interpretation of Revolutionary War-era Williamsburg. Carter's Grove, with its multiple stories spanning some four centuries, is not central to this strategic focus.

The Carter's Grove Plantation site is a historic landmark listed on the National Register of Historic Places and on the Virginia Historic Landmarks Register. The property is located along the James River, eight miles southeast of Williamsburg, Va.

"The transfer of this property to private ownership, with stewardship governed by the terms of an easement, is the best approach to assure long term protection of the property," said Mr. Campbell. "The transfer of a historically significant property from institutional ownership to private ownership is of great interest to the historic preservation and conservation community. We believe this is an appropriate model."

In developing the easement, Colonial Williamsburg staff consulted with a broad range of preservation organizations and with other knowledgeable individuals.

"I have long admired Carter's Grove and I am keenly aware of the historical significance of the property," said Mr. Minor, an anthropology graduate of the University of Virginia. "I feel honored to be given the opportunity to take over its stewardship. I have three simple goals: to provide for the preservation of the property, its structures and historical artifacts; enrich the understanding of Carter's Grove by developing additional research programs that complement those previously performed by Colonial Williamsburg; and to disseminate the newly gathered information so that we may add to the understanding of this historical treasure and its surrounding area and ultimately provide for a richer understanding of American history."

"Halsey Minor's respect for the property, his determination to protect it for the long term and his intended use are clear indications that he will be a fine steward of Carter's Grove," said Mr. Campbell.

Carter's Grove also contains the site of an 18th-century slave quarter which the Foundation will memorialize through the placement of a small monument and plaque at the site.

Proceeds from the sale of the property will support Colonial Williamsburg's educational programs, including an anticipated expansion of the DeWitt Wallace Decorative Arts Museum.

"I am especially grateful to the Colonial Williamsburg team and our consulting partners led by Robert Taylor, senior vice president, finance and administration, for their careful, energetic approach to achieving this important sale as well as for their consistent focus on the long term protection of this historic landmark," said Mr. Campbell. "Their concern for honoring preservation values was evident throughout the sale process and has served the Foundation and the long term stewardship of Carter's Grove exceedingly well."

Members of the team include Edward Chappell, director of architectural research; Victoria Gussman, director of property planning and management; Ronald Hurst, chief curator and vice president, collections and museums; and Douglas Horne and Amanda

Medori Hallauer of D. R. Horne & Company, Arlington, Va., experts in protecting historic properties who served as consultants to Colonial Williamsburg.

Statement from G. Robert ("Bob") Lee, executive director, the Virginia Outdoors Foundation:

*"The Virginia Outdoors Foundation is pleased to partner with the Virginia Department of Historic Resources to protect Carter's Grove, one of the Commonwealth's outstanding cultural heritage resources. We commend Colonial Williamsburg for permanently protecting this significant historic property for the benefit of current and future generations."*

The Virginia Outdoors Foundation was created by the General Assembly of Virginia in 1966 "to promote the preservation of open space lands and to encourage private gifts of money, securities, land or other property to preserve the natural, scenic, historic, open-space and recreational areas of the Commonwealth." The primary mechanism for accomplishing VOF's mission is through open-space easements. Open-space easements allow land to continue to be privately owned but restricted to serve and protect land for the public good. The Virginia Outdoors Foundation currently holds more than 2,000 conservation easements on nearly 406,000 acres in perpetuity, and owns approximately 3,500 acres of conserved land.

Statement from Kathleen S. Kilpatrick, director of the Department of Historic Resources:

*"We have been honored to work with Colonial Williamsburg to provide for the preservation of one of Virginia's master works. Carter's Grove joins 433 other premier properties protected by the preservation easements, and we are excited to work with its new steward to ensure its continued use and vitality."*

The Virginia Department of Historic Resources, the State Historic Preservation Office, is responsible for fostering, encouraging and supporting the stewardship and use of Virginia's significant architectural, archaeological and cultural resources.

Media Contact:
Tom Shrout
(757) 220-7265

Case: 11-30554    Doc# 33-3    Filed: 03/23/11    Entered: 03/23/11 16:17:48    Page 51 of 51