1  Richard M. Pachulski (CA Bar No. 90073)
   Debra I. Grassgreen (CA Bar No. 169978)
2  John W. Lucas (CA Bar No. 271038)
   PACHULSKI STANG ZIEHL & JONES LLP
3  150 California Street, 15th Floor
   San Francisco, California  94111-4500
4  Telephone: 415/263-7000
   Facsimile: 415/263-7010
5  E-mail:  rpachulski@pszjlaw.com
            dgrassgreen@pszjlaw.com
6            jlucas@pszjlaw.com

7  Attorneys for Carter's Grove, LLC
   Debtor and Debtor in Possession

8

9              **UNITED STATES BANKRUPTCY COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11                 **SAN FRANCISCO DIVISION**

12  In re:                               Case No.:  11-30554 (TEC)

13     **CARTER'S GROVE, LLC,**          Chapter 11

14             Debtor.                   **STATUS CONFERENCE STATEMENT
                                         REGARDING CASE ADMINISTRATION
15                                       AND VENUE OF CHAPTER 11 CASE**

16                                       Date:   July 7, 2011
                                         Time:   11:00 a.m.
17                                       Place:  U.S. Bankruptcy Court
                                                 234 Pine Street, 19th Floor
18                                               San Francisco, California
                                         Judge: Honorable Thomas E. Carlson
19

20

21          Carter's Grove, LLC, debtor and debtor-in-possession in the above-captioned case (the

22  "Debtor"), submits this status conference statement pursuant to the *Chapter 11 Status Conference*

23  *Order*, dated February 15, 2011, [Docket No. 11] and the status conference that was held on April

24  1, 2011, and respectfully represents as follows:

25                              <u>BACKGROUND</u>

26          On February 14, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief

27  under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor

28  continues to manage its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in this chapter 11

2  case.

3       The Debtor was formed on December 10, 2007, to hold title to the Carter's Grove

4  Plantation ("Carter's Grove").  Carter's Grove is an historic property/plantation located on the

5  north shore of the James River in the Grove Community of southeastern James City County in the

6  Virginia Peninsula area of the Hampton Roads region of Virginia.  Carter's Grove consists of a

7  Georgian style mansion and 476 acres of pasture surrounding the mansion.

8       In December 2007, Halsey M. Minor ("Mr. Minor") caused the Halsey McLean Minor

9  Revocable Trust 11304 (the "Trust")[1] to acquire Carter's Grove in exchange for a purchase price

10  of $15.3 million.  Mr. Minor caused the Trust to assign its interest in Carter's Grove to the Debtor.

11  Mr. Minor is a strong advocate for historic preservation, which is one of his personal passions, and

12  also owns and lives in a National Historic Landmark in San Francisco.  Mr. Minor purchased

13  Carter's Grove with the intention of restoring it in a manner consistent with its original design.  A

14  conservation easement on the mansion and 400 of the 476 acres is co-held by the Virginia

15  Outdoors Foundation and the Virginia Department of Historic Resources.

16      **A.**     **Case Administration**

17            1.     Maintenance of Carter's Grove

18       Since the Petition Date, the Debtor has been preserving Carter's Grove.  Because Carter's

19  Grove does not operate a business or generate revenue, all of the expenses of maintaining and

20  preserving Carter's Grove have, at all times, been funded by Mr. Minor.  To date, Mr. Minor has

21  expended approximately $110,000 in funds maintaining Carter's Grove and $220,000 prosecuting

22  this case.[2]

23            2.     Operating Reports

24       On or about the 20th of each month, the Debtor has been filing its monthly operating reports

25  in accordance with Section 4.5 of the United States Trustee Guidelines.  The Debtor's monthly

26  operating reports for the months of February, March, April, and May were each filed with the

27

28    [1]  Mr. Minor is the trustee and the sole beneficiary of the Trust.
  [2]  All fees incurred by the Debtor have not been paid and are subject to the approval of the Court.

DOCS_SF:77935.4 33580/002 STATUS CONFERENCE STATEMENT

Court, sent to the United States Trustee, and appear on the Court's docket at Docket Numbers 43, 47, 51, and 63.

### 3. United States Trustee Fees

The Debtor is required to pay quarterly fees to the United States Trustee pursuant to Section 5 of the United States Trustee Guidelines. The Debtor is current with such fees for the quarter ending March 31, 2011. The chapter 11 quarterly fee payments for the period ending June 30, 2011 are not due until July 31, 2011.

### 4. Insurance

The Debtor has maintained insurance for Carter's Grove that provides coverage for general liability and property damage. Shortly after the Petition Date, the Debtor obtained a new annual policy (the "Chartis Policy") with Chartis Property Casualty Company ("Chartis") as the insurance carrier. The annual premium under the Chartis Policy was approximately $25,000. The policy period under the Chartis Policy commenced on March 3, 2011. Under the Chartis Policy, there was a provision that permitted Chartis to cancel the Chartis Policy for any reason in its sole discretion. On or about March 14, 2011, Chartis provided notice to the Debtor that it would discontinue the coverage under the Chartis Policy on account of statements made in the press about the state of the mansion's roof located at Carter's Grove. The Chartis Policy was subsequently cancelled on March 26, 2011.

Promptly after receiving the notice of cancellation, the Debtor's insurance broker began seeking quotes from other insurance carriers. The various proposals received by the Debtor were approximately four times the cost as the premium under the Chartis Policy for coverage that was substantially the same. After reviewing various proposals from various insurance carriers, the Debtor determined that a policy (the "Lloyd's Policy") underwritten by Lloyd's of London ("Lloyd's") was the best policy it could obtain. The Lloyd's Policy has an annual premium of $101,401 and commenced on March 31, 2011.

The Debtor initially paid approximately twenty-five percent of the annual premium due (approximately $28,500) under the Lloyd's Policy, which bound coverage for 60 days. On May 24, 2011, the Debtor filed the *Emergency Motion to Approve Insurance Premium Finance and*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:77554.3 33894/002

STATUS CONFERENCE STATEMENT

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

*Security Agreement and for Authority to Finance Payment of Insurance Premiums* [Docket No. 52] seeking authorization to finance the balance of the premium due under the Lloyd's Policy. Under the finance agreement, the premium was divided into eight (8) monthly installments each in the approximate amount of $9,264. The annual percentage rate under the finance agreement is 3.428% resulting in a total finance charge of approximately $943. On May 27, 2011, the Court approved the foregoing motion [Docket No. 57]. The Debtor is current with its the premium payments due under the finance agreement.

5. <u>Amended Schedules</u>

On June 14, 2011, the Debtor filed amended schedules of assets and liabilities [Docket No. 59] (the "<u>Amended Schedules</u>"). The changes in the Amended Schedules include certain intellectual property that was not listed on the Debtor's schedule of personal property and one general unsecured creditor that was not listed on schedule F.

6. <u>Proofs of Claim</u>

The general bar date for all creditors, other than governmental units, occurred on June 20, 2011 (the "<u>Bar Date</u>"). The bar date with respect to governmental units is August 15, 2011. Since the passing of the Bar Date, five proofs of claim have been filed. Two claims are general unsecured claims filed by utilities in the approximate aggregate amount of $2,750. The Debtor is reviewing these claim to determine whether they are valid. In the event there is no objection, such claims will be paid in full in accordance with the terms and conditions proposed under the Plan (as defined below).

A priority tax claim was filed by the Internal Revenue Service in the approximate amount of $32,000, which relates to certain Federal Insurance Contribution Taxes (FICA) on account of the Debtor's employees. The Debtor believes that all FICA contributions have been paid. As a result, the Debtor and the IRS are exchanging information to determine whether all amounts asserted in the IRS' proof of claim have been paid.

Finally, two secured claims were filed. One claim was filed by The Colonial Williamsburg Foundation and the other by AVN, LLC, both of which are described in greater detail below.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### B.     Property Appraisal

In May 2011, after the stabilization of the real estate market, the Debtor obtained an appraisal (the "Appraisal") of Carter's Grove (inclusive of the approximate 75 acres of developable property), which shows, based on the assumptions and conditions set forth therein, that Carter's Grove is worth no less than $15,800,000.  In preparing the Appraisal, sales, cost, and demographic information were gathered, and analyzed.  Local sources of information included, but were not limited to, area real estate brokers, property managers, property owners, and government officials.  Published sources of information included various government and investment publications.

According to the Appraisal, the value of Carter's Grove is no less than $15,800,000 million provided that the property is marketed for a sufficient amount of time, which might be up to twelve (12) months.  Unlike most real estate, the Debtor's primary asset is unique in that it was declared a National Historic Landmark in 1971 and includes a mansion dating back to the mid 1700's, certain archeological areas in which the excavations revealed the presence of a dairy building, fence lines of eighteenth-century gardens, and African American slave dwellings.  As a result, the appraiser determined that any sale of the property must be conducted over a sufficient amount of time.  Given the unique nature of the property that is located in a historically rich region, the appraiser determined that appropriate marketing is necessary to ensure that a sale would generate the true value of the property.

Accordingly, the Appraisal shows that the fair market value of Carter's Grove substantial exceeds the $8.6 million to $12.5 million in Claims asserted against the Debtor.  Notably, there is an equity cushion of 300% with respect to the secured claim filed by The Colonial Williamsburg Foundation ("CWF").  In addition, the value of the property is sufficiently in excess of the secured claims filed by AVN, LLC ("AVN") and Sotheby's Inc. ("Sotheby's").  The property has approximately $3.5 million in unencumbered equity.

### C.     Plan of Reorganization

On June 14, 2011, the Debtor filed its proposed *Plan of Reorganization* [Docket No. 60] (the "Plan") and the proposed *Disclosure Statement in Support of the Plan of Reorganization*

DOCS_SF:77553.4 3380/002                                                    STATUS CONFERENCE STATEMENT

[Docket No. 61] (the "<u>Disclosure Statement</u>").  As described in greater detail in the Disclosure Statement, the Debtor is solvent.  As a result, the terms and conditions of the Plan provide that all allowed claims will be paid in full.  Because the funding of claims to be paid under the Plan is dependent upon Mr. Minor, the Debtor and Mr. Minor will file detailed financial information regarding Mr. Minor's financial wherewithal and ability to fund the payments contemplated under the Plan.  The Debtor expects that the principal issues that will have to be resolved in connection with the Plan will relate to Mr. Minor's liquidity, and whether the proposed term and interest rate for the secured claim of CWF is fair and equitable.

1.    <u>General Unsecured Claims</u>

Under the Plan, the Debtor estimates that general unsecured claims will total approximately $62,000.  Except to the extent that the holder of an allowed general unsecured claim accepts, or has accepted, less favorable treatment, each holder of such claim will receive, in exchange for and in full and final satisfaction of such Claim, quarterly cash payments over one (1) year plus simple interest at the Federal Judgment Rate per annum that in the aggregate will equal 100% of the amount of the allowed claim.

2.    <u>Secured Claims</u>

Under the Plan there are three separate classes of secured claims.  Carter's Grove, the Debtor's primary asset, secures the claims filed by CWF, AVN, and Sotheby's, each of whom holds a deed of trust against Carter's Grove with relative enforcement priorities respectively held first by CWF, then AVN, and last by Sotheby's.

a.    <u>CWF Secured Claim</u>

The Debtor proposes to treat the secured claim of CWF as follows.  Upon allowance, CWF will receive a new note pursuant to which it will receive quarterly interest payments at the rate of 3.25% per annum subject to a default rate of 5.25% over a three-year period.  All outstanding interest and principal will be paid on or before three years after the effective date under the Plan.  All payment obligations will be subject to a 15 day cure provision in the event the Debtor fails to maintain any of the payments due to CWF under the note.  If the default is not cured within 15 days, the Debtor will be required to sell Carter's Grove pursuant to an "Orderly Sale Process."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Under the Plan, an Orderly Sale Process is proposed in lieu of a foreclosure sale under

2    Virginia law pursuant to the terms of the deeds of trust held by the above secured parties.  Upon a

3    default under the Plan, Carter's Grove and all related personal property, including all intellectual

4    property and other rights in and to the name "Carter's Grove" will be sold in an orderly manner

5    under the supervision and control of the Bankruptcy Court.  Upon receiving a Plan default notice

6    and *provided*, *that* the Debtor does not obtain an order of the Court upon motion filed within 21

7    days of receipt of such notice declaring that no default exists, the Debtor shall promptly list

8    Carters' Grove for sale and shall file with the Bankruptcy Court a motion to approve procedures

9    governing such sale which motion shall include specific timelines governing the marketing and

10   sale of Carters Grove.  During the marketing process, the Debtor shall maintain and insure Carter's

11   Grove.  CWF, AVN, and Sotheby's shall have the right to credit bid at any such sale pursuant to

12   section 363(k) of the Bankruptcy Code.  If no sale can be completed within one year of the Plan

13   default notice, such parties shall be free to commence foreclosure proceedings under Virginia Law

14   pursuant to their respective deeds of trust.

15                        b.    AVN Secured Claim

16       The Debtor and AVN have agreed to treat the AVN secured claim as follows.  AVN shall

17   retain, unaltered, all of the legal, equitable and contractual rights to which it is entitled except that

18   in the event of a default under the Plan, in addition to the remedies AVN may have against Mr.

19   Minor, the sole remedy on account of the guarantee and deed of trust in favor of AVN will be the

20   Orderly Sale Process described above, rather than foreclosure.

21                        c.    Sotheby's Secured Claim

22       The Debtor proposes to treat the secured claim of Sotheby's as follows.  Sotheby's shall

23   retain, unaltered, all of the legal, equitable and contractual rights to which such Claim entitles the

24   holder except that (i) in the event of a default under the Plan, in addition to any remedies Sotheby's

25   has against Mr. Minor, the sole remedy against the Debtor will be the Orderly Sale Process, rather

26   than foreclosure, and (ii) section 2(a) of the Sotheby's Agreement shall be amended to replace

27   December 31, 2011 with March 31, 2012.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**D.     Debtor's Complaint Against the Colonial Williamsburg Foundation**

After the initial status conference that was held on April 1, 2011, the attorneys for the Debtor and CWF met and conferred regarding a timeline and procedures for an informal Bankruptcy Rule 2004 investigation regarding the sale of Carter's Grove.  On April 14, 2011, the Debtor and CWF entered into a case management stipulation that set forth various milestones [Docket No. 45].  In response to the Debtor's informal request for documents, CWF produced nearly 6,000 pages of documents.  The foregoing stipulation was twice amended to accommodate the exchange of documents requested by the Debtor.  In addition, the Debtor took the deposition of four employees of CWF that were familiar with the events prior to and through the sale of Carter's Grove to the Debtor.

During the course of the informal Bankruptcy Rule 2004 investigation, the parties exchanged settlement offers but were not able to agree on terms that were acceptable to both parties.

Consequently, on June 24, 2011, the Debtor commenced an adversary proceeding and filed a complaint (the "Complaint") against CWF (Adv. Case No. 11-03133 (TEC)).  As described in greater detail in the Complaint, the Debtor objects to the claim filed by CWF, and asserts affirmative causes of action for recovery against CWF, on the grounds that CWF knew of, but failed to disclose and actively concealed, significant defects in the property.  Among other things, CWF knew of and actively concealed long-term and pervasive moisture, water damage and mold in the historic Mansion on the property (the "Fraud Claims"), and concealed the disposal of refuse and other debris on the facility from which hazardous substances are now being released (the "CERCLA Claims").  The Debtor is informed and believes that CWF knew of these defects and intentionally concealed them in an effort to mislead the buyer.

**E.     The Motion to Transfer Venue**

Prior to the April 1, 2011 status conference, the Court issued a tentative ruling [Docket No. 42] (the "Tentative Ruling") regarding the motion filed by CWF to transfer the venue of the Debtor's case to the United States Bankruptcy Court for the Eastern District of Virginia [Docket No. 21] (the "Venue Motion").  In the Tentative Ruling, the Court stated that "[w]hether venue

should be transferred depends upon what activities will be important to the administration of the case." In that regard, the Court noted that if the Debtor objects to CWF's claim on the basis of (a) misrepresentation or (b) any challenge to the conservation easements, that such matters should be heard in Virginia. However, if the Debtor's principal seeks additional time to restructure the Debtor's obligations so that they can be paid in full, the case should remain in the Northern District of California. At the scheduled hearing on the Venue Motion, the Court indicated that it wanted to review any objection to ascertain the "gravamen" of the claims raised therein.[3]

In light of the Court's Tentative Ruling and the events that have occurred since the initial status conference, the Debtor believes that venue should remain in this District. The Debtor filed its Plan and Disclosure Statement on June 14, 2011. The terms of the Plan provide for the <u>full payment of all allowed claims</u>. The Debtor is prepared to move forward with the confirmation process and is ready to schedule a hearing on the approval of the Disclosure Statement. Notably, the confirmation of the Plan is not dependent upon the resolution of disputed claims asserted against the Debtor's estate. In that regard, the Debtor will show that all such claims can be paid in full as filed or in any amount ultimately determined by the Court. The issues that will likely arise in connection with Plan confirmation will include feasibility, and the appropriate market terms for the restructured loan from CWF. The foregoing confirmation issues can be appropriately resolved by this Court.

With respect to the gravamen of the issues raised in the Complaint, the Debtor has not and will not challenge the conservation easements. The Debtor is challenging the claim of CWF on the basis of fraudulent concealment and on account of the CERLA Claims. There is nothing unique about the CWF Fraud Claims –they are garden variety fraud claims that can be determined by this Court or the District Court in the Northern District of California. The CERCLA Claims are based under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, *et seq.* ("<u>CERCLA</u>"). As federal claims, they are not dependent upon interpretation of Virginia law and should be decided by the District Court in the Northern District of California.

---

[3] CWF's reply papers raised numerous disputed factual issues. To the extent the Court intends to consider issues beyond those set forth in the Tentative Ruling, the Debtor requests that an evidentiary hearing be scheduled.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1 The Complaint filed against CWF represents one part of this case and should not determine the

2 disposition of the overall case, especially when the chapter 11 case is not dependant on the

3 outcome of the Complaint. [4]

4      In the Venue Motion, CWF asserts that the entire chapter 11 case should be transferred to

5 Virginia solely because the Debtor's primary asset and the various witnesses relating to CWF's

6 claim are located in Virginia. The chapter 11 case is not solely about the claim filed by CWF.

7 CWF is seeking to transfer the case merely for its convenience without regard to the Debtor's

8 proper selection of venue. In any event, CWF demonstrated during the informal Bankruptcy Rule

9 2004 investigation that the proximity of the property and witnesses to this Court are not relevant to

10 the administration of the case. While working on opposite coasts, the attorneys for the Debtor and

11 CWF conferred numerous times regarding the scope of the informal investigation and the

12 documents produced by CWF over the course of approximately four weeks. The attorneys

13 consensually resolved disputes regarding the scope of the investigation and production of

14 information either through e-mail or by telephone, as would happen even if the case was pending

15 in Virginia. Moreover, the fact that the case is pending in this District did not change the fact that

16 CWF had to mail a single banker's box of documents to the Debtor's attorneys in San Francisco,

17 while the supplemental document productions were delivered by e-mail.

18      In addition, the Debtor's attorneys conducted the depositions of four CWF employees

19 during the course of two days in Virginia. If the parties determine that additional discovery is

20 necessary after CWF files its answer to the Complaint, CWF cannot contest that such discovery

21 will similarly proceed without any inefficiencies, notwithstanding the fact that the venue of the

22 chapter 11 case is in this District.

23      In the end, CWF has not contested that the Debtor's choice of venue is proper. On that

24 account, the Debtor's choice of venue should be accorded great. In addition to venue being proper,

25 this case should remain in this District because (a) CWF, the only part y requesting a transfer of

26 venue, is adequately protected by a 300% equity cushion, which demonstrates that its claim will be

27

28     [4] Given the jury trial request and the non-core nature of the CERCLA Claims, the CWF Complaint will be heard by the District Court in any event.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

satisfied in full regardless of how the case is ultimately resolved, (b) the Plan proposes to pay all creditors in full, (c) AVN is not located in Virginia and filed a joinder in support of the Debtor's objection to the Venue Motion, (d) Sotheby's is not located in Virginia and filed an objection to the Venue Motion, (e) Mr. Minor, who is located in San Francisco and responsible for the funding the Plan, is the party that has the real economic stake in this case, (f) the Debtor has diligently prosecuted this case and will be able to show that all claims will and can be paid in full even if CWF's claim is allowed in the amount filed, and (g) confirmation of the Plan is not contingent upon successful outcome of the claims asserted in the Complaint.

Dated:    June 30, 2011                    PACHULSKI STANG ZIEHL & JONES LLP


                                           By    */s/ John W. Lucas*
                                                 _____
                                                 Richard M. Pachulski
                                                 Debra I. Grassgreen
                                                 John W. Lucas

                                                 Attorneys for Debtors
                                                 and Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA