JEFFREY C. KRAUSE, (State Bar No. 94053)
jkrause@stutman.com
H. ALEXANDER FISCH, (State Bar No. 223211)
afisch@stutman.com
GABRIEL I. GLAZER, (State Bar No. 246384)
gglazer@stutman.com
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Telecopy: (310) 228-5788

PAUL K. CAMPSEN, (VSB No. 18133)
pkcampsen@kaufcan.com
DENNIS T. LEWANDOWSKI, (VSB No. 22232)
dtlewand@kaufcan.com
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Telecopy: (757) 624-3169

Counsel for The Colonial Williamsburg Foundation

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

In re:

CARTER'S GROVE, LLC,

Debtor.

Bankruptcy Case No: 11-30554

Chapter 11

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER VENUE CONSISTENT WITH THE COURT'S TENTATIVE RULING**

**<u>Hearing</u>**

Date: July 7, 2011
Time: 11:00 A.M.
Place: Courtroom 23
235 Pine Street
San Francisco, CA 94104

## Introduction

The Colonial Williamsburg Foundation ("CWF") submits this supplemental memorandum in support of CWF's motion to transfer venue of this case from this Court to the United States Bankruptcy Court for the Eastern District of Virginia, Newport News Division ("VA Bankruptcy Court"), which CWF filed on March 3, 2011 [Doc. No. 22] ("Transfer Motion").[1] CWF will not repeat herein the facts or legal arguments set forth in the Transfer Motion. This memorandum addresses only the following matters, each of which occurred after the original hearing on the Transfer Motion: (1) the discovery taken by Carter's Grove, LLC (the "Debtor"), which further demonstrates that virtually all witnesses are located in Virginia, (2) the filing of the Debtor's *Complaint Regarding: (A) Objection to Claim Filed By The Colonial Williamsburg Foundation, (B) Counterclaims For (I) Fraudulent Concealment, (II) Cost Recovery Under CERCLA, And (III) Declaratory Judgment* [Doc. No. 64] ("Complaint"), and (3) the fundamental mischaracterizations of the deposition testimony contained therein.

After briefing on the Transfer Motion was completed this Court issued its tentative ruling ("Tentative Ruling"), which provided in relevant part as follows:

> Whether venue should be transferred depends upon what activities will be important to the administration of the case. **If Debtor objects to [CWF's] claim on the basis of alleged misrepresentation re the Virginia Property,** or if Debtor seeks to challenge conservation easements against the Virginia Property, **those matters should be heard in Virginia and venue should be transferred.** If Debtor's principal merely seeks time to pay Debtor's obligations in full, administration can be handled effectively in the present venue court is inclined to set a prompt deadline for filing objections to claims, and to continue the matter to see what claim objections are filed.

[Doc. No. 42] (emphasis added).

Based on the Court's Tentative Ruling the parties entered into a series of stipulations providing for limited pre-litigation discovery by the Debtor, because the Debtor contended it needed

[1] Capitalized terms not defined herein shall have the meaning set forth in the Transfer Motion. This Supplemental Motion fully incorporates and relies upon all of the facts and legal arguments set forth in the Motion that are not repeated here.

additional information to decide whether to sue CWF. The parties also agreed to set a deadline for the Debtor to file an objection to CWF's secured claim and any claims against CWF. The parties agreed to continue the hearing on the Transfer Motion, which is now scheduled for July 7, 2011. The Debtor demanded the production of documents by CWF, which CWF produced from the records it maintains in Virginia. The Debtor also deposed four witnesses, each of whom resides in Virginia.

On June 24, 2011, the Debtor filed the Complaint against CWF in which the Debtor alleges that CWF fraudulently concealed the condition of the Virginia Property when the Debtor bought it. The Debtor alleges that CWF purportedly concealed: (1) water damage, moisture and mold in the Mansion, and (2) refuse and alleged hazardous substances purportedly dumped by CWF at the Virginia Property, including claims under CERCLA for past and future response costs. The Debtor seeks the disallowance of CWF's entire claim, declaratory relief, and compensatory damages or, in the alternative, rescission of the sale of the Virginia Property and restitution of the amounts paid to CWF, as well as reimbursement for past response costs, punitive damages and attorneys' fees. Complaint at pp. 13-14.

As CWF anticipated in the original Transfer Motion, the Complaint is premised on allegations regarding the condition of the Virginia Property when the Debtor acquired it, and CWF's alleged failure to disclose the conditions to the Debtor. All fact witnesses who are likely to testify in the adversary proceeding, other than Halsey Minor, are located in Virginia. Not surprisingly, every witness examined by the Debtor prior to filing the Complaint is based in Virginia. Most or all expert witnesses are likely to be located in Virginia and will certainly have to travel to Virginia to inspect the Virginia Property. For the reasons articulated by CWF in the papers supporting the Transfer Motion and by the Court in the Tentative Ruling, this chapter 11 case should be transferred to Virginia.

## **Argument**

In deciding venue motions, bankruptcy courts consider the totality of the circumstances, including the following non-exclusive factors: (a) proximity of creditors to the Court; (b) proximity of debtor to the VA Bankruptcy Court; (c) proximity of witnesses necessary to

administration of estate; (d) location of assets; (e) economic and efficient administration of case; and (f) need for further administration if liquidation ensues. *Donald v. Curry (In re Donald),* 328 B.R. 192, 204 (B.A.P. 9th Cir. 2005). As CWF previously explained in the Transfer Motion, an analysis of these factors overwhelmingly supports the transfer of the venue of this case from this Court to the VA Bankruptcy Court.

After careful consideration of the facts and applicable case law, the Court agreed that Virginia would be the most appropriate venue to adjudicate this case if the Debtor elected to file a lawsuit against CWF based on alleged misrepresentations by CWF regarding the Virginia Property. The Debtor has filed the Complaint on these very grounds, raising several claims, each of which arises directly out of the alleged conditions of the Virginia Property. This Court recognized when it issued its Tentative Ruling that if the Debtor chose to launch litigation against CWF (the senior secured creditor with a lien on the Debtor's only material asset) that litigation would be central to the resolution of the chapter 11 case and should proceed in Virginia where the Virginia Property and virtually all witnesses are located. The Tentative Ruling was appropriate when this Court issued it and nothing has changed. The Transfer Motion should be granted.

The Debtor has objected to CWF's claim, and has asserted offsets and counterclaims. Given the amount of CWF's claim, the historical importance of the Virginia Property, and the fact that these issues (most of which are controlled by Virginia law) will be the most significant determinations in this chapter 11 case, the proximity of CWF and the witnesses likely to testify to the forum should be given substantial weight. *In re West Coast Interventional Pain Med., Inc.*, 435 B.R. 569, 580 Bankr. (N.D. Ind. 2010).

The Complaint alleges that CWF's claim for the balance remaining on the Note should be disallowed in its entirety because, among other things, the Virginia Property purportedly had a leak known only to CWF, which CWF fraudulently concealed at the time of the sale. In light of the alleged concealed water damage, moisture and mold, the Debtor also seeks damages based on (i) amounts actually paid for the purchase of the Virginia Property in excess of the value of the Virginia Property at the time of sale, (ii) the costs to "identify and remediate the cause of the water intrusion and persistent mold" that were allegedly concealed, and (iii) the "persistent mold that is an

Case: 11-30554 Doc# 66 Filed: 07/01/11 Entered: 07/01/11 12:26:30 Page 4 of 41

unacceptable health hazard to Mr. Minor's family, which must be fully corrected." Complaint at ¶ 60. In addition, the Debtor asserts that CWF improperly buried, and thereby concealed, asphalt, debris and hazardous substances on the Virginia Property, and that CWF is liable for the removal of such items and remediation of the Virginia Property. The Debtor further asserts that CWF is liable to the Debtor for past and future "response" costs under CERCLA.

CWF denies the allegations of fraud and concealment set forth in the Complaint.[2] CWF is particularly disturbed by the mischaracterization of the deposition testimony given by Thomas Peck, Director of Planning for CWF, based on incomplete excerpts which are cited in paragraph 33 of the Complaint. CWF recognizes that now is not the time to address the merits of the Complaint and the basis of the Transfer Motion is that litigation of such merits will require the testimony of many witnesses based in Virginia. The location of the witnesses is the relevant factor in connection with the Transfer Motion, not their actual substantive testimony.

That said, the Debtor has taken portions of Mr. Peck's testimony out of context in an effort to paint a misleading picture. The Complaint alleges that Mr. Peck "unambiguously admitted that CWF's remedial work with respect to water damage was undertaken for the express purpose of shielding the adverse conditions from prospective purchasers." Complaint at ¶ 33. This is simply untrue. The Debtor has cobbled together Mr. Peck's answers, out of context and out of order, in an effort to mislead the Court into believing that Mr. Peck testified that CWF sought to deceive the Debtor and cover up certain defects. During Mr. Peck's deposition,[3] counsel for the Debtor expressly stated that when he used the term "cover-up," he did not mean "it like in Watergate:"

> Q. You'll see again on page 1598 that there are references to repairing plaster, and on page 1599 there is observation of mold that should be washed. Is it fair to say that all of the re-plastering and washing of the mold was being done to cover up the condition that you observed for purposes of sale?

---

[2] Prior to CWF noticing the foreclosure sale of the Virginia Property and during the three year period that the Debtor owned and was in possession of the Virginia Property, neither the Debtor nor Minor advised CWF of the "leak" issue. It was only after the Debtor was given notice of the impending foreclosure sale that the Debtor decided that the monetary defaults under the Note were justified by the "leak" issue. Taylor Declaration ¶ 14.

[3] A copy of the complete transcript of Mr. Peck's May 24, 2011 deposition ("Peck Deposition Transcript"), is attached hereto as **Exhibit A**.

Mr. Campsen: I'm going to object to the term cover-up to the extent that it –

Mr. Morris: **I mean physically cover up. I'm not using it like in Watergate.**

Peck Deposition Transcript at 50, line 16 to 25 (emphasis added). Despite this explanation, the Debtor now contends that when Mr. Morris asked questions and Mr. Peck answered them regarding an effort to clean up the Virginia Property, the testimony purportedly demonstrates an intent to "cover-up" and conceal the alleged defects.

Mr. Peck actually testified that he believed any damage at the Mansion had been completely repaired, so that there was no defect or damage to be concealed. Mr. Peck testified that CWF's repair efforts were completed in the ordinary course and in preparation for the sale, and that the water damage had been completely repaired before the sale:

Q: Did you have an understanding that the water damage that you observed at that time was going to be patched and painted over?

A: It was going to be repaired. I wouldn't use the word patched. I would use the word repair.

Peck Deposition Transcript at 40, line 24 to 41, line 24.

Q: Was the point of the exercise to make it so that the water damage was no longer visible?

A: It was to repair the broken plaster. Again, it was not an active leak. If it would have been an active leak, we would have repaired it.

Peck Deposition Transcript at 42, line 10-14.

Q: On the process of doing your walkthrough, if there was a serious issue in the building, would you have had an investigation?

[Objection]

A: Absolutely. If there was a problem, we would have fixed it.

Q: Were there any other things you observed and written down in Exhibit No. 3 of the nature that required further inspection?

A: No.

Peck Deposition Transcript at 42, line 13-25.

Q:      What was the general condition of the building in 2007?

A:      I think the general condition of the building was in good condition.

Peck Deposition Transcript at 92, line 8 to line 11.

Q:      Let's take the repairs that are shown on Exhibit No. 3 What was the purpose of doing all of these repairs shown on Exhibit No. 3?

A: The purpose was to make sure that the house was in better condition, and we wanted to make the house look as good as it could for the sale.

Q:      Did the Foundation attempt to cover up any of the issues and repairs that were necessary to the property?

[objection]

A:      Absolutely not.

Peck Deposition Transcript at 93, line 11 to line 25.

Mr. Peck did not testify that he believed that there existed problems that CWF was concealing; he testified he believed the problems had been completely repaired. Relevant portions of the Peck Deposition Transcript appear at pages 39-44, 46-47, 50-51, and 90-93. CWF does not ask this Court to address the merits of the allegations set forth in the Complaint based on the Complaint and the entire Peck Deposition Transcript. CWF could not, however, allow the mischaracterization of Mr. Peck's testimony based on limited sound-bites in the Complaint to create the misimpression that CWF's employee somehow admitted CWF had sought to conceal defects.

CWF intends to vigorously defend the Complaint and in doing so will rely on the testimony of many witnesses, all of whom are located in Virginia. Virginia lawyers conducted the sale of the Virginia Property. Virginia residents maintained the Virginia Property prior to the sale and Virginia caretakers have maintained the Virginia Property since the sale closed. Virginia experts will be in the best position to testify about the condition of the Virginia Property, the historic significance of the Virginia Property, and the steps needed to properly maintain the Virginia Property going forward. Virginia appraisers will testify about the value of the Virginia Property. CWF has identified approximately 20 fact witnesses who CWF anticipates may be required to testify based on the allegations in the Complaint. Other than Mr. Minor, all of these potential fact witnesses

reside in Virginia. It would be patently unfair and inconvenient and would generate a great expense to require CWF and all these witnesses to travel across the country to litigate these matters.

**Conclusion**

CWF respectfully submits that the Court's Tentative Ruling was well-founded and that the Court should grant the Transfer Motion.

Respectfully submitted,

Dated: July 1, 2011

STUTMAN, TREISTER & GLATT
JEFFREY C. KRAUSE
H. ALEXANDER FISCH
GABRIEL I. GLAZER

By: */s/ H. Alexander Fisch*
Counsel for THE COLONIAL WILLIAMSBURG FOUNDATION

Case: 11-30554 Doc# 66 Filed: 07/01/11 Entered: 07/01/11 12:26:30 Page 8 of 41

**EXHIBIT "A"**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

IN RE: )
)
) 
CARTER'S GROVE, LLC, ) Case No. 11-30554(TC)
)
) Chapter 11
Debtor. )
-------------------------

DEPOSITION OF

COLONIAL WILLIAMSBURG FOUNDATIONS, BY AND THROUGH

THOMAS PECK

WILLIAMSBURG, VIRGINIA

MAY 24, 2011

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California 91203
(818) 551-7300

REPORTED BY: NANCY C. MANN

File No.: A50486A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

IN RE: )
)
)
CARTER'S GROVE, LLC, ) Case No. 11-30554(TC)
)
) Chapter 11
Debtor. )
------------------------

Deposition of THOMAS PECK, called as a witness on discovery, taken at the law office of Kaufman & Canoles, 4801 Courthouse Street, Suite 300, Williamsburg, Virginia, commencing at 11:00 a.m., Tuesday, May 24, 2011 before Nancy C. Mann, Court Reporter.

A P P E A R A N C E S

ON BEHALF OF CARTER'S GROVE, LLC:
PACHULSKI, STANG, ZIEHL & JONES, LLP
BY: JOHN A. MORRIS, ESQUIRE
780 Third Avenue
36th Floor
New York, New York 10017-2024
(212)561-7700
jmorris@pszjlaw.com

ON BEHALF OF COLONIAL WILLIAMSBURG FOUNDATION:
KAUFMAN & CANOLES
BY: R. BARROW BLACKWELL, ESQUIRE
4801 Courthouse Street
Suite 300
Williamsburg, Virginia 23188
(757)259-3833
rbblackwell@kaufcan.com
COLONIAL WILLIAMSBURG FOUNDATION
BY: GAIL WADDELL, GENERAL COUNSEL
134 N. Henry Street
Williamsburg, Virginia 23185
(757)220-7220

Also Present: Robert B. Mays

I N D E X

WITNESSES

| Witness: | Examination by: | Page: |
|---|---|---|
| Thomas Peck | Mr. Morris | 6,94 |
| | Mr. Campsen | 87 |

EXHIBITS

| Exhibits for Identification: | Page: |
|---|---|
| 1. Colonial Williamsburg Foundations' Designation of Deponents | 23 |
| 2. Excerpts from Carter's Grove Methos Work Order History | 30 |
| 3. Preparations Room by Room Listing, Bates Nos. CWF01589 - CWF01599 | 39 |
| 4. Carter's Grove Site Preparation for Sale | 53 |

| (Exhibits Con't) | Page |
|---|---|
| 5. Emails, Bates Nos. CWF05839 - CWF05843 | 54 |
| 6. W. A. Lynch Roofing Company, Inspection Report | 64 |
| 7. Tom Peck Photographs, Bates Nos. CWF05046 - CWF05053 | 70 |
| 8. K. F. Wilson Contract | 71 |

THOMAS PECK,
having first been duly sworn, was
examined and testified as follows:

EXAMINATION

BY MR. MORRIS:

**Q. Good morning, Mr. Peck.**

A. Good morning.

**Q. Would you please state your name for the record.**

A. Tom Peck.

**Q. Where do you live, Mr. Peck?**

A. I live in Toano, Virginia.

**Q. Mr. Peck, my name is John Morris. I'm an attorney here for the current owner of the Carter's Grove property. I'm going to ask you a series of questions to which you are required to give complete answers to the best of your knowledge. Do you understand that?**

A. Yes, sir.

**Q. If you don't understand any question that I ask, please let me know and I'll try to rephrase it so that I can clarify or eliminate any confusion that you might have. Do you understand that?**

A. Yes, I do.

**Q. If you would like to take a break at any time, just let me know and I'll be happy to accommodate you as long as a question is not pending. Is that okay?**

A. That's fine.

**Q. Are you currently employed?**

A. Yes, I am.

**Q. Who is your employer?**

A. Colonial Williamsburg.

**Q. Is that also known as the Colonial Williamsburg Foundation?**

A. Yes, it is.

**Q. During the course of this deposition I'm going to refer to the Foundation, and when I do will you understand that I'm referring to your employer?**

A. Yes, I will.

**Q. What is your title today?**

A. Director of planning.

**Q. How long have you held that title?**

A. Since 1995.

**Q. What are your duties and responsibilities today as the director of planning for the Foundation?**

A. I'm in charge of project management, construction management, capital planning.

**Q. Have those three broad areas been within your scope of duties and responsibilities since the time you**

**become the director of planning at the Foundation in 1995?**

A. No. I took on the role of construction management responsibility in roughly 2009.

**Q. Prior to 2009 were the two broad areas of responsibility for you project management and capital planning?**

A. Yes.

**Q. Are you aware that the Foundation sold the property known as Carter's Grove in or around December of 2007?**

A. Yes, I am.

**Q. Prior to the sale of Carter's Grove by the Foundation, did you have any responsibilities with respect to Carter's Grove?**

MR. CAMPSEN: I have to object. Can you kind of limit the time frame?

MR. MORRIS: Sure.

BY MR. MORRIS:

**Q. Between 1995 and the sale.**

A. Responsibilities?

**Q. Yes.**

A. I was involved with the prior -- with the work prior to the sale, and I have general knowledge of before that.

**Q. When did your work in connection with Carter's Grove prior to the sale begin?**

A. Roughly 2007. Specifically, I was involved in some analysis and some discussion prior to that.

**Q. When you say 2007, do you mean roughly January of 2007?**

A. Yes, I do.

**Q. Prior to January of 2007, what analysis and discussion were you involved in with respect to Carter's Grove?**

A. We were involved in making decisions on what to do with the property from roughly 2003 through 2007.

**Q. Other than the discussions and analyses concerning what to do with the property during that period of time, did you have any other responsibilities with Carter's Grove prior to the sale?**

A. You'll have to limit the time frame.

**Q. Let's say 1995 to the sale.**

A. I was involved in project work that went on at Carter's Grove from '95 on.

**Q. From 2002 until the sale, were you involved in any project work at Carter's Grove?**

A. No, not until 2007.

**Q. Can you describe generally what project work you were involved in at Carter's Grove between 1995 and**

**2002?**

A. I can't specifically, but I know there was replacement work that was done out there. Heating systems were replaced. I think we did some air conditioning work from '95 on. So I know that there was some work that went on there, but not specifically.

**Q. Is it fair to say that from 2002 until the end of 2006 your only involvement with Carter's Grove was analysis and discussion concerning what to do with the property?**

A. That's true.

**Q. Do you recall whether, as part of the discussion about what to do with the property from 2002 to 2006, the condition of the property was ever discussed?**

MR. CAMPSEN: I think it was 2003 to 2006, not 2002.

THE WITNESS: That's true.

MR. MORRIS: Let me rephrase it then.

BY MR. MORRIS:

**Q. During the period from 2003 to 2006, when you were involved in discussion about what to do with the property, was the condition of the property ever discussed?**

A. Yes, it was.

**Q. Do you recall any discussion about the**

**condition of the property during that period of time?**

A. In very general terms.

**Q. Can you describe for me in general terms what you remember?**

A. We were asked to give our opinion of the condition of the building from all kinds of physical assets of the building, from the roof to the boiler room, because those discussions engendered conversation about what to do with the property. And there was a group of us that have had enough corporate knowledge and have enough knowledge of the property to give opinions in those areas.

**Q. And did you give any opinions?**

A. Sure.

**Q. Do you recall any opinion you gave?**

A. No, I don't.

**Q. Do you recall whether any of your opinions are reflected in any documents, memos, emails, or any written communication?**

A. I don't recall that.

**Q. Can you tell me more specifically what assets you were asked to give opinions about?**

A. For instance, the condition of the air conditioning system, the interior condition, the condition of the grounds.

**Q. Did you say the boiler?**

**MR. CAMPSEN. No.**

THE WITNESS: I said the systems, heating and air conditioning, electrical systems and such.

BY MR. MORRIS:

**Q. Let's start with the AC system. Do you have any recollection of any opinion you provided with respect to the air conditioning system during this period of 2003 to 2006?**

A. Well, I know it's age, and I can hypothesize from its age its general condition.

**Q. I appreciate that, but I'm asking you if you have any particular recollection of any of the opinions that you expressed.**

A. Other than what I just said, I think that would have been my opinion.

**Q. Do you remember the condition of the air conditioning system during this period of time from 2003 to 2006?**

A. Sure.

**Q. Can you describe for me what the condition of the air conditioning system was during that time?**

A. During the time period of 2002 to --

**Q. 2003 to 2006.**

A. I would say the condition was generally in

good condition given its age.

**Q. How old was it?**

A. It was installed in roughly 1974, so that's almost 30 years old.

**Q. Did you have any understanding at that time about what the normal expected life of an air conditioning unit, such as the one that was in Carter's Grove, would be expected to have?**

A. Usually that stuff lasts 30 to 40 years.

**Q. Were you of the opinion during that period of time, 2003 to 2006, that the air conditioning system at Carter's Grove was near the end of its expected useful life?**

A. Yes, I do.

**Q. Do you recall whether you expressed your opinion that the air conditioning system was near the end of its useful life to anybody at the Foundation during the period of 2003 to 2006?**

A. I'm sure I did, but I can't recall specifically.

**Q. Do you know whether there were any problems identified in the mansion that resulted from the air conditioning system?**

A. No.

**Q. Do you recall whether anybody else expressed an opinion about the state of the air conditioning system**

during the period 2003 to 2006?
A. Can you rephrase the question again?
Q. Do you recall whether anybody else expressed an opinion about the air conditioning system during this period of time?
A. I'm sure they did.
Q. Do you have any recollection of that?
A. No.
Q. Were you asked to provide your opinions on the assets that you've described?
A. I'm sure I was. I'm sure in some of those documents that you're going to find my opinions in there.
Q. Was there a working group or some committee or something to whom you were expected or asked to give your opinions?
MR. CAMPSEN: What time frame? Still 2003 to --
MR. MORRIS: Yeah.

BY MR. MORRIS:
Q. Let's assume that every question now is just from 2002 to 2006.
A. There was a working group, and I was not a part of that working group.
Q. Do you have an understanding as to what the

purpose of the working group was?
A. In my opinion the working group was put together to develop options as to what the future use of the property would be.
Q. And in considering those options, were you expected to give your opinions as to assets so that the working crew could decide what would be needed if they were going to retain Carter's Grove?
A. I wasn't part of the working group, but I'm sure my opinions got floated to that level.
Q. Do you recall whether you expressed the opinion to anybody within the working group that retention of Carter's Grove would require the replacement of the air conditioning system in some short period of time?
A. Do I recollect if I made that recommendation?
Q. Yes.
A. No, I don't -- I don't think I made that recommendation.
Q. Do you recall whether you expressed an opinion to anybody in the working group that any of the assets or systems that you described would need to be replaced in the short term?
A. I think it was general knowledge that there was work that was necessary to be done.
Q. What was the general knowledge, as you

understood it, of the work that was necessary to be done?
A. Well, I think given its age, for instance, the air conditioning system at some point would need to be replaced.
Q. Did you have an understanding of the time period in which that replacement would be expected to occur?
A. As I said before, generally those things last 30 to 40 years.
Q. Was there any other asset or system at Carter's Grove that you felt was going to need to be replaced within five years of your deliberations?
A. Within five years, no.
Q. How about within ten years?
A. No.
Q. Did you ever see a budget that was prepared that described the projected costs that would be necessary if the Foundation decided to retain Carter's Grove as opposed to selling it?
A. Yes.
Q. Do you recall who was responsible for preparing that budget?
A. I put a lot of that together.
Q. Do you recall approximately what the cost would have been to complete the items on the budget if the Foundation had decided to retain Carter's Grove?

A. No, I don't.
Q. How did you go about putting that budget together?
A. We broke the facility assets of the building out in pieces, looked at its condition, and tried to determine what it would cost to bring it back to a serviceable level.
Q. Did you have assistance in the preparation of that budget?
A. I don't recall at this time who worked with me on that.
Q. Did you present that budget to any particular person?
A. The budget eventually went to Bob Taylor.
Q. Did you personally present it to Mr. Taylor?
A. Yes. It came from that. We didn't sit down face to face and do it, but yeah.
Q. Did there ever come a time when you sat down face to face with anybody to discuss what you believed was your final budget?
A. Yes.
Q. Do you recall with whom you had that face to face conversation?
A. Let me retract that. I don't think I ever did a face to face. I think I sent him a spreadsheet or a

letter and said these are the costs and so on and so forth. I don't think that we ever had a face to face conversation.

**Q. Did anybody ever ask you any questions about what you perceive to be your final budget?**

A. I'm sure there was discussion about it, but I don't remember specifically.

**Q. Did the budget that you prepared contemplate the replacement cost of the air conditioning system?**

A. I'm sure it did.

**Q. Do you recall whether the overall size of the budget was more than $1,000,000.00?**

A. No, I don't recall that.

**Q. Do you recall if it was more than $500,000.00?**

A. It must have been more than $500,000.00, sure, certainly.

**Q. Are you at all familiar with the maintenance budget for Carter's Grove during this period from 2003 to 2006?**

A. I know what the budget was before we closed the building in rough numbers, but I'm not familiar with the period between 2003 and 2006.

**Q. What was it before you closed the building, roughly?**

A. Roughly a quarter million dollars.

**Q. And you have no sense as to the magnitude of**

**the maintenance budget post closing?**

A. It must have been less.

**Q. Why do you say that?**

A. Because the building wasn't open to the public.

**Q. I know there are less or fewer maintenance costs as a result of that?**

A. Yes.

**Q. Do you have any understanding of what maintenance costs would be reduced or eliminated as a result of the closing of the building?**

A. No, I don't.

**Q. Do you recall when the decision was made to sell the property?**

A. Well, I know when that decision was made, but I don't recall it at this time. But I think it was late 2006.

**Q. Are you at all familiar with the reasons which caused the Foundation to decide to sell rather than retain Carter's Grove?**

A. No, I'm not.

**Q. Did you ever discuss with anybody the reasons why the Foundation decided to sell Carter's Grove?**

A. With anybody?

**Q. Yes.**

A. Anybody at the Colonial Williamsburg?

**Q. Yes.**

MR. CAMPSEN: Are we talking about the same time frame?

MR. MORRIS: Yes, any time after the decision was made.

THE WITNESS: Yes, there was casual conversation about why we're selling Carter's Grove.

BY MR. MORRIS:

**Q. Do you recall any of those casual conversations?**

A. Not specifically.

**Q. Do you recall generally?**

A. Well, there was obviously much discussion internally about the selling of Carter's Grove. It's a big asset. It's been with us a long time. So, yes, there was lots of conversation in the hallway at the water fountain about the selling of Carter's Grove.

**Q. Did you have any opinion about what the Foundation should do with that property?**

A. My opinion?

**Q. Yes.**

A. I think they made the right decision.

**Q. To sell it?**

A. Yes.

**Q. Why do you think that?**

A. Because I don't think it fits into the message of Colonial Williamsburg.

**Q. In what sense doesn't it fit in?**

A. Well, it doesn't interpret -- it's not part of the town of Williamsburg, and I think that we ought to focus our efforts on the core of the -- in the historic area as opposed to sort of outlying properties.

**Q. Do you have an understanding as to when the Foundation acquired Carter's Grove?**

A. Roughly '69.

**Q. At any point from 1969 until the sale in 2007 was Carter's Grove part of the town?**

A. No.

**Q. So that wasn't a new fact that developed in 2003, 4, 5, or 6, is it?**

A. No.

**Q. Is there anything that occurred during that period that led you to believe that a sale would be appropriate other than the fact that it wasn't part of the town?**

A. Say the question again.

**Q. Was there anything that led you to believe**

that the decision to sell was the right one other than the fact that Carter's Grove was not part of the town?
A. Well, I didn't get involved in the decision to sell Carter's Grove, so I'll have to leave that to the people that made that decision.
Q. But you did form an opinion that the decision to sell was the right one; is that correct?
A. Yes, I did.
Q. And did you base that opinion on anything other than the fact that Carter's Grove was not part of the town?
A. No.
Q. You were aware of the cost of your maintenance and repair budget; is that correct?
A. Uh-huh.
Q. Was the cost of the maintenance and repair budget a factor in your opinion that the decision to sell was the right one?
A. Yes.
Q. In what way?
A. It's a very expensive property to own and operate. And I was not privy to the revenue, so I can't judge on that, but I do know that it was an expensive property to operate.
Q. Do you know what the primary expenses of

operation were?
A. No.
MR. MORRIS: I would like to mark as Peck Exhibit No. 1 a document that's titled, "The Colonial Williamsburg Foundation's Designation of Deponents Pursuant to Rule 30(b)(6)."

(Colonial Williamsburg Foundation's Designation of Deponents was marked as Peck Exhibit No. 1 for identification.)

BY MR. MORRIS:
Q. Mr. Peck, I'm going to direct your attention to Page 5. I just want to go through this document with you to see if you can confirm what's being presented. Have you seen this document before, sir?
A. No, I have not.
Q. Mr. Peck, the current owner of the property has asked the Foundation to provide a witness to answer questions with respect to certain topic areas. I'll represent to you that this document was prepared by the Foundation's lawyers in response to those requests. I just want to go through the document to make sure that you know why you're here and that you're prepared to answer the questions on the topics that the Foundation has offered

you for.
In No. 1 under C, a request has been made for a witness who could describe maintenance and repair at Carter's Grove during the five years prior to the sale, and I have summarized that. Below you're referred to as someone having knowledge of the maintenance and repair but limited to work performed on the property in connection with the walkthrough and in preparation for the sale. Do you see that?
A. Yes, I do.
Q. Do you, in fact, have knowledge about the maintenance and repair with respect to work performed on the property in connection with the walkthrough and in preparation for the sale?
A. Can you describe what the word walkthrough means?
Q. That was really a word that was used by the Foundation and not by me or my colleagues.
Mr. CAMPSEN: If I might add, I think what they're referring to there is the 2007 room by room inspection. I think it was about January or in early 2007, a room by room inspection.
THE WITNESS: Okay.

BY MR. MORRIS:
Q. Can you describe for me the maintenance and repair work that was performed on the property in connection with the walkthrough?
A. Yes, I can.
Q. Can you do that for me, please?
A. As part of the walkthrough?
Q. Yes.
A. Once we made the decision to sell the property, we formed a team of people. I was asked to be the designate to coordinate all of the work necessary to turn the house from -- sort of transfer the house from a museum setting, a public house, into a residence. There was a team of us that walked through the building, and we identified in not only that building but all the rest of the buildings the work necessary to take all of the museum items out and to prepare it for the sale.
Q. Other than the moving of furniture, did you have any responsibility for any maintenance and repair with respect to the walkthrough?
A. Those people did not report to me directly, but I was asked to be the coordinator of all the work.
Q. Are you generally familiar with the maintenance and repair that was done in connection with the walkthrough?

Case: 11-30554 Doc# 66 Filed: 07/01/11 Entered: 07/01/11 12:26:30 Page 16 of 41

A. Generally.

**Q. What do you recall generally about the maintenance and repair that was done with respect to the walkthrough?**

A. We walked through the building and identified the work that we wanted to do, painting, plaster repair, moving of furniture, changing or taking down drapes, that sort of thing. We put it all on a list, and then over the course of the next two months, three months, the work got done. I was responsible to make sure that it did get done, and, you know, made decisions on who would do the work, how quickly it got done.

**Q. Was there a separate list that was created for maintenance and repair work that was done in preparation for the sale?**

A. A separate list? Yes, there was a list.

**Q. I'm just looking at this Item No. 1 on the document. Were there distinct periods of time that covered the maintenance and repair in connection with the walkthrough as opposed to maintenance and repair in preparation for the sale?**

A. No. There was generally one list of work that was done starting in roughly January of 2007. That was the list that we referred to as the walkthrough.

**Q. And is there anything --**

A. Prior to that the building was closed to the public.

**Q. Was there anything done in preparation for the sale that wouldn't be included on the list that was initially created in January of 2007 in connection with the walkthrough?**

A. No.

MR. MORRIS: Can we take a very short break?

MR. CAMPSEN: Sure.

(Whereupon, a brief recess was taken.)

BY MR. MORRIS:

**Q. Mr. Peck, did there come a time in late 2006 that you were asked to oversee the maintenance and repair that was going to be conducted in connection with the sale?**

A. Yes.

**Q. Who asked you to do that?**

A. My boss, Tori Gussman.

**Q. Had you ever overseen the implementation of a maintenance and repair set of work in connection with the sale of a piece of property for the Foundation?**

A. No.

**Q. Do you know why you were asked to perform this role at this time?**

A. I have a lot of project management experience. I'm good at taking a loosely defined project and making it happen.

**Q. As part of your project management experience, did you ever have occasion to oversee maintenance and repair budgets?**

A. Yes.

**Q. How about with respect to the implementation of maintenance and repair tasks?**

A. Yes.

**Q. Can you describe the circumstances where your duties and responsibilities called for you to implement maintenance and repair work?**

A. Prior to 1995 I was the director of mechanical operations in maintenance and had 45 people under my responsibility and had maintenance and repair budgets there.

**Q. From 1995 to 2006 had you had any responsibility for overseeing maintenance and repair work on behalf of the Foundation?**

A. I would say not specifically, but generally I was part of the maintenance operation. I was involved in estimates and project management and work that was going on. So I did have general knowledge of maintenance and repair.

**Q. But no supervisory role in executing**

**maintenance and repair action plans?**

A. That's true.

**Q. What specifically did Tori Gussman ask you to do with respect to maintenance and repair in preparation for sale?**

A. She asked me to coordinate the efforts to do the work necessary to prepare the property for sale.

**Q. Who determined what efforts were necessary to prepare the property for sale?**

A. That was part of the walkthrough that we did in early 2007.

**Q. Who was part of that walkthrough?**

A. Bob Taylor, Ron Hurst, Ernest Clements, and myself.

**Q. How long did the walkthrough last?**

A. Three hours.

**Q. Did you tour any building on the property other than the mansion? Withdrawn. Did you tour the mansion as part of the walkthrough?**

A. Yes, we did.

**Q. Did you tour any other building on the property other than the mansion?**

A. Not at that time. We came back later and did the other buildings.

**Q. Can you describe for me what other buildings**

**Q. there are on the property?**

A. There is a caretaker's cottage. There is a museum building. There was a reception center building. There was a stable building. There were slave quarters buildings, and there was an operating stable building.

**Q. Now, just focussing on the mansion for the moment, was the maintenance and repair list, that was created with respect to the mansion, was that created as a result of the walkthrough that you described?**

A. Yes, it was.

**Q. Was the maintenance and repair list for the mansion ever amended or modified after the time it was created as a result of this walkthrough?**

A. I'm sure it was. It was added to, I'm sure.

MR. MORRIS: I would like to mark as Peck Exhibit 2 some excerpts of the report that were previously delivered to us.

(Excerpts from Carter's Grove Methos Work Order History was marked as Peck Exhibit No. 2 for identification.)

BY MR. MORRIS:

**Q. Have you ever seen a document of this type, Mr. Peck?**

A. Yes, I have.

**Q. Do you have an understanding of what this document is?**

A. Yes, I do.

**Q. What is your understanding of what this document is?**

A. This is a list of work orders that I assume but can't validate that -- it says, "Carter's Grove Methos Work History," so I assume that it's work that was done at Carter's Grove.

**Q. In the course of the work that you --**

A. Is that true?

**Q. I believe that's right, but I haven't seen these documents in the ordinary course of business. Have you ever seen a document in this format in the ordinary course of your business?**

A. Sure.

**Q. What is the Methos system?**

A. The Methos system is a maintenance management system that Colonial Williamsburg has, and it's used to record work that's done to all of our properties. It keeps track of cost, who works at a specific site, what gets done. It's sort of the brains that helps us do our work.

**Q. During 2007 when you were overseeing the maintenance and repair work that was being done in**

**preparation for the sale, was the work that was done reflected in any way in the Methos system?**

A. Yes, it was.

**Q. Can you describe for me the manner in which the work that was performed would be reflected in the Methos system?**

A. It would generally create a work order, and all of the efforts associated with the -- for instance, in this case, the work necessary at Carter's Grove to prepare it for sale would have gone into the work order system by step and by trade. All of the costs would have been accumulated. All the efforts would have been accumulated in that one work order. There may have been one work order for the interior, one work order for the exterior. We would have had different work orders for different buildings. It helped us categorize the work.

**Q. Do you know whether there was any work done in connection with the sale or in preparation for the sale that wasn't reflected in the work order?**

A. No. Now, you have to be careful with how specific the work is, but in general all the work was categorized in the work order.

**Q. Do you know whether there were any costs incurred by the Foundation in connection with the maintenance and repair that was done in preparation for sale**

**that would not be reflected in the Methos system?**

A. It would all be in the Methos system.

**Q. Do you know whether there was any work done by any third-party contractor that was done in preparation for the sale that's not reflected in the Methos system?**

A. That's not reflected in it, no. There wouldn't have been any work that was not reflected in the work order system.

**Q. Even if it was done by an outside party?**

A. Yes. For instance, we had a cleaning crew come in and help us with the preparation for the sale. That effort should be in the work order system.

**Q. Do you recall whether there was any expenditure by the Foundation that exceeded a thousand dollars for maintenance or repair work done in preparation for the sale?**

A. I'm sure there was.

**Q. Why are you sure there was?**

A. Because there was a lot of effort put into place. I'm sure the cleaning crew just by itself was more than a thousand dollars.

MR. MORRIS: Since I have written on it, I'm not going to mark it as an exhibit, but I'm going to place before the witness documents with Bates Nos. CWF01741, 742, 743, and 744.

Case: 11-30554 Doc# 66 Filed: 07/01/11 Entered: 07/01/11 12:26:30 Page 18 of 41

BY MR. MORRIS:
**Q. I'm just going to show this to you, Mr. Peck. Looking at the document ending in Bates No. 741, is it fair to say that that is the beginning of the work orders that were entered in the Methos system for 2007?**
A. That date is either the date that the work order was written or the date that the work order was closed. And from that document I can't tell the difference.
**Q. If we continue down from the first entry of 2007 and we turn the page, are all of the entries on the next page, which is Bates No. 742, entries for work orders that were either created or implemented in 2007?**
A. Created or implemented?
**Q. Yes.**
A. I can't tell that from that information.
**Q. Do you have any idea what the date in the right-hand column refers to?**
A. It's either the date that the work order was written or the date that it was closed, and I can't tell from this document what that is.
**Q. Is there any entry on pages ending in Bates No. 741, 742, 743, or 744 for a 2007 entry that exceeds a thousand dollars? If you'll just take a look.**
MR. CAMPSEN: I'll just interject an objection that the document speaks for itself,

but you can go ahead and answer.
THE WITNESS: So 741, 742?

BY MR. MORRIS:
**Q. All of the 2007 entries?**
A. No, I don't see any over a thousand dollars.
**Q. Do you recall whether there were any work orders that were prepared prior to 2007 in connection with the work that you were overseeing in preparation for the sale?**
A. Not in preparation for the sale.
**Q. Would a work order be closed at the time that the work was completed? Withdrawn. You mentioned that work orders are closed at some point in time; is that correct?**
A. That's correct.
**Q. At what point in time is a work order closed in the ordinary course of your business?**
A. When the work is complete.
**Q. And would the work done in preparation for the sale necessarily have to have been completed prior to the sale itself?**
A. Yes.
**Q. And the sale occurred in 2007; is that correct?**
A. That's true.

**Q. So would all work orders done, with respect to the preparation for sale, necessarily have to have been closed in 2007?**
A. It could have been closed in 2008 after all the work was done. Usually we allow some time for all the invoices to arrive, and, actually, all the material to be acquired by the work order system, and then at that point it's closed. So it doesn't necessarily -- it could have happened in 2008.
**Q. Are you aware of any work order that was closed after the sale?**
A. I'm not aware of any, but I'm sure there was.
**Q. Looking at this document, does that refresh your recollection that services performed by contractors were not included in the Methos system?**
A. Say that again.
**Q. Looking at the document that I have placed before you, does that refresh your recollection that services rendered by contractors or other third parties were not recorded in the Methos system?**
A. I'm sorry. I'm trying to understand what you're asking me.
**Q. Earlier I believe you testified that your recollection was that all work done in preparation for the sale would be reflected in the Methos system, whether it was**

**done by the Foundation or whether it was done by third parties?**
A. That's true.
**Q. Then you testified that certain costs you recall being more than a thousand dollars; is that right?**
A. That's right.
**Q. Now looking at the document that I've placed before you, does that cause you to rethink your recollection that the Methos system reflects all expenses for maintenance and repair in preparation for the sale?**
A. It doesn't cause me to change my original answer. Is that the question?
**Q. It is the question. Do you see anywhere on the document that I've placed before you any entry for more than a thousand dollars?**
A. Sure.
**Q. Can you show me where that is?**
A. Right here.
**Q. Is that the work that you had in mind earlier when you were describing work done by a third party?**
A. I can't tell from that document what that is.
**Q. Can you tell from this document whether that entry refers to work done by a third party?**
A. Yes.
**Q. Just help me to understand that.**

A. Because this column reflects non-stock costs. Generally we put contractor cost in the non-stock column. So that would be material that we purchased off site, not through our warehouse. And that's generally where we put contractor costs.

**Q. Now, the date of that is -- withdrawn. Is the date of that October 23rd, 2006 for that particular entry?**

A. Yes, it is.

**Q. Had you hired any third party for the purpose of performing repair and maintenance in preparation for the sale as early as October 23rd, 2006?**

A. (The witness shakes head in the negative.)

**Q. So is it fair to say that that particular entry doesn't reflect maintenance and repair work that was done in preparation for the sale?**

A. In general that reflects that, yes.

**Q. It does not reflect work that was done in preparation for sale?**

A. Right, generally it does not reflect, that's right.

MR. MORRIS: I'm going to mark as Peck Exhibit No. 3 a document with Bates Nos. CWF01589 through 599.

(Preparations Room by Room Listing, Bates Nos. CWF01589 - CWF01599, was marked as Peck Exhibit No. 3 for identification.)

BY MR. MORRIS:

**Q. Mr. Peck, are you familiar at all with the document that has been marked as Peck No. 3?**

A. Yes, I am.

**Q. Can you tell me what that document is?**

A. This is a document that was prepared by myself to assist the workers that were on the site making the preparations for the sale. It was intended to identify room by room what was necessary in each room to prepare it for sale.

**Q. Was this document prepared after the tour that you described earlier?**

A. Yes, it was.

**Q. Turn to the second page. There is a reference to water damage. Do you see that?**

A. Yes, I do.

**Q. Did you personally observe the water damage that's referred to on this page?**

A. Yes, I did.

**Q. Do you recall what you saw?**

A. No, I don't.

**Q. Do you recall whether you had any conversation with anybody on the tour about the water damage that's referred to on this page?**

A. No.

**Q. Were you ever asked to identify the cause of the water damage that you observed during this tour?**

A. No.

**Q. Did you ever make any effort to identify the cause of the water damage in Grandma's Room that you observed during this tour?**

A. No, we did not.

**Q. Did you ever ask anybody to identify the cause of the water damage that you observed in Grandma's Room during this tour?**

A. No.

**Q. To the best of your knowledge, prior to the sale, did anybody identify the cause of the water damage that you observed during this tour?**

A. No, not to the best of my knowledge.

**Q. Did you have an understanding of what work was going to be done to remove the water damage, as you've used that phrase, on this document?**

A. Say the question again.

**Q. What work was going to be done to remove the water damage as you have used that term?**

A. I'm sure the wall would have been patched in some manner, whatever damage was there. It must not have been an active leak. If it was an active leak, we would have repaired it. It must have been from something previous, or we would have investigated and repaired it.

**Q. Did anybody tell you that there had been water damage in that area prior to the time that you observed it?**

A. No.

**Q. Did anybody ever tell you that that area had previously been patched and repaired?**

A. No.

**Q. Did you ask anybody whether or not this condition had been previously observed?**

A. No, I didn't ask anybody. Again, if it had been a bad problem, we would have fixed it.

**Q. Do you have an understanding that that problem was a persistent problem since at least 2003?**

A. No.

**Q. So is it your understanding that the water damage that you observed at that time was going to be patched and painted over?**

A. It was going to be repaired. I wouldn't use the word patched. I would use the word repair.

**Q. What is your understanding of the steps that**

Case: 11-30554 Doc# 66 Filed: 07/01/11 Entered: 07/01/11 12:26:30 Page 20 of 41

**were required to repair?**

A. Whatever effervescence was visible would have been taken off. Some new plaster would have been put on, and it would have been painted.

**Q. Would it have been sanded?**

A. Possibly.

**Q. So new plaster, possible sanding and painting; is that right?**

A. That's right.

**Q. Was the point of the exercise to make it so that the water damage was no longer visible?**

A. It was to repair the broken plaster. Again, it was not an active leak. If it would have been an active leak, we would have repaired it.

**Q. I appreciate that, but you did observe water damage; is that correct?**

A. Uh-huh.

**Q. And you gave instructions to remove the water damage; is that correct?**

A. That's right.

**Q. And the goal of the removal of the water damage was to make it so that the water damage was no longer visible; is that fair?**

A. That's true.

**Q. Can you turn, please, to Page 1593? There is**

**a reference there in No. 4 to, quote, "Selectively touch up walls." Do you see that?**

A. Uh-huh.

**Q. Do you have any recollection at all as to why you wrote that?**

A. I think we went in there and looked at the condition of the paint on the walls and felt that it was best suited -- instead of painting out the entire room, was to selectively touch up the walls in lieu of painting out the entire room.

**Q. Do you have any recollection as to where in the second floor southeast bedroom the touch was needed?**

A. No, I don't.

**Q. Do you have any recollection as to the condition of the paint that required the touch up? Was it peeling? Was it chipping? Was it bubbling? Do you have any recollection as to what was happening?**

A. I don't have any recollection of that.

**Q. Can you turn to Page 1594? In Item 2 there is a reference to repair and replastering of the sides of the south dormers. Do you see that?**

A. Yes, I do.

**Q. Do you recall what caused you to write that?**

A. There must have been some plaster damage

on the sides of those dormer walls, which is typical in older houses.

**Q. Do you know what repair work would have been done to the condition that you just described?**

A. We would have scraped off the bad plaster, put some new plaster on and repainted.

**Q. Did you make any effort to determine the cause of the condition that you observed in this particular area of the mansion?**

A. No. Again, it wasn't an active leak. Even if it was a leak, it could have been from condensation of the inside of the building. It could have been from mold from the inside of the building. It could have been from anything. So, again, if it had been a bad problem, we would have fixed it.

MR. MORRIS: Could I have my question read back? I move to strike the answer, and I would ask you to just listen to my question and answer my question.

(Whereupon, the court reporter read back the previous question.)

THE WITNESS: No.

BY MR. MORRIS:

**Q. Did anybody ask you to attempt to identify the cause of the condition that you observed on the second floor west bathroom?**

A. No.

**Q. Did you ask anybody to make any effort to identify the cause of the condition that you observed in this room?**

A. No.

**Q. Once the bad plaster was scraped off, the new plaster replaced and the area repainted, nobody would be able to observe that there was a problem with the plaster in that particular spot in the mansion; is that correct?**

MR. CAMPSEN: I object, speculation.

BY MR. MORRIS:

**Q. That was the goal, wasn't it, sir?**

A. Say the question again.

**Q. The goal of scraping off the bad plaster, putting on new plaster and repainting was so that the condition that you observed would no longer be visible; is that fair?**

A. That's true.

**Q. There is a reference there in No. 4 to washing mildew. Do you see that?**

Case: 11-30554 Doc# 66 Filed: 07/01/11 Entered: 07/01/11 12:26:30 Page 21 of 41

A. Yes, I do.
**Q. Do you recall seeing mildew in this particular area of the mansion?**
A. I don't recall at this point, but there must have been something there.
**Q. Do you recall seeing mildew in any other parts of the mansion other than this spot here?**
A. I don't recall that unless it's listed in this document.
**Q. Do you recall having any discussion with anybody in 2007 about mildew in the mansion?**
A. No.
**Q. Did anybody tell you that problems with mildew were a recurring problem in the mansion?**
A. No.
**Q. Did you tell anybody that you found mildew in the mansion other than what's reflected in this document?**
A. No.
**Q. Do you remember what you did with this document?**
A. This document was printed out page by page and taped in each individual room so the painters and carpenters and the workers knew exactly what had to be done in every room.
**Q. Did you personally tape it up in each room?**

A. Yes, I did.
**Q. Did you have any conversations with any of the workers about the content of the pages that you were putting up in each room?**
A. Absolutely.
**Q. Do you recall giving anybody any instructions as to how to remove mildew?**
A. No.
**Q. Why did you instruct the workers to wash the mildew?**
A. Because it needed to be removed.
**Q. Why?**
A. Because it was there and it needed to come off the building.
**Q. Why?**
A. We were preparing it for sale, and it's not appropriate to be in a house that's for sale.
**Q. Was the mildew visibly unappealing, in your opinion?**
A. Somebody must have made a comment to that effect, yes.
**Q. Were you removing the mildew because it was visibly unappealing and therefore would detract from the Foundation's efforts to sell?**
A. Yes.

**Q. Do you know whether or not mildew presents any health hazard?**
A. Say the question again.
**Q. Do you know whether mildew presents any health hazard?**
MR. CAMPSEN: I'm going to object. It's beyond the scope of his expertise.
THE WITNESS: I don't know that.

BY MR. MORRIS:
**Q. Was the removal of the mildew done for any reason other than esthetic reasons?**
A. No.
**Q. Once the mildew was washed -- withdrawn. Was the intention of washing the mildew so that perspective buyers wouldn't know that the mildew had previously been there?**
A. Yes.
**Q. Can you turn the page, please? There is a reference in No. 1 to repairing and replacing the cheek walls. Do you see that?**
A. Yes, I do.
**Q. I apologize, because I understand that from your perspective this may seem somewhat tedious, but I'm going to be asking many of the same questions that I've**

**asked before, and I would just ask for your patience and ask that you listen carefully to my questions.**
**Did you ask anybody to determine the cause -- withdrawn. Let's start with whether or not you recall what you saw, in the second floor west bedroom No. 1, that caused you to write the entry in No. 1.**
A. I don't recall specifically, but there must have been some plaster damage on the walls.
**Q. Do you recall whether or not you were ever asked to identify the cause of that plaster damage?**
A. No, I was not.
**Q. Do you recall whether or not you ever asked anybody to identity the cause of the plaster damage?**
A. No.
**Q. Do you recall whether or not you ever, in fact, identified the cause of the plaster damage?**
A. No.
**Q. Do you recall whether or not prior to the sale the Foundation ever identified the cause of the plaster damage?**
A. No.
**Q. Do you recall ever having any conversations prior to the sale as to the cause of the plaster damage?**
A. No.
**Q. Do you recall prior to the sale saying any**

**communication relating to any possible cause of the plaster damage that you saw?**

A. Prior to the sale?

**Q. Yes.**

A. No.

**Q. Did you see it after the sale?**

A. Well, I do know that the flashing on the roof in every one of these dormers needs to be replaced.

**Q. But as of the time of the sale did the Foundation believe that the flashing was the cause of the conditions that you observed?**

A. I don't know that.

**Q. And you never had any conversation with anybody to that effect, did you?**

A. No.

**Q. You'll see again on Page 1598 that there are references to repairing plaster, and on Page 1599 there is observation of mold that should be washed. Is it fair to say that all of the replastering and the washing of the mold was being done to cover up the conditions that you observed for purposes of sale?**

MR. CAMPSEN: I'm going to object to the term cover up to the extent that it --

MR. MORRIS: I mean physically cover up. I'm not using it like in Watergate.

MR. CAMPSEN: Okay.

BY MR. MORRIS:

**Q. But the attempt is to physically cover up the conditions that you observed in preparation for the sale; is that fair?**

A. No. It's to remove the mold.

**Q. I apologize. Let's take it one step at a time. We have the replastering, right?**

A. Uh-huh.

**Q. And the replastering is done at places where you have already observed some uneven or effervescent problem with the plaster; is that correct?**

A. That's correct.

**Q. And the purpose of removing the old plaster in each of these places, replastering and repainting, is so that a perspective buyer wouldn't observe the conditions that you observed; is that correct?**

A. Okay.

**Q. Is that fair?**

A. That's correct.

**Q. Now let's talk about the mold. In certain areas of the mansion you observed the presence of mold; is that correct?**

A. We never had it tested, so I can't really say

that it's mold.

**Q. I'm sorry. Did you use the word mildew in your report?**

A. I used the word mildew and I did use the word mold.

**Q. So let's just use the words that you used previously, mold and mildew. You wrote that you observed mold and mildew in various aspects of the house as reflected on Peck No. 3; is that correct?**

A. That's true.

**Q. And you instructed the Foundation's employees to wash the mold and mildew in the places that you observed it on Peck No. 3; is that fair?**

A. That's true.

**Q. And the reason that you wanted them to wash it is because you didn't want the mold or mildew to be visible to perspective purchasers; is that correct?**

A. That's true.

MR. MORRIS: Thank you. Can we just take a short break?

MR. CAMPSEN: Sure.

MR. MORRIS: Or we can go ahead and take a lunch break.

MR. CAMPSEN: All right.

(Whereupon, a lunch recess was taken.)

MR. MORRIS: I would like to mark as Exhibit No. 4 a document entitled, "Carter's Grove Site Preparation For Sale."

(Carter's Grove Site Preparation For Sale was marked as Peck Exhibit No. 4 for identification.)

BY MR. MORRIS:

**Q. Mr. Peck, do you know what this document is?**

A. This was the document that we used to keep track of the work necessary for the sale of the property.

**Q. Would this be a more formal iteration of the document that we saw as Exhibit No. 3? Is there any relationship between the two documents?**

A. This is a more global perspective.

**Q. This is Exhibit 4?**

A. Right. Exhibit 4 is a more global perspective on all of the work necessary for the entire site. Exhibit 3 is really specific just to the mansion.

**Q. The document that is Exhibit 4, is that a document that you prepared?**

A. Yes.

**Q. Is it a document that you maintained and updated from time to time?**

A. Yes.

**Q. What was the purpose of the document?**

A. Really to communicate on a broader level all of the work that was going on and its status.

**Q. Was this document disseminated to anybody?**

A. Yes. It was shared with my boss, Bob Taylor, and others like that.

MR. MORRIS: I would like to mark as the next exhibit a series of emails with Bates Nos. 5839 through 43.

(Emails, Bates Nos. CWF05839 - CWF05843, were marked as Peck Exhibit No. 5 for identification.)

BY MR. MORRIS:

**Q. I would ask, Mr. Peck, that you begin by reviewing the last email, which is the one on the bottom of the page that's noted as 29.**

MR. CAMPSEN: 29 or 39?

MR. MORRIS: Mine says 29.

MR. CAMPSEN: I'm sorry. I thought you were talking about Bates stamping.

MR. MORRIS: Bates stamped 40, Page 29.

BY MR. MORRIS:

**Q. Do you recall, Mr. Peck, having received that email from Patricia Silence?**

A. I don't recall it, but it's here.

**Q. Do you know who Patricia Silence is?**

A. Yes.

**Q. Who is Patricia Silence?**

A. She's a curator in our collections division. She has responsibility for the internal -- the interior environments in our museum buildings.

**Q. Do you know why she sent this email to you among other people?**

A. Because I was involved with the preparation for sale for Carter's Grove.

**Q. Do you see the phrase black mold?**

A. Yes, I do.

**Q. Do you have an understanding of what black mold is?**

A. No, I don't.

**Q. Did you ask Ms. Silence what she meant by black mold?**

A. No, I did not.

**Q. Did you do anything in response to your receipt of this email?**

A. It appears here that I forwarded this to Chris Anderson, who works in our maintenance department, and asked about adjusting the temperature and humidity levels.

**Q. Did you ever disclose to a perspective buyer the existence of black mold as described in Ms. Silence's email?**

A. Me personally?

**Q. Yes.**

A. No.

**Q. Do you know if anybody from the Foundation ever disclosed to the perspective buyer the presence of mold of any kind at the Carter's Grove property?**

A. No, I don't.

**Q. Do you recall whether or not the Foundation believed that the mold problem at Carter's Grove was caused by excess humidity?**

A. Ask that question again.

MR. MORRIS: Let me have that question read back, please.

(Whereupon, the court reporter read back the previous question.)

MR. CAMPSEN: I'll object on the basis of speculation.

THE WITNESS: No, I don't.

BY MR. MORRIS:

**Q. Now, looking at your email, do you recall why you asked Chris Anderson to raise the temperature setting on the first and second floors by two degrees?**

A. Generally, as you raise the temperature, the humidity level in the space will go down, and that will reduce the environment by which mold can grow.

**Q. Did you ask Mr. Anderson to raise the temperature for that particular purpose?**

A. Yes, we did.

**Q. And that was to decrease the possibility of mold; is that right?**

A. Not specifically. It was to raise -- we asked him to raise the temperature so that the humidity level in the space would go down.

**Q. Why did you want the humidity level to go down?**

A. It must have been too high, but it also reduces the opportunity for mold to grow.

**Q. In your last sentence of the first paragraph, you refer at the end to, quote, "This problem." Do you see that?**

Case: 11-30554 Doc# 66 Filed: 07/01/11 Entered: 07/01/11 12:26:30 Page 24 of 41

A. Okay. I got it.
**Q. Do you have any understanding of what the problem was that you were referring to there?**
A. The problem must have been higher humidity levels, higher than normal humidity levels. And by increasing the temperature in the space it would have lowered the interior humidity.
**Q. Did you personally believe on or around September 5th, 2007 that the excess humidity was the cause of the mold that had been observed?**
A. I was focussing on the humidity level, not the mold.
**Q. What about the humidity level caught your attention?**
A. Because they said it was a little high.
**Q. Does having humidity levels that are a little high have any adverse impacts?**
A. On the interior of the space it does, yes.
**Q. What is the adverse impact?**
A. We try to keep the space at a certain temperature and humidity, and if they go out of wack we make adjustments to bring them back into --
**Q. What's the possible result if it goes out of wack?**
A. It causes damage to the objects. It causes

damage to the original material in the building. Our first concern here was really to make sure the building, the interior environment was in good condition.
**Q. Among the elements of it being in good condition is being mold free and mildew free; is that fair?**
A. Sure.
**Q. You raise a question at the end here. It says, quote, "Who do we suggest clean the mold?" Do you see that?**
A. Uh-huh.
**Q. Did anybody ever respond to that?**
A. It looks like Patty did.
**Q. Do you have a recollection, or just what you read on the paper?**
A. Just what I read on the paper.
**Q. Do you know if the mold that had been observed was cleaned up and painted?**
A. My assumption is that it got cleaned up.
**Q. Why do you have that assumption?**
A. Because we wouldn't have sold the building with that in it.
**Q. Why is that?**
A. That's not something we would have done.
**Q. Had the property yet been open for viewing by perspective buyers as of early September 2007?**

A. Yes.
**Q. When did that process begin?**
A. My recollection is that it's sort of a March/April time frame 2007.
**Q. Do you recall whether the observations that are contained in these emails were of parts of the mansion that are referred to in Peck Exhibit 3, or are they in different places?**
A. It looks like from this email that it was in the kitchen area. The cupboards, that would have been in the kitchen area.
**Q. And the kitchen area isn't some place that's mentioned on Peck Exhibit 3, is it?**
A. No, sir.
**Q. Do you know what the last several pages are of this exhibit, the charts?**
A. These are hygrothermograph charts that represent the temperature and humidity in a given space.
**Q. In 2007 was the Foundation actively monitoring temperature and humidity in the mansion?**
A. Yes, in selected areas.
**Q. Do you know how those areas were selected?**
A. No, I don't.
**Q. Can you describe for me what areas were selected for temperature and humidity testing?**

A. I don't know that except for what I read right here.
**Q. What do you read right here?**
A. This one happens to be in the Carter's Grove smoking room. This one is the Carter's Grove furniture storage, and this one is the Carter's Grove drawing room.
**Q. Do you recall any other areas of the mansion being subjected to temperature and humidity testing in 2007?**
A. No.
**Q. Do you recall that these particular rooms were subjected to temperature and humidity testing in 2007?**
A. No.
**Q. Independent of the documents that you're looking at?**
A. No.
**Q. Do you have any recollection as to why the Foundation was testing for temperature and humidity in 2007?**
A. The Foundation was concerned about the interior of the building and the objects in the building, and wanted to make sure that the environment there was suitable for those objects.
**Q. Do you have any understanding as to whether those concerns arose for the first time in 2007 or whether those concerns existed prior to that year?**
A. Those have been our guidelines ever since we

bought the property.

**Q. What about the interior was the Foundation concerned about?**

A. Excuse me?

**Q. I think you mentioned that they were concerned about the interior and with --**

A. And the objects.

**Q. And the objects. So --**

A. There is original material inside Carter's Grove, panelling, woodwork, antique flooring, that sort of thing that we would be concerned about.

**Q. Is plaster among the original materials that the Foundation was concerned about?**

A. It's not original and it's not harmed as much by variations in temperature and humidity as wood is.

**Q. Let me ask a different question. Was the Foundation concerned about the plaster in 2007?**

A. Absolutely.

**Q. Was that one of the reasons why temperature and humidity testing was being conducted in actively selected areas?**

A. In a general way.

**Q. Did you have any responsibility for communicating with any of the inspectors that were retained prior to the sale?**

A. No.

**Q. Can you take a look at Exhibit 1, please? And I would ask you to turn to Page 5. If you see under Item 2, a request is made for a witness that can testify as to, "Any inspections of the property commissioned by CW at any time prior to the sale." Do you see that?**

A. Yes, I do.

**Q. And you are identified as somebody with specific knowledge of all inspections performed as part of the walkthrough or in preparation of the sale. Do you see that?**

A. Yes.

**Q. Is that statement true?**

A. I was involved with the preparation for the sale. But the actual transfer of sale, the inspection as part of the transfer of sale, I was not involved in.

**Q. Do you have any knowledge of the inspection that was conducted of the roof by W. A. Lynch Roofing Company?**

A. Only as I've seen in preparation for this deposition.

**Q. Did you ever speak with anybody from the W. A. Lynch Roofing Company?**

A. No, sir.

**Q. Do you know if anybody from the Foundation**

**ever spoke with anybody from the W. A. Lynch Roofing Company in connection with the inspection that was done prior to sale?**

A. I don't know if anybody has had a conversation with W. A. Lynch.

**Q. Do you know the party that retained the W. A. Lynch Roofing Company to inspect the roof prior to sale?**

A. I would assume it would be the buyer.

**Q. Why do you assume that?**

A. Because we've never used that firm before.

MR. MORRIS: I'm going to mark as the next exhibit -- I guess it's Peck Exhibit 6, the W. A. Lynch Roofing Company Inspection Report.

(W. A. Lynch Roofing Company Inspection Report was marked as Peck Exhibit No. 6 for identification.)

BY MR. MORRIS:

**Q. I'm just going to begin, Mr. Peck, by asking you if you've seen this document before?**

A. No.

**Q. I'm just going to direct your attention to the last sentence of the first paragraph where it says, quote, "In discussions with CWF personnel, I was told there were no**

**known active leaks," close quote. Do you see that?**

A. Yes, I do.

**Q. Do you know whether anybody from the Foundation ever told W. A. Lynch Roofing Company that there were, quote, "No known active leaks?"**

A. I don't know that.

**Q. Have you ever heard that before today? Have you ever heard that representation made before today?**

A. No. That's the first time I have heard that.

**Q. As of the day of this report, November 12, 2007, did you know of any known active leaks at the mansion?**

A. No.

**Q. As of November 12th, 2007 did anybody ever tell you that they knew of any known active leaks at the mansion?**

A. No.

**Q. As of November 12th, 2007 did you have any reason to believe at all that there were active leaks in the roof at the mansion?**

A. No.

**Q. As of November 12th, 2007 did anybody ever tell you that they had any reason at all to believe there were active leaks in the roof at the mansion?**

A. No.

**Q. Were you aware that the buyer had identified**

**repairs that were purportedly needed with respect to the roof?**
A. No.
**Q. Can you tell me, looking back at Exhibit 1, what specific knowledge you have of the information contained in all inspections performed as part of the walkthrough of the property or in preparation for the sale?**
A. Those would have been inspections that I had done generally starting in 2007.
**Q. Do you have any knowledge of any inspection done by any third party on behalf of the Foundation?**
A. When?
**Q. Prior to the sale.**
A. No.
**Q. Do you have any knowledge of any inspection that was performed by any third party on behalf of the buyer prior to the sale?**
A. No.
**Q. So the only inspections of which you have any knowledge that occurred prior to the sale are those inspections that you conducted yourself; is that fair?**
A. Uh-huh, as part of the preparation for sale.
**Q. And you described for me that you had a walkthrough early in 2007 which resulted in the creation of some of the documents that we have seen; is that right?**

A. That's correct.
**Q. Other than that initial -- withdrawn. Is that an inspection as you characterize it?**
A. Yes, it is.
**Q. How many other inspections did you do in 2007 prior to the sale?**
A. That would have been a formal inspection that I had done, but I was out there three or four times a week looking at the property.
**Q. How many other formal inspections did you do?**
A. Before?
**Q. The sale, yes.**
A. That was the one formal inspection that we did, defined by your definition of inspection.
**Q. You used the word formal, not me. So what do you mean by formal? What made that first one in early 2007, quote, "Formal?"**
A. Well, if I went out to the site to check on the work as an inspection. So you could say that I had done inspections on a very regular basis as part of the preparation for sale.
**Q. I just want to understand why you used the term formal with respect to the tour that you described having occurred early in 2007.**
A. That was the one that we -- where we wrote all

of the items down.
**Q. Did the people who accompanied you on that tour contribute to the creation of the list of items that needed to be maintained and repaired?**
A. Yes, they did.
**Q. Was there ever an occasion where you took a tour of the property with that same group of people for purposes of identifying maintenance and repair requirements?**
A. No.
**Q. Were your observations of any subsequent inspection prior to the sale recorded in any document anywhere?**
A. Exhibit 4 was modified on a regular basis.
**Q. I have seen various iterations of that. Just so I understand, as you would make the inspections, the non-formal inspections that you've described, you would update the document that's been marked as Peck Exhibit 4; is that correct?**
A. That's correct.
**Q. Is there any other manner in which your observations during these non-formal inspections would have been recorded?**
A. No.
**Q. Did you have anything to do with the retention of a contractor who demolished the recreation center and the**

**parking lot?**
A. The reception center?
**Q. Yes.**
A. Yes.
**Q. Did I say recreation?**
A. Uh-huh.
**Q. I've had this problem for two days now. I apologize. What did you do with respect to the retention of a contractor for purposes of demolishing the reception center?**
A. I developed the scope of work for the demolition. I bid the work out to several contractors. I worked with the county on permitting. I communicated the work internally.
**Q. Do you have an understanding of why the Foundation decided to demolish the recreation center and parking lot?**
A. Yes.
**Q. What is your understanding of the reason for the demolition?**
A. It was part of our effort to take all of the museum items away from the property, and it was an appropriate site for a residence if somebody wanted to build a residence on that site.
MR. MORRIS: I would like to mark as Peck

Exhibit 7 a document that is titled, "Tom Peck Photographs," attached to which are Bates Nos., 5046 through 53.

(Tom Peck Photographs, Bates Nos. CWF05046 - CWF05053, were marked as Peck Exhibit No. 7 for identification.)

BY MR. MORRIS:

**Q. Mr. Peck, do you know what this document is?**

A. These are photographs that were taken prior to the demolition of the reception center, primarily showing the Rockefeller Memorial at the rear of the site.

**Q. Looking at the page that is marked 46 in the lower right-hand corner, which is the second page of the document, is that the reception center?**

A. Yes, it is.

**Q. Was this walkway demolished or does that still exist today to the best of your knowledge?**

A. That's the bridge that goes over the ravine, and that still remains today.

**Q. But the building itself in the background is gone?**

A. Yes, it is.

**Q. Is that the building which you hired the contractor for, to demolish?**

A. Yes.

**Q. Are there any other buildings or creations in any of the photographs in this document that were demolished pursuant to your instructions?**

A. Say that again.

**Q. Is there any other building or structure reflected in these photographs that was demolished pursuant to your instructions?**

A. Not specifically in these photographs, but the parking lot and the memorial were all taken down.

**Q. Is the memorial the plaque that's depicted on the next to the last page?**

A. Yes, it is.

**Q. Do you know whatever happened to that plaque?**

A. No, I don't.

MR. MORRIS: I'm going to mark as the next exhibit, which will be Peck Exhibit No. 8, a document where the first page is entitled, "K. F. Wilson," and it goes from Bates Nos. 5027 through 37.

(K. F. Wilson Contract was marked as Peck Exhibit No. 8 for identification.)

BY MR. MORRIS:

**Q. Have you ever seen this document before?**

A. Yes.

**Q. What is it?**

A. This is a contract that the contractor had, the actual formal purchase order and contract that the contractor had to demolish and remove all the items from the reception center.

**Q. And who is Margaret Brown?**

A. Margaret Brown was a purchasing agent at the time.

**Q. Did you present this document to Ms. Brown for her signature?**

A. She created the document.

**Q. Can you tell me how K. F. Wilson came to be the contractor for the purposes described in Peck Exhibit No. 8?**

A. We selected four or five contractors to give us bids on this work. We developed a scope of work and met four or five contractors out on the site, took them through it. They presented their proposals to us and we selected K. F. Wilson.

**Q. What were the factors that the Foundation used in deciding who the winning bider would be?**

A. We had used K. F. Wilson before, so we had some experience with them, and they were the lowest price.

**Q. On how many other occasions are you aware of that the Foundation used K. F. Wilson?**

A. I can't tell you specifically, but I know we've used them before, more than two or three times.

**Q. And they were also the lowest price?**

A. That's right.

**Q. If you turn your attention to the page that's marked 5029 in the right-hand corner, you'll see there are a couple of bullet points that refer to the disposal of materials resulting from the demolition. Do you see that?**

A. Okay.

**Q. I apologize. We are going to come back to that in a moment. If you can, turn the page to the Contract Administrator provision.**

MS. WADDELL: Where are you, John?

MR. MORRIS: The page that is marked 5030. Towards the bottom you'll see there is a provision called Contract Administrator.

BY MR. MORRIS:

**Q. Is it true, sir, that you were identified as the Foundation's contract administrator who would, among others thing, monitor the contractor's performance and adherence to the requirements unique to the work?**

A. That's correct.
**Q. Now, if you turn back to Page 5029, there were some contractual requirements for the removal of the demolition debris; is that fair?**
A. That's correct.
**Q. And the contractor was prohibited from allowing the debris to accumulate at the Carter's Grove site; is that fair?**
A. That's correct.
**Q. And they were required to transport and legally dispose of all materials resulting from the demolition operation somewhere other than Carter's Grove; is that right?**
A. That's correct.
**Q. Do you know whether the contractor complied with those contractual provisions?**
A. As part of this contract they were required to do that.
**Q. I understand that that's what they were required to do. That's what we've just established. What I'm asking you is whether you know that the contractor complied with those specific provisions that we just read?**
A. Yes, they did do that.
**Q. How do you know they did that?**
A. I saw them on a couple of occasions when I was

out there, and we had our construction manager that was responsible for overseeing the day-to-day work. There is nothing for me to believe that they didn't do what they said they were going to do.
**Q. When you say you saw them, what did you see them doing?**
A. I saw them tearing down the building and putting it in trucks and hauling it away.
**Q. Where did you see the trucks go?**
A. They left the Carter's Grove site.
**Q. You saw them actually exit onto a road that was not part of the Carter's Grove property?**
A. Absolutely.
**Q. Where did you see them do that?**
A. Onto Ron Springs Road.
**Q. Did you follow them down there?**
A. No, sir.
**Q. How did it come to be that you happened to be at that particular spot at the moment the trucks were leaving?**
A. Because the access in and out of the Carter's Grove site is via Ron Springs Road. It was the only way we could get in and out of there. And when I would drive in to observe the work that was going on, I would see trucks leaving the same way I was coming in.

**Q. How many times did you see that happen?**
A. Three or four.
**Q. Who was the construction manager that you referred to?**
A. Larry Heath.
**Q. Was Mr. Heath employed by the Foundation?**
A. Yes, he was.
**Q. What was Mr. Heath's responsibility?**
A. To deal with the day-to-day responsibility, among other things, but watching this contractor.
**Q. Do you know where the debris was dumped?**
A. No, I don't.
**Q. Did you ever ask?**
A. No.
**Q. Did the contractor have any responsibility to provide proof to the Foundation that it had legally disposed off site of all materials that it had removed?**
A. No.
**Q. Did, in fact, the contractor ever make any representation to the Foundation that it had complied with these provisions?**
A. Say that again.
**Q. Did the contractor ever make any representation to the Foundation that it had disposed of all materials and done so by transporting and legally disposing**

**of them off site?**
A. They did that by agreeing to the contract and by sending us a bill at the end of the job.
**Q. And that's the only basis on which the Foundation can conclude that the contractor represented that it was in compliance with these provisions that we've reviewed; is that correct?**
A. That's correct.
**Q. Did you ever learn that the buyer of the property had made allegations that some or all of the recreation center and parking lot had either been buried or dumped on the Carter's Grove property?**
A. I knew that he had made allegations to that point, yes.
**Q. When did you first become aware of those allegations?**
A. When it was in the newspaper.
**Q. Do you recall when that was?**
A. Spring of 2011.
**Q. At any time since learning of these allegations have you spoken with the contractor about what it did with the debris from the demolition of the recreation center and parking lot?**
A. Yes.
**Q. When did you speak with the contractor?**

A. This morning.
**Q. What did the contractor tell you?**
A. The contractor told me that they removed all of the items from the Carter's Grove site.
**Q. Who did you speak with at the contractor?**
A. Ken Wilson, president of K. F. Wilson.
**Q. Did you ask Mr. Wilson if he had any documentation that could demonstrate that?**
A. No.
**Q. Did Mr. Wilson offer any documentation to demonstrate that his company had properly disposed of all of the debris from the demolition?**
A. No.
**Q. How long did the conversation last?**
A. Forty-five seconds.
**Q. Is there anything that was said in the conversation that you haven't described for me so far?**
A. No.
**Q. Have you taken any trips to the Carter's Grove property for purposes of doing an inspection relative to the allegations that you read about in the newspaper?**
A. Only at the request of the buyer.
**Q. How many inspections did you do?**
A. One.
**Q. When was that?**

A. Whenever we went the first time, three weeks ago, four weeks ago.
**Q. Who was with you at that time?**
A. Mark Wenger, Rollin Wolley, Andy Edwards, myself, Gail, Barrow. I think that's it.
**Q. How long did this site visit last?**
A. The site visit at the reception center lasted ten minutes or so.
**Q. I mean at the property in general. We'll talk about what you did there in a moment.**
A. An hour.
**Q. What was the purpose of the visit?**
A. We were requested by the buyer to come out and look at the site for the purpose of looking at some potential dump sites.
**Q. Was there any other purpose to the visit?**
A. No.
**Q. Were you shown any potential dump sites?**
A. Yes.
**Q. Do you recall where they were located?**
A. They were located along the beach road, three sites along the beach road.
**Q. Can you describe for me what you saw at those sites along the beach road?**
A. The first site was sort of a low area in the

middle of the pasture. The second area was two depressions in the ground, and the third was some debris, some gravel debris that had been deposited along the beach road.
**Q. Who on behalf of the owner accompanied you during this tour?**
A. Mr. Wenger.
**Q. Did anybody express an opinion as to the cause of the depressions that you observed?**
A. No.
**Q. Did anybody express an opinion as to the cause of the low area that you observed in the middle of the pasture?**
A. Other than low drainage, no, a low spot in the pasture.
**Q. Did anybody offer an opinion as to the source of the gravel debris that you described as being on the beach road?**
A. No.
**Q. Did you notice whether there was any asphalt in the gravel debris?**
A. There appeared to be some.
**Q. Did anybody try to identify the source of the asphalt that you observed in the gravel debris?**
A. I think there has been some discussion about it, but I don't know what the outcome has been.

**Q. Have you been involved in any such discussions?**
A. No.
**Q. Do you have any information about the nature of such discussions?**
A. No.
**Q. Do you know who was involved in such discussions?**
A. Mark Wenger was one of them, and some of the facilities people.
**Q. Do you know the names of any of the facilities people who were involved in these discussions with Mr. Wenger?**
A. Rollin Wolley would be the only one.
**Q. Do you know anything about the conversations between Mr. Wenger and Mr. Wolley about this?**
A. No, I don't.
**Q. How do you know that they discussed it?**
A. Because there was discussion during the site visit.
**Q. What did you hear?**
A. They were trying to hypothesize where it came from.
**Q. Were any particular sources identified during this hypothesis?**

A. No.
**Q. Was there any speculation at all as to the source of the asphalt?**
A. Some discussion that it may have come from the gravel parking lot in front of the stable building that used to be the visitor center prior to 1987.
**Q. Did anybody suggest that they had seen those piles prior to the sale?**
A. No.
**Q. Nobody said, oh, gee, those have been there forever, I've seen those a million times or anything like that?**
A. No. To answer your question, no.
**Q. Was there any suggestion at all that the piles existed as you observed them prior to the sale?**
A. Yes.
**Q. What can you tell me about that?**
A. There were trees growing up in the middle of them, so I would have to assume they had been there awhile.
**Q. Was there any discussion about that, or was that just your observation?**
A. My observation.
**Q. Do you have any understanding of the requirements of the -- withdrawn. In the contract the contractor was required to, quote, "Legally dispose off site**

Page 82

**all materials resulting from the demolition operations," and I'm wondering if you have any knowledge of the legal requirements referred to there.**
A. The legal requirements would be to remove them from the site and put them in a legal landfill.
**Q. Was the legal landfill ever identified for you?**
A. No.
**Q. Did you ever ask for the identification of the legal landfill?**
A. No.
**Q. Can you identify for me, as you sit here today, a legal landfill within 50 miles of Carter's Grove?**
A. No.
**Q. How about within 500 miles?**
A. I don't know. I don't know what the definition of a legal landfill is.
MR. MORRIS: Okay. I was just using your term. Let's take a five-minute break. I may be just about done.

(Whereupon, a brief recess was taken.)

BY MR. MORRIS:
**Q. Earlier you testified that you saw the**

Page 83

**contractor's trucks leaving the property, and I think you testified that the exit that they were departing from was the only exit at the property; is that right?**
A. The only exit that we allowed them to go out. We didn't want them to go out the front of the property because it might damage the road.
**Q. Are you aware that there was a second more recent site visit?**
A. Yes.
**Q. You did not go on that site visit?**
A. Yes, I did.
**Q. Oh, you did. I thought you said you only went once.**
A. I'm sorry. I've been to both site visits.
**Q. How long after the first site visit did you go on the second site visit?**
A. I don't recall the exact details, probably three weeks.
**Q. Did the same group of people accompany you on the second site visit as went on the first one?**
A. Yes, they did.
**Q. What was the purpose of the second site visit?**
A. To look at some debris that the owner had dug up out of the ground.
**Q. How long did this site visit last?**

Page 84

A. Approximately an hour.
**Q. What did you do during this hour?**
A. We were shown the debris that the owner dug up out of the ground.
**Q. What did you visually -- what did you see?**
A. There was a hole in the ground with some dirt and fill that had been taken out, and a couple of pieces of material. I don't know what the material was.
**Q. Did it look like asphalt?**
A. I don't know what the material was.
**Q. I'm not asking you if you knew what it was. I'm asking you if it looked like asphalt.**
A. Appeared to be an asphalt type material.
**Q. Does the Foundation have any reason to believe that that asphalt type material had been placed in the ground after the sale?**
A. No.
**Q. Did you have any discussions with anybody from the Foundation as to potential sources of the asphalt that you -- of the material that appeared to be asphalt that you observed during the second visit?**
A. No.
**Q. Did you ever have any discussion with anybody about the potential source of the material that appeared to be asphalt?**

Page 85

A. No.

**Q. Did you have any conversation with anybody from the Foundation about the visit itself? Withdrawn. Did you have any conversations with anybody employed by the Foundation about what was seen at this hole?**

A. I think we discussed in general the fact that there was a hole and that there was some material there, but no conjecture as to where it came from.

**Q. Did anybody suggest taking any further steps in connection with the observations that were made during this site visit?**

A. Do you mean in terms of next steps?

**Q. Uh-huh.**

A. No, not that I'm aware of.

**Q. Did anybody express any concern that any of the materials might be hazardous?**

A. No.

**Q. Was anybody given any responsibilities to take any act in connection with the allegations pertaining to the burial of debris?**

A. No.

**Q. Was anybody given any instructions to take any act with respect to the allegations pertaining to the asphalt or other debris piles in the woods?**

A. No.

Page 86

MR. MORRIS: I have no further questions at this time.

MR. CAMPSEN: I have a couple.

EXAMINATION

BY MR. CAMPSEN:

**Q. Mr. Peck, prior to 2003 what was the use of the mansion and the property?**

MR. MORRIS: Objection, beyond the scope of anything that you have allowed us to ask of the witness. The five-year period was established by the Foundation.

MR. CAMPSEN: You had asked what it was used for before, and I just want to -- it's a lead in question. I'm not going to go into anything before that.

MR. MORRIS: That's fine.

THE WITNESS: Repeat the question again.

BY MR. CAMPSEN:

**Q. What was the property used for prior to 2003?**

A. It was used as an exhibition building as part of the Colonial Williamsburg properties.

**Q. What happened in 2003?**

Page 87

A. We closed the property to the public in an effort to determine what its future use would be.

**Q. How long did it remain closed?**

A. It remained closed to the public until it was sold in December of 2007.

**Q. So between 2003 and 2007 it was closed to the public and was not otherwise used?**

A. That's right.

MR. MORRIS: Objection to the form of the question.

BY MR. CAMPSEN:

**Q. Now, when was this property constructed?**

MR. MORRIS: Objection to the form of the question.

BY MR. CAMPSEN:

**Q. When was the mansion constructed?**

MR. MORRIS: Objection to the form of the question.

THE WITNESS: Can I answer?

BY MR. CAMPSEN:

**Q. Yes.**

A. Roughly 1725, sometime in the early 1700s.

Page 88

**Q. Now, between 2003 and 2007 you testified it was closed. Can you describe generally what happens to a building, and I'm talking about the mansion, a building of this age when it's closed?**

MR. MORRIS: Objection to the form of the question.

THE WITNESS: Generally what we would do is we would close the buildings, do regular inspections to buildings, adjust the temperature and humidity accordingly because it's not open to the public. And that's about it.

BY MR. CAMPSEN:

**Q. When the building is closed do you expect mold to occur in the building?**

MR. MORRIS: Objection to the form of the question.

THE WITNESS: We would expect some mold and mildew to grow inside a closed up building like that.

BY MR. CAMPSEN:

**Q. Would you expect spalling in the building?**

MR. MORRIS: Objection to the form of the question.

Page 89

THE WITNESS: There would be some minor plaster repairs necessary, spalling, cracking of plaster, that sort of thing. It's to be expected.

BY MR. CAMPSEN:

**Q. Why is that?**

A. Generally because the building is closed up and generally because the temperature and humidity levels are adjusted.

**Q. Explain how that occurs, the spalling, the cracking.**

A. The cracking normally happens because plaster shifts or the building moves a little bit. Spalling is normally associated with some sort of water penetration, water, moisture problem, either internal or external.

**Q. And is that typical in a building of this nature?**

A. Very typical in a building of this nature.

**Q. Now, you did a walkthrough inspection in early 2007, and I believe Exhibit 3 were the results of that inspection?**

A. That's right.

**Q. Now, you testified in connection with some of the items in here. For example, Page 1590, Bates stamp 1590, No. 2, in Grandma's Room remove water damage on the south wall. Explain the extent of the water damage that you recall observing.**

A. I don't recall specifically how big it was, but that would generally be some spalling plaster maybe on the face of the fireplace. Water could have come in through flashing, could have come in through the interior of the fireplace, or it could have been from the humidity level on the inside of the building.

MR. MORRIS: I move to strike. The answer is non-responsive.

BY MR. CAMPSEN:

**Q. If in the process of doing your walkthrough, if there were a serious issue in the building, would you have had an investigation, work done?**

MR. MORRIS: Objection to the form of the question.

THE WITNESS: Absolutely. If there was a problem we would have fixed it.

BY MR. CAMPSEN:

**Q. Were any of the things you observed and written down in Exhibit No. 3 of the nature that required further inspection?**

A. No.

**Q. Would you characterize those as typical of those occurrences in a building of this age?**

MR. MORRIS: Objection to the form of the question.

THE WITNESS: Yes, I would.

BY MR. CAMPSEN:

**Q. What was the general condition of the building in 2007?**

A. I think the general condition of the building was in good condition.

**Q. You testified in response to questions on Exhibit No. 5 about the black mold, that black mold was there, or something that looked like black mold was there?**

A. Uh-huh.

MR. MORRIS: Objection to the form of the question.

BY MR. CAMPSEN:

**Q. Do you have any knowledge that it reoccurred after it was cleaned up?**

A. No.

**Q. With respect to the questions concerning the dumping, did the Foundation have any evidence that during its ownership of the property that it ever dumped any asphalt or asphalt like material on the property?**

A. Not to my knowledge.

**Q. Repairs that were done in connection with the sale of the property, why did you do those repairs?**

MR. MORRIS: Objection to the form of the question. Can we be more specific about which particular repairs? There are lists and lists and pages of repairs.

BY MR. CAMPSEN:

**Q. Let's take the repairs that are shown on Exhibit No. 3. What was the purpose of doing all of these repairs shown on Exhibit No. 3?**

A. The purpose was to make the repair so that the house was in better condition, and we wanted to make the house look as good as it could for the sale.

**Q. Did the Foundation attempt to cover up any of the issues and repairs that were necessary to the property?**

MR. MORRIS: Objection to the form of the question.

THE WITNESS: Absolutely not.

MR. CAMPSEN: All right. I have no other questions.

EXAMINATION

BY MR. MORRIS:

**Q. The repairs that were done that we talked about earlier, the replastering and the repainting, once those repairs are finished a perspective buyer can no longer see the conditions that caused you to make the repairs; isn't that correct?**

A. Is that a question?

**Q. Yes. Isn't that correct?**

A. That's correct.

MR. MORRIS: Thank you. I have no further questions.

MR. CAMPSEN: You have a right to read and make corrections to the transcript, which I would recommend that you do.

THE WITNESS: Okay.

(Whereupon, the deposition was concluded at 2:30 p.m.)

Page 94

REPORTER'S CERTIFICATE

I, NANCY C. MANN, Court Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken to the best of my ability of the testimony given by the witness.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

Dated this day of , 2011.

Nancy C. Mann, Court Reporter
Registration No. 7072030

Page 95

A

ability 95:11
able 45:12
Absolutely 47:5 62:18 75:13 91:18 93:22
AC 12:6
access 75:21
accommodate 7:2
accompanied 68:2 80:4
accompany 84:19
accumulate 74:7
accumulated 32:12,12
acquired 21:12 36:7
act 86:19,23
action 29:1 95:15
active 41:3,3 42:13,13 44:10 65:1,5,11,14,18 65:23
actively 60:19 62:20
actual 63:15 72:6
add 24:19
added 30:14
adherence 73:25
adjust 89:9
adjusted 90:9
adjusting 56:4
adjustments 58:22
administrator 73:15,19 73:23
adverse 58:17,19
age 12:10,11 13:1 16:2 89:4 92:2
agent 72:10
ago 79:2,2
agreeing 77:2
ahead 35:1 52:22
air 10:4 11:22 12:3,8,17 12:22 13:6,11,15,21 13:25 14:4 15:13 16:3 18:8
allegations 77:10,13,16 77:21 78:21 86:19,23
allow 36:5
allowed 84:4 87:11
allowing 74:7
amended 30:12
analyses 9:13
analysis 9:4,8 10:9
Anderson 56:3 57:6,11
Andy 79:4
answer 23:19,24 35:1 37:12 44:17,18 82:13 88:21 91:9
answers 6:18
antique 62:10
anybody 13:16,24 14:3 15:12,20 17:19 18:3 19:22,24 20:1 40:2,12 40:17 41:6,10,13,15 45:2,6 46:11,13,16 47:6 49:3,13 50:14 54:7 56:11 59:11 63:22,25 64:1,4 65:3 65:13,21 80:7,10,15 80:22 82:7 85:18,23 86:2,4,9,15,18,22
apologize 48:23 51:8 69:8 73:13
appeared 80:21 85:13 85:20,24
appears 56:2
appreciate 12:12 42:15
appropriate 21:22 47:17 69:23
approximately 16:23 85:1
area 21:9 41:7,10 44:8 45:11 46:3 60:10,11 60:12 79:25 80:1,11
areas 7:24 8:4 11:11 23:20 51:23 60:21,22 60:24 61:7 62:21
arose 61:23
arrive 36:6
asked 11:5,21 14:9,14 23:19 25:10,22 27:15 27:18,24 29:6 40:5 49:1,10,12 56:3 57:6 57:16 87:14
asking 12:12 36:22 48:25 64:20 74:21 85:11,12
aspects 52:8
asphalt 80:19,23 82:3 85:9,12,13,15,19,20 85:25 86:24 93:1,1
asset 16:9 20:18
assets 11:6,20 14:10 15:6,20 17:4
assist 39:11
assistance 17:8
associated 32:8 90:14
assume 14:21 31:7,9 64:8,9 82:19
assumption 59:18,19
ATKINSON-BAKER 1:21
attached 70:2
attempt 45:2 51:4 93:17
attention 23:13 58:14 64:23 73:8
attorney 6:16 95:14
Avenue 3:5
aware 8:8 22:13 36:10 36:12 65:25 73:2 77:15 84:7 86:14
awhile 82:19
a.m 2:18
A50486A 1:25

B

B 3:17
back 17:6 29:23 44:17 44:22 56:20,23 58:22 66:4 73:13 74:2
background 70:22
bad 41:16 44:5,14 45:10 45:19
BANKRUPTCY 1:1 2:1
Barrow 3:10 79:5
base 22:9
basis 56:25 67:20 68:13 77:4
Bates 4:23 5:3,6 33:24 34:3,11,21 38:23 39:1 54:11,14,25 55:1 70:2 70:5 71:20 90:24
bathroom 45:4
beach 79:21,22,24 80:3 80:17
bedroom 43:12 49:5
beginning 34:4
behalf 3:3,9 28:19 66:11 66:16 80:4
believe 21:21,25 31:13 36:23 50:10 58:8 65:18,22 75:3 85:14 90:20
believed 17:19 56:16
best 6:18 40:16,19 43:8 70:19 95:11
better 93:15
beyond 48:7 87:10
bid 69:12
bider 72:24
bids 72:19
big 20:17 91:3
bill 77:3
bit 90:13
black 55:17,19,23 56:6 92:13,13,14
BLACKWELL 3:10
Bob 17:14 29:13 54:8
boiler 11:7,25
boss 27:19 54:8
bottom 54:20 73:18
bought 62:1
Boulevard 1:22
brains 31:23
Brand 1:22
break 7:1 27:8 52:20,23 83:19
bridge 70:20
brief 27:11 83:22
bring 17:6 58:22
broad 7:24 8:4
broader 54:5
broke 17:4
broken 42:12
Brown 72:9,10,12
bubbling 43:16
budget 16:15,21,24 17:2 17:9,12,14,20 18:4,7 18:11,17,19 19:1 22:14,17
budgets 28:6,16
build 69:23
building 11:6,7 17:4 18:20,22 19:4,11 25:14,15 26:5 27:1 29:17,21 30:3,3,4,5 44:12,13 47:14 59:1,2 59:20 61:19,19 70:22 70:25 71:7 75:7 82:5 87:23 89:3,3,14,15,19 89:23 90:7,13,16,18 91:8,14 92:2,8,10
buildings 25:15 29:24 29:25 30:5 32:15 55:12 71:3 89:8,9
bullet 73:10
burial 86:20
buried 77:11
business 31:14,16 35:17
buyer 51:17 56:5,12 64:8 65:25 66:16 77:9 78:22 79:13 94:6
buyers 48:16 59:25

C

C 1:24 2:19 3:1 24:2 95:3 95:22
California 1:1,22 2:1
called 2:15 28:12 73:19
Campsen 4:9 8:15 10:15 12:1 14:16 20:3 24:19 27:9 34:24 45:14 48:6 50:22 51:1 52:21,24 54:22,24 56:25 87:3,7 87:14,21 88:12,17,23 89:13,22 90:5 91:12 91:21 92:7,19 93:10 93:23 94:14
Canoles 2:16 3:10
capital 7:23 8:5
careful 32:20
carefully 49:2
caretaker's 30:2
carpenters 46:22
Carter's 1:7 2:7 3:3 4:20 4:24 6:16 8:9,12,14 9:1,9,16,20,22,25 10:8 13:7,12 15:8,13 16:10 16:17,25 18:17 19:20 19:23 20:8,17,20 21:12,15 22:2,4,10 24:4 30:19 31:8,10 32:9 53:4,7 55:16 56:13,16 61:4,5,6 62:9 74:7,12 75:10,12,21 77:12 78:4,19 83:13
case 1:7 2:7 32:9
casual 20:7,12
categorize 32:16
categorized 32:21
caught 58:13
cause 37:8,11 40:5,9,12 40:17 44:7 45:3,7 49:3 49:10,13,16,19,23 50:1,10 58:9 80:7,10
caused 19:19 43:23 49:5 56:16 94:7
causes 58:25,25
center 30:3 68:25 69:2 69:10,16 70:12,16 72:8 77:11,23 79:7 82:6
certain 23:20 37:4 51:22 58:20
certainly 18:15
CERTIFICATE 95:1
certify 95:3,13
change 37:11
changing 26:7
Chapter 1:8 2:8
characterize 67:3 92:1
charge 7:22
charts 60:16,17
check 67:18
cheek 48:20
chipping 43:16
Chris 56:2 57:6
circumstances 28:11
clarify 6:23
clean 59:8
cleaned 59:17,18 92:21
cleaning 33:10,20
Clements 29:13
close 65:1 89:8
closed 18:19,22 27:1 34:8,19 35:12,14,16 36:3,4,8,11 88:1,3,4,6 89:2,4,14,19 90:7
closing 19:1,11
colleagues 24:18
collections 55:10
Colonial 1:15 3:9,14 4:18 7:8,9 20:1 21:5 23:5,8 31:20 87:24
column 34:17 38:1,2
come 17:18 27:14 33:11 47:13 73:13 75:18 79:13 82:4 91:5,6
coming 75:25
commencing 2:18
comment 47:20
commissioned 63:5
committee 14:13
communicate 54:5
communicated 69:13
communicating 62:24
communication 11:18 50:1
company 5:4 63:19,23 64:1,7,13,15 65:4 78:11
complete 6:18 16:24 35:18
completed 35:13,20
compliance 77:6
complied 74:15,22 76:20
concern 59:2 86:15
concerned 61:18 62:3,5 62:11,13,17
concerning 9:14 10:9 92:23
concerns 61:23,24
conclude 77:5
concluded 94:20
condensation 44:11
condition 10:14,23 11:1 11:6,22,23,23 12:11 12:17,21,25 13:1 17:5 41:14 43:7,15 44:4,8 45:3,7,21 59:3,5 92:8 92:10,11 93:15
conditioning 10:4 11:23 12:3,8,18,22 13:6,11 13:15,22,25 14:4 15:14 16:3 18:8
conditions 50:11,20 51:5,17 94:7
conducted 27:16 62:20 63:18 66:21
confirm 23:15
confusion 6:23
conjecture 86:8
connection 9:1 24:7,13 25:3,24 26:19 27:5,16 27:21 32:18,24 35:8 64:2 86:10,19 90:23 93:3
considering 15:5
constructed 88:13,18
construction 7:23 8:2 75:1 76:3
contained 60:6 66:6
contemplate 18:7
content 47:3
continue 34:9
contract 5:7 71:23 72:5 72:6 73:14,19,23 74:17 77:2 82:24
contractor 33:4 38:2,5 68:25 69:9 71:1 72:5,7 72:16 74:6,15,21 76:10,15,19,23 77:5 77:21,25 78:2,3,5 82:25
contractors 36:14,19 69:12 72:18,20
contractor's 73:24 84:1
contractual 74:3,16
contribute 68:3
conversation 11:8 17:23 18:2 20:8,19 40:1 50:13 64:4 78:14,17 86:2

conversations 20:13 47:2 49:22 81:15 86:4
Con't 5:1
coordinate 25:11 29:6
coordinator 25:22
core 21:9
corner 70:15 73:9
corporate 11:10
correct 22:7,14 35:14,15 35:24 42:16,19 45:13 51:13,14,18,21,24 52:9,17 67:1 68:18,19 74:1,5,9,14 77:7,8 94:8,10,11 95:10
corrections 94:15
cost 16:23 17:6 18:8 22:13,16 31:22 38:2
costs 16:16 18:1 19:7,10 32:11,23 37:4 38:1,5
cottage 30:2
COUNSEL 3:14
county 69:13
couple 73:10 74:25 85:7 87:3
course 7:12 26:9 31:11 31:14,16 35:17
court 1:1,21 2:1,19 44:21 56:22 95:3,22
Courthouse 2:17 3:11
cover 50:20,23,24 51:4 93:17
covered 26:18
cracking 90:2,11,12
create 32:7
created 26:13 27:5 30:8 30:8,13 34:12,13 72:14
creation 66:24 68:3
creations 71:3
crew 15:7 33:10,20
cupboards 60:10
curator 55:10
current 6:16 23:18
currently 7:5
CW 63:5
CWF 64:25
CWF01589 4:23 38:23 39:2
CWF01599 4:23 39:2
CWF01741 33:25
CWF05046 5:6 70:5
CWF05053 5:6 70:6
CWF05839 5:3 54:14
CWF05843 5:3 54:14

D

D 4:1
damage 39:19,21 40:2,6 40:9,13,17,21,25 41:2 41:7,21 42:11,16,19 42:22,22 43:25 49:8 49:10,13,16,20,23 50:2 58:25 59:1 84:6 90:25 91:1
date 34:6,6,7,16,18,19 38:6,7
Dated 95:16
day 65:10 95:16
days 69:7
day-to-day 75:2 76:9
deal 76:9
debris 74:4,7 76:11 77:22 78:12 80:2,3,16 80:20,23 84:23 85:3
86:20,24
Debtor 1:9 2:9
December 8:9 88:5
decide 15:7 19:19
decided 16:17,25 19:23 69:16
deciding 72:24
decision 19:13,15 20:5 20:25 22:1,3,5,6,17 25:9
decisions 9:11 26:11
decrease 57:14
defined 28:2 67:14
definition 67:14 83:17
degrees 57:7
deliberations 16:11
delivered 30:17
demolish 69:16 71:1 72:7
demolished 68:25 70:18 71:4,8
demolishing 69:9
demolition 69:12,20 70:12 73:11 74:4,12 77:22 78:12 83:1
demonstrate 78:8,11
departing 84:2
department 56:3
depicted 71:12
Deponents 4:19 23:6,9
deposited 80:3
deposition 1:14 2:15 7:12 63:21 94:19
depressions 80:1,8
describe 9:24 11:3 12:21 24:3,15 25:2 28:11 29:25 32:4 60:24 79:23 89:2
described 14:10 15:21 16:16 30:9 39:16 44:4 56:6 66:23 67:23 68:16 72:16 78:17 80:16
describing 37:20
designate 25:11
Designation 4:18 23:5,9
details 84:17
determine 17:6 44:7 49:3 88:2
determined 29:8
detract 47:23
develop 15:3
developed 21:17 69:11 72:19
difference 34:8
different 32:15,15 60:8 62:16
direct 23:13 64:23
directly 25:21
director 7:17,21 8:1 28:14
dirt 85:6
disclose 56:5
disclosed 56:12
discovery 2:16
discuss 17:19 19:22
discussed 10:14,23 81:18 86:6
discussion 9:4,9 10:9 10:13,22,25 18:5 20:16 46:10 80:24 81:19 82:4,20 85:23
discussions 9:13 11:8 64:25 81:2,5,8,12
85:18
disposal 73:10
dispose 74:11 82:25
disposed 76:16,24 78:11
disposing 76:25
disseminated 54:7
distinct 26:18
DISTRICT 1:1 2:1
division 1:2 2:2 55:10
document 23:4,14,16,21 23:23 26:18 30:24 31:3,6,15 34:3,8,20,25 36:13,17 37:7,14,21 37:22 38:23 39:7,9,10 39:15 40:22 46:9,17 46:20,21 53:4,12,13 53:16,23,24 54:1,4,7 64:21 68:11,17 70:1 70:10,16 71:4,19 72:2 72:12,14
documentation 78:8,10
documents 11:17 14:12 31:14 33:24 53:17 61:13 66:25
doing 75:6 78:20 91:13 93:12
dollars 18:24 33:15,21 34:23 35:6 37:5,15
dormer 44:1
dormers 43:21 50:8
drainage 80:13
drapes 26:7
drawing 61:6
drive 75:23
dug 84:23 85:3
duly 6:2
dump 79:15,18
dumped 76:11 77:12 92:25
dumping 92:24
duties 7:20,25 28:12

E

E 3:1,1 4:1
earlier 36:23 37:19 39:16 83:25 94:5
early 24:22 29:11 38:12 59:25 66:24 67:16,24 88:25 90:19
Edwards 79:4
effect 47:21 50:14
effervescence 42:2
effervescent 51:12
effort 33:12,19 40:8 44:7 45:6 69:21 88:2
efforts 21:9 29:6,8 32:8 32:12 47:24
either 34:6,12,18 77:11 90:15
electrical 12:3
elements 59:4
eliminate 6:23
eliminated 19:10
email 54:20 55:5,13 56:1 56:7 57:5 60:9
emails 5:3 11:17 54:11 54:14 60:6
employed 7:5 76:6 86:4
employee 95:13
employees 52:11
employer 7:7,14
engendered 11:8
entered 34:5
entire 43:8,10 53:21
entitled 53:4 71:19
entries 34:10,11 35:5
entry 34:9,21,22 37:14 37:23 38:8,15 49:6
environment 57:10 59:3 61:20
environments 55:12
Ernest 29:13
ESQUIRE 3:4,10
established 74:20 87:12
esthetic 48:12
estimates 28:22
eventually 17:14
evidence 92:24
exact 84:17
exactly 46:23
examination 4:6 6:5 87:5 94:1 95:8
examined 6:3
example 90:24
exceeded 33:14
exceeds 34:22
excerpts 4:20 30:16,19
excess 56:17 58:9
Excuse 62:4
executing 28:25
exercise 42:10
exhibit 23:4,10 30:16,21 33:23 38:23 39:3 53:3 53:8,16,19,20,21,23 54:11,15 60:7,13,16 63:2 64:12,12,16 66:4 68:13,17 70:1,6 71:18 71:18,24 72:16 90:20 91:23 92:13 93:12,13
exhibition 87:23
Exhibits 4:14,16 5:1
exist 70:19
existed 61:24 82:15
existence 56:6
exit 75:11 84:2,3,4
expect 89:14,18,23
expected 13:6,8,12 14:14 15:6 16:6 90:3
expenditure 33:14
expenses 22:25 37:9
expensive 22:21,23
experience 28:1,4 73:1
expertise 48:7
Explain 90:10 91:1
express 80:7,10 86:15
expressed 12:14 13:14 13:24 14:3 15:11,19
extent 50:23 91:1
exterior 32:14
external 90:15

F

F 5:7 71:20,23 72:15,22 72:25 73:3 78:6
face 17:17,17,19,19,22 17:23,25,25 18:2,2 91:5
facilities 81:10,11
facility 17:4
fact 21:17,22 22:2,10 24:11 49:16 76:19 86:6
factor 22:17
factors 72:23
fair 10:7 34:3 38:14 42:23 45:22 50:18 51:6,20 52:13 59:5
66:21 74:4,8
familiar 18:16,20 19:18 25:23 39:6
far 78:17
felt 16:10 43:7
fewer 19:6
File 1:25
fill 85:7
final 17:20 18:4
financially 95:14
find 14:12
fine 7:4 87:18
finished 94:6
fireplace 91:5,7
firm 64:10
first 6:2 34:9 57:7,23 59:1 61:23 64:24 65:9 67:16 71:19 77:15 79:1,25 84:15,20
fit 21:6
fits 21:4
five 16:11,12 24:4 72:18 72:20
five-minute 83:19
five-year 87:12
fixed 41:16 44:15 91:19
flashing 50:7,10 91:6
floated 15:10
floor 1:22 3:5 43:12 45:3 49:5
flooring 62:10
floors 57:7
focus 21:8
focussing 30:6 58:11
follow 75:16
follows 6:3
foregoing 95:4,10
forever 82:11
form 22:6 88:9,14,19 89:5,16,24 91:16 92:3 92:16 93:5,20
formal 53:15 67:7,10,13 67:15,16,17,23 72:6
format 31:15
formed 25:10
forth 18:1 95:5
Forty-five 78:15
forwarded 56:2
found 46:16
Foundation 3:9,14 7:10 7:13,21 8:1,8,13 13:16 16:17,25 19:19,23 20:22 21:12 23:19,25 24:18 27:22 28:19 32:24 33:14 37:1 49:19 50:10 56:11,15 60:19 61:17,18 62:2 62:13,17 63:25 65:4 66:11 69:16 72:23 73:3 76:6,16,20,24 77:5 85:14,19 86:3,5 87:13 92:24 93:17
Foundations 1:15 4:18
Foundation's 23:5,8,22 47:24 52:11 73:23
fountain 20:19
four 67:8 72:18,20 76:2 79:2
frame 8:16 9:17 14:16 20:4 60:4
Francisco 1:2 2:2
free 59:5,5
front 82:5 84:5
furniture 25:18 26:7

61:5
**further** 86:9 87:1 91:24 94:12 95:13
**future** 15:3 88:2

G

**Gail** 3:14 79:5
**gee** 82:10
**general** 3:14 8:24 11:2,3 12:11 15:23,25 28:23 32:21 38:17 62:22 79:9 86:6 92:8,10
**generally** 9:24 12:25 16:7 20:15 25:23 26:1 26:2,22 28:20 32:7 38:2,4,20 57:8 66:9 89:2,7 90:7,8 91:4
**give** 6:18 11:5,11,12,21 14:14 15:6 72:18
**given** 13:1 16:2 60:18 86:18,22 95:12
**giving** 47:6
**Glendale** 1:22
**global** 53:18,20
**go** 17:2 23:14,23 35:1 52:22 57:9,18,19 58:21 75:9 84:4,5,10 84:15 87:16
**goal** 42:21 45:17,19
**goes** 58:23 70:20 71:20
**going** 6:17 7:12 14:12 15:8 16:10 23:13 27:16 28:22 33:23,23 34:2 38:22 40:21,24 41:21,23 48:6,25 50:22 54:6 64:11,20 64:23 71:17 73:13 75:4,24 87:16
**good** 6:8,9 13:1 28:2 59:3,4 92:11 93:16
**Grandma's** 40:9,13 90:25
**gravel** 80:2,16,20,23 82:5
**ground** 80:2 84:24 85:4 85:6,16
**grounds** 11:24
**group** 11:9 14:13,23,24 15:1,2,9,12,20 68:7 84:19
**Grove** 1:7 2:7 3:3 4:20 4:24 6:16 8:9,12,14 9:2,10,16,20,22,25 10:8 13:7,12 15:8,13 16:10,17,25 18:17 19:20,23 20:9,17,20 21:12,15 22:2,4,10 24:4 30:19 31:8,10 32:9 53:4,7 55:16 56:13,16 61:4,5,6 62:10 74:7,12 75:10 75:12,22 77:12 78:4 78:19 83:13
**grow** 57:10,22 89:19
**growing** 82:18
**guess** 64:12
**guidelines** 61:25
**Gussman** 27:19 29:3

H

**hallway** 20:19
**happen** 28:3 76:1
**happened** 36:9 71:15
75:18 87:25
**happening** 43:17
**happens** 61:4 89:2 90:12
**happy** 7:2
**harmed** 62:14
**hauling** 75:8
**hazard** 48:2,5
**hazardous** 86:16
**head** 38:13
**health** 48:2,4
**hear** 81:21
**heard** 65:7,8,9
**Heath** 76:5,6
**Heath's** 76:8
**heating** 10:3 12:2
**held** 7:18
**help** 33:11 37:25
**helped** 32:16
**helps** 31:23
**Henry** 3:15
**high** 57:21 58:15,17
**higher** 58:4,5
**hired** 38:10 70:25
**historic** 21:9
**History** 4:21 30:20 31:9
**hole** 85:6 86:5,7
**hour** 79:11 85:1,2
**hours** 29:16
**house** 25:12,12,13 47:17 52:8 93:15,16
**houses** 44:2
**humidity** 56:4,17 57:9 57:17,19 58:4,5,7,9,11 58:13,16,21 60:18,20 60:25 61:8,11,17 62:15,20 89:9 90:8 91:7
**Hurst** 29:13
**hygrothermograph** 60:17
**hypothesis** 81:25
**hypothesize** 12:10 81:22

I

**idea** 34:16
**identification** 4:16 23:10 30:21 39:3 53:9 54:16 64:17 70:7 71:24 83:9
**identified** 13:21 25:14 26:5 49:16,19 63:8 65:25 73:22 81:24 83:6
**identify** 39:12 40:5,8,12 40:17 45:2,7 49:10 80:22 83:12
**identifying** 68:8
**identity** 49:13
**impact** 58:19
**impacts** 58:17
**implement** 28:12
**implementation** 27:20 28:8
**implemented** 34:12,13
**included** 27:4 36:15
**increasing** 58:6
**incurred** 32:24
**Independent** 61:13
**individual** 46:22
**information** 34:15 66:5 81:4
**initial** 67:2
**initially** 27:5
**inside** 44:12,13 62:9 89:19 91:8
**inspect** 64:7
**inspection** 5:5 24:21,23 63:15,17 64:2,13,15 66:10,15 67:3,7,13,14 67:19 68:11 78:20 90:19,21 91:24
**inspections** 63:5,9 66:6 66:8,19,21 67:5,10,20 68:15,16,21 78:23 89:8
**inspectors** 62:24
**installed** 13:3
**instance** 11:22 16:2 32:8 33:10
**instruct** 47:9
**instructed** 52:11
**instructions** 42:18 47:6 71:5,9 86:22
**intended** 39:12
**intention** 48:15
**interested** 95:15
**interior** 11:23 32:14 55:11 58:7,18 59:3 61:19 62:2,6 91:6
**interject** 34:24
**internal** 55:11 90:15
**internally** 20:17 69:14
**interpret** 21:7
**investigated** 41:5
**investigation** 91:15
**invoices** 36:6
**involved** 8:23 9:3,9,11 9:19,21,25 10:22 22:3 28:21 55:15 63:14,16 81:1,7,12
**involvement** 10:8
**issue** 91:14
**issues** 93:18
**Item** 26:17 43:19 63:3
**items** 16:24 25:16 68:1,3 69:22 72:7 78:4 90:24
**iteration** 53:15
**iterations** 68:14

J

**January** 9:5,8 24:22 26:23 27:5
**jmorris@pszjlaw.com** 3:7
**job** 77:3
**John** 3:4 6:15 73:16
**JONES** 3:4
**judge** 22:23

K

**K** 5:7 71:20,23 72:15,22 72:25 73:3 78:6
**Kaufman** 2:16 3:10
**keep** 53:13 58:20
**keeps** 31:21
**Ken** 78:6
**kind** 8:15 56:13
**kinds** 11:6
**kitchen** 60:10,11,12
**knew** 46:23 65:14 77:13 85:11
**know** 6:22 7:2 10:2,5 12:10 13:20 18:19 19:6,15 22:23,25 23:23 26:11 27:24 32:17,23 33:3 44:3
48:1,4,8,16 50:7,12 53:12 55:7,13 56:11 59:16 60:15,22 61:1 63:25 64:4,6 65:3,6,11 70:10 71:15 73:4 74:15,21,24 76:11 80:25 81:7,11,15,18 83:16,16 85:8,10
**knowledge** 6:19 8:24 11:10,10 15:23,25 24:6,11 28:23 40:16 40:19 63:9,17 66:5,10 66:15,20 70:19 83:2 92:20 93:2
**known** 7:9 8:9 65:1,5,11 65:14

L

**landfill** 83:5,6,10,13,17
**Larry** 76:5
**lasted** 79:7
**lasts** 13:9
**late** 19:16 27:14
**law** 2:16
**lawyers** 23:22
**lead** 87:15
**leak** 41:3,3 42:13,14 44:10,11
**leaks** 65:1,5,11,14,18,23
**learn** 77:9
**learning** 77:20
**leave** 22:4
**leaving** 75:20,25 84:1
**led** 21:21,25
**left** 75:10
**legal** 83:2,4,5,6,10,13,17
**legally** 74:11 76:16,25 82:25
**letter** 18:1
**let's** 9:18 12:6 14:21 49:4 51:8,22 52:6 83:19 93:11
**level** 15:10 17:7 54:5 57:9,17,19 58:11,13 91:7
**levels** 56:4 58:5,5,16 90:8
**lieu** 43:9
**life** 13:6,12,16
**limit** 8:16 9:17
**limited** 24:6
**list** 26:8,13,16,16,22,24 27:4 30:7,11 31:7 68:3
**listed** 46:8
**listen** 44:18 49:2
**Listing** 4:22 39:1
**lists** 93:7,7
**little** 58:15,16 90:13
**live** 6:13,14
**LLC** 1:7 2:7 3:3
**LLP** 3:4
**located** 79:20,21
**long** 7:3,18 20:18 29:15 78:14 79:6 84:15,25 88:3
**longer** 42:11,22 45:21 94:6
**look** 34:23 63:2 79:14 84:23 85:9 93:16
**looked** 17:5 43:6 85:12 92:14
**looking** 26:17 34:3 36:13,17 37:7 57:5 61:14 66:4 67:9 70:14
79:14
**looks** 59:12 60:9
**loosely** 28:2
**lot** 16:22 28:1 33:19 69:1 69:17 71:11 77:11,23 82:5
**lots** 20:19
**low** 79:25 80:11,13,13
**lower** 70:15
**lowered** 58:7
**lowest** 73:1,6
**lunch** 52:23 53:1
**Lynch** 5:4 63:18,23 64:1 64:5,7,13,15 65:4

M

**magnitude** 18:25
**maintained** 54:1 68:4
**maintenance** 18:16 19:1 19:6,10 22:13,16 24:3 24:6,12 25:2,19,24 26:3,14,19,20 27:15 27:21 28:5,9,13,15,16 28:18,21,23 29:1,4 30:7,11 31:19,25 32:25 33:15 37:9 38:11,15 56:3 68:8
**making** 9:11 28:2 39:11
**management** 7:22,23 8:3,5 28:1,4,22 31:19
**manager** 75:1 76:3
**Mann** 1:24 2:19 95:3,22
**manner** 32:4 41:2 68:20
**mansion** 13:21 29:18,19 29:22 30:6,8,12 44:9 45:13 46:3,7,11,14,17 51:23 53:22 60:6,20 61:7 65:11,15,19,23 87:9 88:18 89:3
**March/April** 60:4
**Margaret** 72:9,10
**mark** 23:3 30:15 33:23 38:22 53:3 54:10 64:11 69:25 71:17 79:4 81:9
**marked** 23:9 30:20 39:2 39:7 53:8 54:15 64:16 68:17 70:6,14 71:23 73:9,17
**material** 36:6 38:3 59:1 62:9 85:8,8,10,13,15 85:20,24 86:7 93:1
**materials** 62:12 73:11 74:11 76:17,25 83:1 86:16
**Mays** 3:17
**mean** 9:5 50:24 67:16 79:9 86:12
**means** 24:16
**meant** 55:22
**mechanical** 28:14
**memorial** 70:13 71:11 71:12
**memos** 11:17
**mentioned** 35:13 60:13 62:5
**message** 21:4
**met** 72:19
**Methos** 4:20 30:19 31:8 31:18,19 32:2,5 33:1,2 33:5 34:5 36:15,20,25 37:9
**middle** 80:1,11 82:18
**mildew** 45:25 46:2,6,11

Case: 11-30554 Doc# 66 Filed: 07/01/11 Entered: 07/01/11 12:26:30 Page 37 of 41

46:13,16 47:7,10,18 47:22 48:1,4,11,14,15 48:16 52:2,4,7,8,12,16 59:5 89:19
miles 83:13,15
million 18:24 82:11
mind 37:19
Mine 54:23
minor 90:1
minutes 79:8
modified 30:12 68:13
moisture 90:15
mold 44:12 50:18,19 51:7,22,23 52:1,5,7,8 52:12,16 55:17,20,23 56:6,12,16 57:10,15 57:22 58:10,12 59:5,8 59:16 89:14,18 92:13 92:13,14
moment 30:7 73:14 75:19 79:10
monitor 73:24
monitoring 60:19
months 26:9,9
morning 6:8,9 78:1
Morris 3:4 4:7 6:7,15 8:17,19 10:18,20 12:5 14:18,20 20:5,11 23:3 23:12 25:1 27:8,13 30:15,23 33:22 34:1 35:4 38:22 39:5 44:16 45:1,16 48:10 50:24 51:3 52:19,22 53:3,11 54:10,18,23 55:1,3 56:19 57:4 64:11,19 69:25 70:9 71:17 72:1 73:17,21 83:18,24 87:1,10,18 88:9,14,19 89:5,16,24 91:9,16 92:3,16 93:5,20 94:3 94:12
move 44:17 91:9
moves 90:13
moving 25:18 26:7
museum 25:12,16 30:3 55:12 69:22

**N**

N 3:1,15 4:1
name 6:10,15
names 81:11
Nancy 1:24 2:18 95:3,22
nature 81:4 90:17,18 91:23
near 13:12,15
necessarily 35:20 36:2 36:8
necessary 15:24 16:1 16:16 25:11,16 29:7,8 32:9 39:13 53:14,21 90:2 93:18
need 15:21 16:3,10
needed 15:7 43:12 47:11 47:13 66:1 68:4
needs 50:8
negative 38:13
never 50:13 51:25 64:10
new 3:6,6 21:17 42:3,7 44:6 45:10,20
newspaper 77:17 78:21
non-formal 68:16,21
non-responsive 91:10
non-stock 38:1,2
normal 13:6 58:5
normally 90:12,14
North 1:22
NORTHERN 1:1 2:1
Nos 4:23 5:3,6 33:25 38:23 39:2 54:11,14 70:2,5 71:20
noted 54:21
notes 95:11
notice 80:19
November 65:10,13,17 65:21
numbers 18:20

**O**

oath 95:6
object 8:15 45:14 48:6 50:22 56:25
objection 34:25 87:10 88:9,14,19 89:5,16,24 91:16 92:3,16 93:5,20
objections 95:7
objects 58:25 61:19,21 62:7,8
observation 50:18 82:21 82:22
observations 60:5 68:10 68:21 86:10
observe 39:21 42:15 45:12 51:17 75:24
observed 40:6,10,13,18 41:8,14,21 44:8 45:3,7 45:21 50:11,20 51:5 51:12,18,23 52:7,12 58:10 59:16 80:8,11 80:23 82:15 85:21 91:22
observing 91:2
obviously 20:16
occasion 28:5 68:6
occasions 73:2 74:25
occur 16:6 89:15
occurred 21:20 35:23 66:20 67:24
occurrences 92:2
occurs 90:10
October 38:7,12
offer 78:10 80:15
offered 23:25
office 2:16
oh 82:10 84:12
okay 7:3 24:24 51:1,19 58:1 73:12 83:18 94:17
old 13:2,4 51:15
older 44:2
once 25:9 45:10 48:14 84:13 94:5
open 19:4 59:24 89:10
operate 22:22,24
operating 30:5
operation 23:1 28:21 74:12
operations 28:15 83:1
opinion 11:5,14 12:7,16 13:10,15,25 14:4 15:2 15:12,19 20:21,23 22:6,9,17 47:19 80:7 80:10,15
opinions 11:11,12,16,21 12:13 14:9,12,15 15:6 15:10
opportunity 57:22
opposed 16:18 21:10 26:20
options 15:3,5
order 4:20 30:20 32:7,10 32:13,13,14,19,22 33:8,12 34:7,7,18 35:12,16 36:7,10 72:6
orders 31:7 32:15 34:4 34:11 35:8,14 36:1
ordinary 31:14,15 35:17
original 37:11 59:1 62:9 62:12,14
ought 21:8
outcome 80:25
outlying 21:10
outside 33:9
overall 18:10
oversee 27:15 28:5
overseeing 28:18 31:24 35:9 75:2
overseen 27:20
owner 6:16 23:18 80:4 84:23 85:3
ownership 92:25

**P**

P 3:1,1
PACHULSKI 3:4
page 4:6,16 5:1 23:14 34:10,11 39:18,22 40:3 42:25 43:19 46:21,21 48:19 50:16 50:17 54:21 55:1 63:3 70:14,15 71:13,19 73:8,14,17 74:2 90:24
pages 34:21 47:3 60:15 93:8
paint 43:7,15
painted 41:22 42:4 59:17
painters 46:22
painting 26:6 42:7 43:8 43:9
panelling 62:10
paper 59:14,15
paragraph 57:23 64:24
parking 69:1,17 71:11 77:11,23 82:5
part 10:12 14:24 15:9 21:7,15,22 22:2,10 25:7 28:4,21 29:10,12 29:19 63:9,16 66:6,22 67:20 69:21 74:17 75:12 87:23
particular 12:13 17:12 38:7,14 44:8 45:13 46:2 57:12 61:10 75:19 81:24 93:7
parties 36:19 37:2 95:14
parts 46:6 60:6
party 33:9 37:20,23 38:10 64:6 66:11,16
pasture 80:1,12,14
patched 41:1,11,22,24
patience 49:1
Patricia 55:5,7,9
Patty 59:12
Peck 1:16 2:15 4:7 5:6 6:1,8,12,13,15 23:3,10 23:13,18 27:14 30:15 30:20,25 34:2 38:22 39:3,6,7 52:9,13 53:8 53:12 54:15,19 55:4 60:7,13 64:12,16,20 68:17 69:25 70:1,5,6 70:10 71:18,24 72:16
87:8
peeling 43:16
pending 7:3
penetration 90:14
people 22:5 25:10,21 28:15 55:14 68:2,7 81:10,12 84:19
perceive 18:4
perform 27:24
performance 73:24
performed 24:7,12 25:3 32:5 36:14 63:9 66:6 66:16
performing 38:11
period 9:14 10:21 11:1 12:8,18,23 13:10,17 14:1,5 15:14 16:6 18:17,21 21:21 87:12
periods 26:18
permitting 69:13
persistent 41:18
person 17:13
personally 17:15 39:21 46:25 56:8 58:8
personnel 64:25
perspective 48:15,24 51:17 52:17 53:18,20 56:5,12 59:25 94:6
pertaining 86:19,23
photographs 5:6 70:2,5 70:11 71:4,8,10
phrase 40:22 55:17
physical 11:6
physically 50:24 51:4
piece 27:22
pieces 17:5 85:7
piles 82:8,14 86:24
place 33:20,24 60:12 95:5
placed 36:17 37:7,14 85:15
places 51:11,16 52:12 60:8
planning 7:17,21,23 8:1 8:6
plans 29:1
plaque 71:12,15
plaster 26:6 42:3,7,12 43:25 44:5,6 45:10,11 45:12,19,20 49:8,10 49:13,16,19,23 50:1 50:17 51:13,15 62:12 62:17 90:2,3,12 91:4
please 6:10,22 25:6 42:25 48:19 56:20 63:2
point 16:3 21:14 35:14 35:16 36:7 42:10 46:4 77:14
points 73:10
possibility 57:14
possible 42:7 50:1 58:23
Possibly 42:6
post 19:1
potential 79:15,18 85:19 85:24
preparation 4:24 17:8 24:8,14 26:14,21 27:3 29:4 32:1,18,25 33:4 33:11,15 35:9,11,19 36:2,24 37:10 38:11 38:16,19 51:5 53:5,7 55:15 63:10,14,20 66:7,22 67:21
preparations 4:22 39:1 39:12
prepare 25:17 29:7,9 32:9 39:13
prepared 16:15 18:7 23:21,24 35:8 39:10 39:15 53:24
preparing 16:21 47:16
presence 51:23 56:12
present 3:17 17:12,15 72:12
presented 23:15 72:21
presents 48:1,4
president 78:6
previous 41:5 44:22 56:23
previously 30:17 41:11 41:14 48:16 52:7
price 73:1,6
primarily 70:12
primary 22:25
printed 46:21
prior 8:4,12,23,24 9:2,4 9:8,16 24:4 27:1 28:14 35:8,20 40:16 41:7 49:18,23,25 50:3 61:24 62:25 63:6 64:2 64:7 66:13,17,20 67:6 68:11 70:11 82:6,8,15 87:8,22
privy 22:22
probably 84:17
problem 41:16,17,18 44:14 45:12 46:14 51:13 56:16 57:24 58:3,4 69:7 90:15 91:19
problems 13:20 46:13
proceedings 95:4
process 60:2 91:13
prohibited 74:6
project 7:22 8:5 9:19,22 9:24 28:1,2,4,22
projected 16:16
proof 76:16
properly 78:11
properties 21:10 31:21 87:24
property 6:17 8:9 9:12 9:14 10:10,13,14,23 10:23 11:1,9,11 15:4 19:14 20:22 22:21,24 23:18 24:7,13 25:3,10 27:22 29:7,9,17,22 30:1 53:14 56:13 59:24 62:1 63:5 66:7 67:9 68:7 69:22 75:12 77:10,12 78:20 79:9 84:1,3,5 87:9,22 88:1 88:13 92:25 93:1,4,19
proposals 72:21
provide 14:9 23:19 76:16
provided 12:7
provision 73:15,18
provisions 74:16,22 76:21 77:6
public 19:5 25:13 27:2 88:1,4,7 89:10
purchase 72:6
purchased 38:3
purchasers 52:17
purchasing 72:10
purportedly 66:1

purpose 15:1 38:10 51:15 54:4 57:12 79:12,14,16 84:22 93:12,14
purposes 50:21 68:8 69:9 72:16 78:20
pursuant 23:6 71:5,8
put 15:2 16:22 26:8 33:19 38:2,4 42:3 44:5 83:5 95:6
putting 17:2 45:20 47:3 75:8
p.m 94:20

**Q**

quarter 18:24
quarters 30:4
question 6:21 7:3 14:2 14:21 21:24 37:12,13 40:23 44:16,18,19,22 45:18 48:3 56:18,19 56:23 59:7 62:16 82:13 87:16,19 88:10 88:15,20 89:6,17,25 91:17 92:4,17 93:6,21 94:9
questions 6:17 18:3 23:20,25 48:25 49:2 87:1 92:12,23 93:24 94:13
quickly 26:12
quote 43:1 57:24 59:8 64:24 65:1,5 67:17 82:25

**R**

R 3:1,10
raise 57:6,8,11,16,17 59:7
ravine 70:20
rbblackwell@kaufcan... 3:13
read 44:16,21 56:19,22 59:14,15 61:1,3 74:22 78:21 94:14
really 24:17 51:25 53:22 54:5 59:2
rear 70:13
reason 48:12 52:15 65:18,22 69:19 85:14
reasons 19:18,22 48:12 62:19
recall 10:12,25 11:14,16 11:19 13:14,18,24 14:3 15:11,19 16:20 16:23 17:10,22 18:10 18:12,13 19:13,16 20:12,15 26:2 33:13 35:7 37:5 39:24 40:1 43:23 46:2,4,6,8,10 47:6 49:4,7,9,12,15,18 49:22,25 55:4,6 56:15 57:5 60:5 61:7,10 77:18 79:20 84:17 91:2,3
receipt 56:1
received 55:4
reception 30:3 69:2,9 70:12,16 72:8 79:7
recess 27:11 53:1 83:22
recollect 15:15
recollection 12:7,13 14:7 36:14,18,24 37:8 43:4,11,14,17,18 59:13 60:3 61:16
recommend 94:16
recommendation 15:15 15:18
record 6:11 31:21
recorded 36:20 68:11,22 95:8
recreation 68:25 69:5,16 77:11,22
recurring 46:14
reduce 57:10
reduced 19:10
reduces 57:22
refer 7:13 57:24 73:10
reference 39:18 43:1,20 45:24 48:20
references 50:17
referred 24:5 26:24 39:22 40:3 60:7 76:4 83:3
referring 7:14 24:20 58:3
refers 34:17 37:23
reflect 38:15,18,20
reflected 11:17 32:2,5 32:19 33:1,5,6,7 36:25 46:17 52:8 71:8
reflects 37:9 38:1,17
refresh 36:13,18
Registration 95:23
regular 67:20 68:13 89:8
relating 50:1
relationship 53:17
relative 78:20 95:13
remain 88:3
remained 88:4
remains 70:21
remember 11:4 12:17 18:6 46:19
removal 42:21 48:11 74:3
remove 40:21,24 42:18 47:7 51:7 72:7 83:4 90:25
removed 47:11 76:17 78:3
removing 47:22 51:15
rendered 36:19
reoccurred 92:20
repainted 44:6 45:11
repainting 45:20 51:16 94:5
repair 22:14,16 24:3,6 24:12 25:3,19,24 26:3 26:6,14,19,20 27:15 27:21 28:5,9,13,16,18 28:24 29:1,4 30:7,11 31:25 32:25 33:15 37:10 38:11,15 41:24 42:1,12 43:20 44:3 68:8 93:14
repaired 41:4,5,11,23 42:14 68:4
repairing 48:20 50:17
repairs 66:1 90:2 93:3,4 93:7,8,11,13,18 94:4,6 94:7
Repeat 87:19
rephrase 6:22 10:18 14:2
replaced 10:4 15:21 16:4,11 45:11 50:8
replacement 10:3 15:13 16:6 18:8
replacing 48:20
replastering 43:20 50:19 51:9,11,16 94:5
report 5:5 25:21 30:16 52:3 64:13,16 65:10
REPORTED 1:24
reporter 2:19 44:21 56:22 95:3,22
REPORTERS 1:21
REPORTER'S 95:1
represent 23:21 60:18
representation 65:8 76:20,24
represented 77:5
request 24:2 63:4 78:22
requested 79:13
requests 23:22
require 15:13
required 6:18 42:1 43:15 74:10,17,20 82:25 91:23
requirements 68:8 73:25 74:3 82:24 83:3 83:4
residence 25:13 69:23 69:24
respect 8:13 9:9 12:7 23:20 24:12 25:20 26:3 28:8 29:4 30:8 36:1 66:1 67:23 69:8 86:23 92:23
respond 59:11
response 23:22 55:25 92:12
responsibilities 7:20,25 8:13,21 9:15 28:12 86:18
responsibility 8:3,5 25:19 28:16,18 55:11 62:23 76:8,9,15
responsible 16:20 26:10 75:2
rest 25:15
result 19:7,10 30:9,13 58:23
resulted 13:21 66:24
resulting 73:11 74:11 83:1
results 90:20
retain 15:8 16:17,25 19:19
retained 62:24 64:6
retention 15:12 68:24 69:8
rethink 37:8
retract 17:24
revenue 22:22
reviewed 77:7
reviewing 54:20
right 20:25 22:1,7,18 31:13 37:5,6,18 38:20 38:21 42:8,9,20 51:9 52:24 53:20 57:15 61:1,3 66:25 73:7 74:13 84:3 88:8 90:22 93:23 94:14
right-hand 34:17 70:15 73:9
road 75:11,15,22 79:21 79:22,24 80:3,17 84:6
Robert 3:17
Rockefeller 70:13
role 8:2 27:25 28:25
Rollin 79:4 81:14
Ron 29:13 75:15,22
roof 11:7 50:7 63:18 64:7 65:19,23 66:2
Roofing 5:4 63:18,23 64:1,7,13,15 65:4
room 4:22,22 11:7 24:21 24:21,22,22 39:1,1,12 39:13,13 40:9,13 43:8 43:10 45:8 46:22,24 46:25 47:4 61:5,6 90:25
rooms 61:10
rough 18:20
roughly 8:3 9:3,5,12 13:3 18:23,24 21:13 26:23 88:25
Rule 23:6

**S**

S 3:1
sale 4:24 8:12,20,24 9:2 9:16,18,21 21:14,21 24:4,8,14 25:17 26:15 26:21 27:4,16,22 29:5 29:7,9 32:1,10,18,18 32:25 33:5,11,16 35:10,11,20,21,23 36:2,11,25 37:10 38:12,16,19 39:12,14 40:17 47:16,17 49:18 49:23,25 50:3,6,9,21 51:5 53:5,8,14 55:16 62:25 63:6,10,15,15 63:16 64:3,7 66:7,13 66:17,20,22 67:6,12 67:21 68:11 82:8,15 85:16 93:4,16
San 1:2 2:2
sanded 42:5
sanding 42:7
sat 17:18
saw 39:24 49:5 50:2 53:16 74:25 75:5,7,11 79:23 83:25
saying 49:25
says 31:8 54:23 59:8 64:24
scope 7:25 48:7 69:11 72:19 87:10
scraped 44:5 45:10
scraping 45:19
second 39:18 43:12 45:3 49:5 57:7 70:15 80:1 84:7,16,20,22 85:21
seconds 78:15
see 16:15 23:15 24:8 35:6 37:13 39:19 43:2 43:21 45:25 48:21 50:6,16 55:17 57:25 59:8 63:3,6,10 65:1 73:9,11,18 75:5,9,14 75:24 76:1 85:5 94:7
seeing 46:2,6
seen 23:16 30:24 31:13 31:15 63:20 64:21 66:25 68:14 72:2 82:7 82:11 86:5
selected 60:21,22,25 62:21 72:18,21
selectively 43:1,9
sell 19:14,19,23 21:1 22:1,4,7,17 25:9 47:24
selling 16:18 20:8,17,20
sending 77:3
sense 18:25 21:6
sent 17:25 55:13
sentence 57:23 64:24
separate 26:13,16
September 58:9 59:25
series 6:17 54:11
serious 91:14
serviceable 17:7
services 36:14,19
set 27:21 95:5
setting 25:13 57:6
shakes 38:13
shared 54:8
shifts 90:13
short 15:14,22 27:8 52:20
shorthand 95:11
show 34:2 37:17
showing 70:12
shown 79:18 85:3 93:11 93:13
sides 43:20 44:1
signature 72:13
Silence 55:5,7,9,22
Silence's 56:6
sir 6:20 23:16 45:17 60:14 63:24 73:22 75:17
sit 17:16 83:12
site 4:24 31:22 38:3 39:11 53:4,7,21 67:18 69:23,24 70:13 72:20 74:8 75:10,22 76:17 77:1 78:4 79:6,7,14,25 81:19 82:25 83:5 84:8 84:10,14,15,16,20,22 84:25 86:11
sites 79:15,18,22,24
size 18:10
slave 30:4
smoking 61:5
sold 8:8 59:20 88:5
somebody 47:20 63:8 69:23
somewhat 48:24
sorry 36:21 52:2 54:24 84:14
sort 21:10 25:12 26:8 31:23 60:3 62:10 79:25 90:3,14
source 80:15,22 82:3 85:24
sources 81:24 85:19
south 43:21 91:1
southeast 43:12
space 57:9,18 58:6,18 58:20 60:18
spalling 89:23 90:2,10 90:13 91:4
speak 63:22 77:25 78:5
speaks 34:25
specific 31:22 32:20 53:22 63:9 66:5 74:22 93:6
specifically 9:3 10:2,6 11:20 13:19 18:6 20:14 28:20 29:3 49:7 57:16 71:10 73:4 91:3
speculation 45:14 57:1 82:2
spoke 64:1
spoken 77:21
spot 45:13 46:7 75:19

80:13
spreadsheet 17:25
Spring 77:19
Springs 75:15,22
stable 30:4,5 82:5
stamp 90:24
stamped 55:1
stamping 54:25
STANG 3:4
start 12:6 49:4
starting 26:23 66:9
state 6:10 13:25
statement 63:13
STATES 1:1 2:1
status 54:6
stenographically 95:9
step 32:11 51:8
steps 41:25 86:9,12
storage 61:6
Street 2:17 3:11,15
strike 44:17 91:9
structure 71:7
stuff 13:9
subjected 61:8,11
subsequent 68:10
suggest 59:8 82:7 86:9
suggestion 82:14
suitable 61:21
Suite 2:17 3:11
suited 43:8
summarized 24:5
supervisory 28:25
sure 8:17 11:13 12:20 13:18 14:6,11,11 15:10 18:5,9,14 23:23 26:10 27:9 30:14,14 31:17 33:17,18,20 36:12 37:16 41:1 52:21 59:2,6 61:20
sworn 6:2
system 11:23 12:6,8,18 12:22 13:11,15,22,25 14:4 15:14 16:3,9 18:8 31:18,19,20 32:2,6,10 33:1,2,5,8,12 34:5 36:7,15,20,25 37:9
systems 10:3 12:2,3 15:21

T

take 7:1 25:16 27:8 34:23 51:8 52:19,22 63:2 69:21 83:19 86:18,22 93:11
taken 2:16 27:11 42:3 53:1 70:11 71:11 78:19 83:22 85:7 95:4 95:11
talk 51:22 79:9
talked 94:4
talking 20:3 54:25 89:3
tape 46:25
taped 46:22
tasks 28:9
Taylor 17:14,15 29:13 54:8
team 25:10,13
tearing 75:7
tedious 48:24
tell 11:20 34:8,15,19 37:21,22 39:9 41:6,10 46:13,16 65:14,22 66:4 72:15 73:4 78:2 82:17
temperature 56:4 57:6,8 57:12,17 58:6,21 60:18,20,25 61:8,11 61:17 62:15,19 89:9 90:8
ten 16:13 79:8
term 15:22 40:25 50:23 67:23 83:19
terms 11:2,3 86:12
tested 51:25
testified 6:3 36:23 37:4 83:25 84:2 89:1 90:23 92:12
testify 63:4
testimony 95:7,12
testing 60:25 61:8,11,17 62:20
Thank 52:19 94:12
thing 26:8 62:11 73:24 90:3
things 16:7 76:10 91:22
think 10:4,15 12:15 15:17,23 16:2 17:24 17:25 18:2 19:16 20:25 21:3,4,8 24:19 24:21 43:6 62:5 79:5 80:24 84:1 86:6 92:10
third 1:22 3:5 36:19 37:1 37:20,23 38:10 66:11 66:16 80:2
third-party 33:4
Thomas 1:16 2:15 4:7 6:1
thought 54:24 84:12
thousand 33:14,21 34:23 35:6 37:5,15
three 7:24 26:9 29:16 67:8 73:5 76:2 79:1,21 84:18
time 7:1,25 8:16 9:15,17 11:1 12:18,22,23 13:5 13:11 14:5,16 15:14 16:5 17:10,18 19:16 20:4,5,18 26:18 27:14 27:25 29:23 30:12 35:12,14,16 36:5 41:7 41:21 50:9 51:9 54:2,2 60:4 61:23 63:5 65:9 72:11 77:20 79:1,3 87:2 95:5,5,8
times 67:8 73:5 76:1 82:11
title 7:16,18
titled 23:4 70:1
Toano 6:14
today 7:16,21 65:7,8 70:19,21 83:13
told 64:25 65:4 78:3
Tom 5:6 6:12 70:1,5
topic 23:20
topics 23:25
Tori 27:19 29:3
touch 43:1,9,12,15
tour 29:17,18,21 39:15 40:2,6,10,14,18 67:23 68:3,7 80:5
town 21:8,15,23 22:2,11
track 31:22 53:14
trade 32:11
transcribed 95:9
transcript 94:15 95:10
transfer 25:12 63:15,16
transport 74:10
transporting 76:25
trees 82:18
tried 17:5
trips 78:19
trucks 75:8,9,19,24 84:1
true 10:11,17 29:2 31:12 35:25 37:3 42:24 45:23 52:10,14,18 63:13 73:22 95:10
try 6:22 58:20 80:22
trying 36:21 81:22
Tuesday 2:18
turn 25:11 34:10 39:18 42:25 43:19 48:19 63:3 73:8,14 74:2
two 8:4 26:9 53:17 57:7 69:7 73:5 80:1
type 30:24 85:13,15
typical 44:1 90:16,18 92:1

U

Uh-huh 22:15 42:17 43:3 51:10 59:10 66:22 69:6 86:13 92:15
unappealing 47:18,23
understand 6:19,21,24 7:14 36:21 37:25 48:23 67:22 68:15 74:19
understanding 13:5 14:25 16:5 19:9 21:11 31:2,5 40:20 41:17,20 41:25 55:19 58:2 61:22 69:15,19 82:23
understood 16:1
uneven 51:12
unique 73:25
unit 13:7
UNITED 1:1 2:1
update 68:17
updated 54:2
use 15:3 41:23,24 52:2,4 52:6 87:8 88:2
useful 13:12,16
Usually 13:9 36:5

V

validate 31:8
variations 62:15
various 52:8 68:14
viewing 59:24
Virginia 1:17 2:17 3:12 3:15 6:14
visible 42:2,11,23 45:21 52:16
visibly 47:18,23
visit 79:6,7,12,16 81:20 84:8,10,15,16,20,22 84:25 85:21 86:3,11
visitor 82:6
visits 84:14
visually 85:5

W

W 5:4 63:18,22 64:1,5,6 64:12,15 65:4
wack 58:21,24
WADDELL 3:14 73:16
walked 25:14 26:5
walkthrough 24:8,13,15 25:4,7,20,25 26:4,20 26:24 27:6 29:10,12 29:15,19 30:9,13 63:10 66:7,24 90:19 91:13
walkway 70:18
wall 41:1 91:1
walls 43:2,7,9 44:1 48:21 49:8
want 23:14,23 52:16 57:19 67:22 84:5 87:15
wanted 26:6 52:15 61:20 69:23 93:15
warehouse 38:4
wash 47:9 52:12,15
washed 48:14 50:18
washing 45:24 48:15 50:19
wasn't 15:9 19:4 21:17 21:22 32:19 44:10 45:17
watching 76:10
water 20:19 39:19,21 40:2,6,9,13,17,21,25 41:7,20 42:11,15,18 42:21,22 90:14,15,25 91:1,5
Watergate 50:25
way 22:20 32:2 62:22 75:22,25
week 67:8
weeks 79:1,2 84:18
Wenger 79:4 80:6 81:9 81:13,16
went 9:19 10:5 17:14 43:6 67:18 79:1 84:12 84:20
west 45:4 49:5
We'll 79:9
we're 20:8
we've 64:10 73:5 74:20 77:6
Williamsburg 1:15,17 2:17 3:9,12,14,15 4:18 7:8,10 20:1 21:5,8 23:5,8 31:20 87:24
Wilson 5:7 71:20,23 72:15,22,25 73:3 78:6 78:6,7,10
winning 72:24
withdrawn 29:18 35:13 38:6 48:14 49:4 67:2 82:24 86:3
witness 2:15 4:6 10:17 12:2 20:7 23:19 24:3 24:24 33:24 35:2 38:13 44:24 48:8 57:2 63:4 87:12,19 88:21 89:7,18 90:1 91:18 92:5 93:22 94:17 95:6 95:7,12
WITNESSES 4:4
Wolley 79:4 81:14,16
wondering 83:2
wood 62:15
woods 86:24
woodwork 62:10
word 24:15,17 41:24,24 52:2,4,4 67:15
words 52:6
work 4:20 8:23 9:1,19,22 9:24 10:3,4,5 15:24 16:1 24:7,12 25:3,11 25:16,22 26:6,9,11,14 26:22 27:21 28:13,18 28:22 29:7 30:20 31:7 31:9,9,11,21,23,25 32:1,5,7,9,10,13,13,14 32:15,16,17,19,21,21 32:22 33:3,7,8,12,15 34:4,6,7,11,18 35:7,9 35:12,13,13,16,18,19 36:1,5,7,10,24 37:19 37:20,23 38:15,18 40:20,24 44:3 53:14 53:21 54:6 67:19 69:11,12,14 72:19,19 73:25 75:2,24 91:15
worked 17:10 69:13
workers 39:11 46:23 47:3,9
working 14:13,23,24 15:1,2,7,9,12,20
works 31:22 56:3
wouldn't 27:4 33:7 41:23 48:16 51:17 59:20
write 43:23 49:6
written 11:17 33:22 34:7 34:19 91:23
wrote 43:5 52:7 67:25

X

X 4:1

Y

yeah 14:18 17:17
year 61:24
years 13:4,9 16:8,11,12 16:13 24:4
York 3:6,6

Z

ZIEHL 3:4

$

$1,000,000.00 18:11
$500,000.00 18:13,14

1

1 4:18 23:4,10 24:2 26:17 48:20 49:5,6 63:2 66:4
10017-2024 3:6
11 1:8 2:8
11-30554(TC) 1:7 2:7
11:00 2:18
12 65:10
12th 65:13,17,21
134 3:15
1590 90:24,25
1593 42:25
1594 43:19
1598 50:16
1599 50:17
1700s 88:25
1725 88:25
1969 21:14
1974 13:3
1987 82:6
1995 7:19 8:1,20 9:18,25 28:14,17

2

2 4:20 30:16,21 43:19 63:3 90:25
2:30 94:20
2002 9:21 10:1,7,13,16 12:23 14:22

**2003** 9:12 10:15,21 12:8 12:18,24 13:11,17 14:1,16 18:17,21 21:18 41:18 87:8,22 87:25 88:6 89:1
**2006** 10:8,14,15,21 12:9 12:19,24 13:11,17 14:1,22 18:18,21 19:17 27:14 28:17 38:7,12
**2007** 8:10 9:3,5,6,8,12 9:23 21:14 24:20,22 26:23 27:5 29:11 31:24 34:5,10,12,22 35:5,8,23 36:3 46:11 58:9 59:25 60:4,19 61:8,11,17,23 62:17 65:11,13,17,21 66:9 66:24 67:5,16,24 88:5 88:6 89:1 90:20 92:9
**2008** 36:4,9
**2009** 8:3,4
**2011** 1:18 2:18 77:19 95:17
**212)561-7700** 3:6
**23** 4:19
**23rd** 38:7,12
**23185** 3:15
**23188** 3:12
**24** 1:18 2:18
**29** 54:21,22,23 55:1

**3**

**3** 4:22 38:23 39:3,7 52:9 52:13 53:16,21 60:7 60:13 90:20 91:23 93:12,13
**30** 4:21 13:4,9 16:8
**30(b)(6)** 23:6
**300** 2:17 3:11
**36th** 3:5
**37** 71:21
**39** 4:23 54:22

**4**

**4** 4:24 21:18 43:1 45:24 53:4,8,19,20,23 68:13 68:17
**40** 13:9 16:8 55:1
**43** 54:12
**45** 28:15
**46** 70:14
**4801** 2:17 3:11

**5**

**5** 5:3 21:18 23:14 54:15 63:3 92:13
**5th** 58:9
**50** 83:13
**500** 1:22 83:15
**5027** 71:20
**5029** 73:9 74:2
**5030** 73:17
**5046** 70:3
**53** 4:24 70:3
**54** 5:3
**551-7300** 1:23
**5839** 54:12
**599** 38:24

**6**

**6** 5:4 21:18 64:12,16
**6,94** 4:7
**64** 5:5
**69** 21:13

**7**

**7** 5:6 70:1,6
**70** 5:6
**7072030** 95:23
**71** 5:7
**741** 34:3,22 35:2
**742** 33:25 34:11,22 35:2
**743** 33:25 34:22
**744** 33:25 34:22
**757)220-7220** 3:16
**757)259-3833** 3:12
**780** 3:5

**8**

**8** 5:7 71:18,24 72:17
**818** 1:23
**87** 4:9

**9**

**91203** 1:22
**95** 9:20 10:5